Phillip Kim (PK 9384)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD BAKER, DERIVATIVELY ON BEHALF OF KANDI TECHNOLOGIES GROUP, INC., | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** |
| v. | **(1) BREACH OF FIDUCIARY DUTY;** |
| XIAOYING ZHU, XIAOMING HU, CHENG WANG, BING MEI, JERRY LEWIN, HENRY YU, and LIMING CHEN, | **(2) UNJUST ENRICHMENT;** **(3) ABUSE OF CONTROL;** **(4) GROSS MISMANAGEMENT;** **(5) WASTE OF CORPORATE ASSETS; AND** |
| Defendants, | **(6) VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| And | |
| KANDI TECHNOLOGIES GROUP, INC., | **JURY TRIAL DEMANDED** |
| Nominal Defendant. | |

Plaintiff Richard Baker ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Kandi Technologies Group, Inc. ("Kandi" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Xiaoming Hu,

1

Xiaoying Zhu, Cheng Wang, Bing Mei, Jerry Lewin, Henry Yu, and Liming Chen (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Kandi, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(A) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Kandi, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Kandi's directors and officers starting on November 15, 2013 and through the present (the "Relevant Period").

2.      Kandi is an automotive manufacturing company with primary business operations comprised of designing, developing, manufacturing and commercializing electric vehicles ("EV"), EV parts and off-road vehicles. The Company conducts its business operations through its wholly-owned subsidiary, Zhejiang Kandi Vehicles Co., Ltd. ("Kandi Vehicles") and the partially and wholly-owned subsidiaries of Kandi Vehicles, including Kandi Electric Vehicles Group Co., Ltd. (the "JV Company").

3.      In 2013, the Company teamed with Geely Automobile Holdings Ltd. ("Geely") to set up a 50/50 joint venture (the "JV Company" or "Joint Venture") for the purpose of manufacturing EVs.  At the time, lucrative subsidies were given out by China's central and provincial governments to manufacturers and purchasers of EVs, and the Company entered into the joint venture with Geely in order to take advantage of them.  Kandi has derived almost all of its revenue from its stake in the Joint Venture since they entered into it.  The Company, however, was "double dipping" in the two subsidies.  In early 2016, Chinese officials began to learn of the subsidy scheme engaged in by the Company and several other manufacturers.  The "double dipping" of the Company and other manufacturers has caused the Chinese government to reduce the subsidy program and mandate to eventually remove the program altogether by phasing out subsidies over the next four years.

4.      Prior to Chinese officials becoming aware of the subsidy scheme, Kandi ran a specific business model.  The Company would sell auto parts to the JV Company and the JV Company would produce the EVs and sell them to an entity called Zuozhongyou ("ZZY").  ZZY purportedly used the EVs purchased from the JV Company to run a car share operation.  However, this business model was filled with conflicts as 9.5% of ZZY is owned by Kandi and an additional 13% of ZZY is owned by the Company's Chairman, defendant Xiaoming Hu.

5.      The Company's business model allowed them to obtain both of the subsidies offered by the Chinese government (one for manufacturers and one for purchasers of EVs), as the JV Company was eligible for the manufacturer subsidy, and ZZY, which was created for this purpose, was able to take advantage of the other subsidy as a purchaser (the "Fraudulent Subsidiary Scheme").  Thus, Kandi would manufacture parts for EVs, sell them to the JV Company, which would then manufacture EVs, and ZZY would buy the EVs.  This allowed

them to "double dip."  As noted in a *Seeking Alpha* article published on August 2016 and titled, "Kandi Technologies: Chinese EV Clunker Begins to Break Down Amid Subsidy Scandal, 70% Downside," the benefits the Company derived from both subsidies could be worth more than the cost of building the EVs.

6.      By early 2016, as noted above, the subsidy scheme engaged in by the Company and other manufacturers began to come to light, and the Company was at the center of an investigation conducted by one of China's biggest financial journals, *Caixin*, due to its part as one of the originators of the scheme.  *Caixin* published a story on Kandi and China's EV subsidy fraud issue.

7.      Once the widespread subsidy fraud began to be exposed, Kandi's sales began a precipitous fall, as EV producers began to be investigated by Chinese regulatory agencies.

8.      Upon the EV subsidy scheme being exposed, Kandi reported that the JV Company's sales came to a complete stop in the first quarter of 2016, as the JV Company sold zero EVs during that period.  The JV Company additionally reported for the first quarter of 2016 negative $500,000 in revenue, and Kandi revealed that it had not received any subsidies for EV sales that occurred in 2015.

9.      Per the August 2016 *Seeking Alpha* article, Kandi's auditor, Albert Wong & Co., was banned from the auditing industry a few weeks after news emerged that the subsidy program would be eliminated.  The Company's auditor was banned because it failed to investigate obvious signs of fraud engaged in by Kandi's management, which included a financial controller of the Company and defendant Xiaoming Hu producing personal bank account statements as evidence of Kandi's cash on hand.

10.     On July 25, 2016, Geely announced that it was going to sell its 50% stake in the Joint Venture at a valuation that was barely above book value.

11.     On November 14, 2016, the Company announced the abrupt resignation of Defendant Cheng Wang ("Wang"), the Company's Chief Financial Officer ("CFO") at the time.

12.     On this news, shares of Kandi fell $0.40, or over 10%, from its previous closing price to close at $3.50 per share on November 14, 2016.

13.     Approximately four months later, on March 13, 2017, the Company unexpectedly announced in a Form 8-K filed with the SEC that the Company's previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 could no longer be relied upon and would need to be restated. The Company also revealed that "there were deficiencies in its internal controls over financial reporting that constitute material weaknesses" at all the relevant times.

14.     On this news, shares of Kandi fell $0.30, or approximately 6%, from its previous closing price to close at $4.05 per share on March 14, 2017.

15.     On March 16, 2017, the Company filed an annual report on Form 10-K with the SEC (the "2016 10-K"), in which the Company restated its consolidated financial statements for the years ended December 31, 2015 and 2014 and its unaudited quarterly financial data for the first three quarters for the year ended December 31, 2016 and 2015. The Company acknowledged its previous failures and inabilities to make proper, accurate and complete financial disclosures and identified the material weaknesses that have long been residing in the Company's internal controls over financial reporting.

16.     On this news, Kandi's share price fell $0.35, or 8.6%, to close at $3.70 per share on March 16, 2017.

17.     Throughout the Relevant Period, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material adverse fact. Specifically, the Individual Defendants caused the Company to: 1) fail to correctly classify certain cash and noncash activities related to notes receivable, notes payable, accounts receivable and accounts payable in the Company's statements of cash flows; 2) fail to disclose the amount of related party transactions on the face of the Company's balance sheets and income statements; 3) fail to transfer the $7.5 million of construction-in-progress[1] recorded in 2014 back to the advances to suppliers or prepayments to reflect the changed completion status of its Hainan facility; 4) fail to properly report the income taxes for each reporting period during the Relevant Period; 5) fail to include separate audited financial statements for its equity investment in the JV Company; 6) engage in the Fraudulent Subsidiary Scheme; 7) fail to disclose that the Company's previously issued financial statements for the first three quarters for the year ended December 31, 2016 and the years ended December 31, 2015 and 2014, contained numerous other sections that the Company was required to adjust; 8) fail to disclose that the Company lacked effective disclosure controls and internal controls over financial reporting; and 9) fail to disclose that the Company lacked sufficient expertise to ensure the accuracy and completeness of its accounting treatment and financial reporting.

18.     Moreover, the Company failed to disclose that the Company had to readjust its public filings with regard to: 1) the classification of notes receivable and notes payable in the Company's statements of cash flow and certain related party accounts on its Balance Sheets and its Consolidated Statements of Income (Loss) and Comprehensive Income (Loss); 2) audited

---

[1] As defined by the Company, construction in progress represents the direct costs of construction, the acquisition cost of buildings or machinery and design fees. Capitalization of these costs ceases, and the construction in progress is transferred to plant and equipment, when substantially all the activities necessary to prepare the assets for their intended use are completed. No depreciation is provided until the assets are completed and ready for their intended use.

financial statements for the Company's equity investment in the Joint Venture; 3) Kandi's unaudited quarterly data for the first three quarters ended December 31, 2016; 4) the section titled "Construction-in-Progress of the Notes to the Company's Consolidated Financial Statements;" 5) the section titled "Taxes of the Notes to the Company's Consolidated Financial Statements;" 6) the section titled "Summarized Information of Investment in the Joint Venture of the Notes to the Company's Consolidated Financial Statements;" and 7) the section titled "Taxes of the Notes to the Company's Consolidated Financial Statements."

19.     Moreover, the Company's management awarded themselves excessive compensation while the wrongdoing described herein was occurring.  For the fiscal year ended December 31, 2015, the Company awarded management stock-based compensation in the total of $22,306,987.  According to the Company's annual report on Form 10-K filed with the SEC on March 14, 2016, that amount accounted for 68% of Kandi's operating expenses and 78% of its gross profits.  In the first six months of the fiscal year 2016, according to the Company's quarterly report on Form 10-Q filed with the SEC on August 9, 2016, management's stock-based compensation rose 200% (to $15,134,658) from the same period in the prior year.

20.     In light of the Individual Defendants' misconduct, which has subjected Kandi and its Chief Executive Officer ("CEO")-Chairman, its current CFO, and two of its former CFOs to being named as defendants in four federal securities fraud class action lawsuits pending in this Court (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and of certain of them in the Securities Class Actions, their being beholden to each other, and their not being disinterested and/or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the federal securities class action based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

24.     Additionally, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff is a citizen of Pennsylvania and none of the Defendants is a citizen of Pennsylvania, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

25.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     Venue is proper in this district because a portion of the transactions and wrongs complained of herein, including the Defendants' participation in the wrongful acts detailed

herein, have occurred in this district. In addition, the Defendants have conducted substantial business in this district, and have derived substantial compensation from their activities in this district.

**PARTIES**

**Plaintiff**

27.      Plaintiff is a current shareholder of Kandi common stock, has continuously held Kandi common stock throughout the Relevant Period, and purchased in 2012 the Kandi common stock that he currently owns.  Plaintiff is a citizen of Pennsylvania.

**Nominal Defendant Kandi**

28.      Kandi is a Delaware corporation with its principal executive offices at Jinhua City Industrial Zone, Jinhua, Zhejiang Province, People's Republic of China ("PRC") 321016. Kandi's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "KNDI."

**Defendant Hu**

29.      Defendant Xiaoming Hu ("Hu") has served as the Company's Chairman of the Board, CEO, and President since June 2007. According to the Company's Schedule 14A filed with the SEC on November 2, 2016 (the "2016 Proxy Statement"), as of October 17, 2016, Defendant Hu beneficially owned 13,138,077 shares of the Company's common stock, which was about 27.54% of the Company's issued and outstanding common stock.[2]  Given that the

---

[2] The 2016 Proxy Statement disclosed that because Defendant Hu became the sole stockholder of Excelvantage Group Limited ("Excelvantage") on March 29, 2010, he has the power to dispose of or direct the disposition of the shares of Kandi stock held by Excelvantage. As a result, Defendant Hu may also be deemed to be the beneficial owner of the shares owned by Excelvantage. Therefore, the number of shares owned by Defendant Hu, as the Company disclosed in the 2016 Proxy Statement, includes (i) 1,138,077 shares owned directly by Mr. Hu, and (ii) 12,000,000 shares owned by Excelvantage

price per share of the Company's common stock at the close of trading on October 17, 2016 was $5.40, Hu owned about $70,945,616 million worth of Kandi stock.

30.     For the fiscal year ended December 31, 2015, Defendant Hu received $3,842,504 in compensation from the Company.  This included $29,076 in salary, $1,195,000 in stock awards, and $2,618,428 in option awards. According to the Company's 2016 10-K, for the fiscal year ended December 31, 2016, Defendant Hu received $3,087,831 in compensation from the Company.  This included $27,331 in salary and $3,060,500 in option awards.

31.     The Company disclosed in the 2016 Proxy Statement that Defendant Hu is not considered an independent director under the NASDAQ listing rules.

32.     Upon information and belief, Defendant Hu is a citizen of the PRC.

33.     The Company's 2016 Proxy Statement stated the following about Defendant Hu:

**Hu Xiaoming** was appointed as our Chief Executive Officer, President and Chairman of the Board in June 2007. Prior to joining the Company, from October 2003 to April 2005, Mr. Hu served as the Project Manager (Chief Scientist) in the WX Pure Electric Vehicle Development Important Project of Electro-vehicle in the State 863 Plan. From October 1984 to March 2003, Mr. Hu served as: (i) Factory Director of the Yongkang Instrument Factory, (ii) Factory Director of the Yongkang Mini Car Factory, (iii) Chairman and General Manager of the Yongkang Vehicle Company, (iv) General Manager of the Wan Xiang Electric Vehicle Developing Center and (v) the General Manager of the Wan Xiang Battery Company. Mr. Hu personally owned 4 invention patents and 7 utility model patents, which he transferred to the Company in fiscal year 2012. Mr. Hu's experience as our Chief Executive Officer and President, as well as Chairman of the Board, and extensive scientific and operational knowledge and expertise qualifies him to serve as Chairman of the Board and led the Board to conclude that he should be nominated to serve another term as a director.

34.     Defendant Hu has a 13% ownership interest in Zhejiang ZuoZhongYou Electric Vehicle Service Co., Ltd. (the "Service Company"), in which the Company has a 9.5% ownership interest.  According to the 2016 Proxy Statement, Service Company owed Kandi $40,606,162.

35.     Defendant Hu's son, Wangyuan Hu, is the sole officer and shareholder of Eliteway, which imported the Company's products to the U.S.  As of December 31, 2014, the Company was owed $620,410 by Eliteway.

**Defendant Zhu**

36.     Defendant Xiaoying Zhu ("Zhu") was the Company's CFO from June 2007 until her resignation on April 30, 2015.

37.     According to the Company's 2016 Proxy Statement, for the fiscal year ended December 31, 2015, Defendant Zhu still received $1,310,090 in compensation from the Company.  This included $26,844 in salary, $119,500 in stock awards, and $1,163,746 in option awards. According to the Company's 2016 10-K, for the fiscal year ended December 31, 2016, Defendant Zhu again received more than one million in compensation from the Company. For 2016, Defendant Zhu received $1,377,019, which included $16,797 in salary and $1,360,222 in option awards.

38.     Upon information and belief, Defendant Zhu is a citizen of the PRC.

39.     The Company's annual report filed with the SEC on March 16, 2015 (the "2014 10-K") stated the following about Defendant Zhu:

> **Zhu Xiaoying** was appointed as our Chief Financial Officer and a director of the Company in June 2007. In addition, since September 2003, Ms. Zhu has served as Chief Financial Officer of Zhejiang Kandi Vehicles Co., Ltd., our wholly-owned operating subsidiary. From January 2000 to September 2003, Ms. Zhu served as the Accounting Manager for Zhejiang Yonkang Automobile Manufacture Co. Ms. Zhu graduated from Hangzhou Electronic Engineering University. Ms. Zhu acquired CIA certificate in 2010 and EMBA certificate from Hong Kong Polytechnic University in 2011.

**Defendant Wang**

11

40.     Defendant Wang was the Company's CFO from May 1, 2015 until his resignation on November 14, 2016. Defendant Wang currently serves as the Chief Strategy Officer ("CSO") of the Company. He has also served as the Company's director since May 20, 2015.

41.     For the fiscal year ended December 31, 2015, Defendant Wang received $1,613,074 in compensation from the Company.  This included $80,717 in salary, $77,675 in stock awards, and $1,454,682 in option awards. According to the Company's 2016 10-K, for the fiscal year ended December 31, 2016, Defendant Wang received $1,801,700 in compensation from the Company.  This included $101,422 in salary and $1,700,278 in option awards.

42.     Pursuant to the Form 8-K filed by the Company with the SEC on November 18, 2016 ("11/18/16 8-K"), the compensation to Defendant Wang for his role as the CSO follows the same terms pursuant to the employment contract between the Company and Defendant Wang dated March 20, 2015. Under Defendant Wang's 2015 employment agreement, Defendant Wang shall receive an annual salary in the amount of RMB1,200,000 (approximately $193,080) and an annual bonus in the amount of at least RMB300,000 (approximately $48,271) at each year end based on the Company's results of operations and his performance, which may be in the form of equity. Defendant Wang's employment agreement is effective from May 1, 2015 for three years until April 30, 2018.

43.     The Company disclosed in the 2016 Proxy Statement that Defendant Wang is not considered an independent director under the NASDAQ listing rules.

44.     Upon information and belief, Defendant Wang is a citizen of the PRC.

45.     The Company's 2016 Proxy Statement stated the following about Defendant Wang:

> **Wang Cheng (Henry)** was appointed as Chief Financial Officer, effective May 1, 2015. Mr. Wang has over 20 years of international financial management

experience. Before joining the Company, Mr. Wang served as CFO for Shanghai Always Marketing Service Co., LTD., one of the largest field marketing service agencies in China, leading its procurement and finance departments since May 2014. Prior to that, Mr. Wang worked for Renesola Ltd. (NYSE: SOL), an international leading brand and technology provider of green energy products, initially as Vice President of Finance since January 2010, ascending to CFO in July 2011. Mr. Wang holds both certifications as Certified Public Accountants ("CPA") in China and Certified Internal Auditor ("CIA"). He earned a Master's degree in Law from Renmin University of China and a Master's of Business Administration from the Open University of Hong Kong. Mr. Wang's prior experience in accounting and finance qualifies him to serve a director of the Company and led the Board to conclude that he should be nominated to serve us as a director.

**Defendant Mei**

46.     Defendant Bing Mei ("Mei") has served as the Company's CFO since November 14, 2016. He was also elected as a Company director on December 16, 2016.  According to the Company's 2016 10-K, Defendant Mei's three-year term employment agreement entered with the Company in November 2016 granted him the right to receive an aggregate 10,000 shares of common stock each year, vested in four equal quarterly installments of 2,500 shares.

47.     For the one and a half month of service in 2015, Defendant Mei received $30,000 in compensation from the Company, all in salary.

48.     The 11/18/16 8-K disclosed that the Company and Defendant Mei entered into an employment agreement on November 14, 2016, pursuant to which Mr. Mei shall receive an annual salary in the amount of $180,000, an annual living allowance in the amount of $20,000, an aggregate of 10,000 shares of the Company's common stock in four equal quarterly installments of 2,500 shares under the Company's 2008 Omnibus Long-Term Incentive Plan or any available plan in the future, and an equity incentive at each year end based on the Company's results of operations and his performance. The employment agreement is effective from November 14, 2016 for three years until November 13, 2019.

49.     The Company disclosed in the 2016 Proxy Statement that Defendant Mei is not considered an independent director under the NASDAQ listing rules.

50.     Upon information and belief, Defendant Mei is a citizen of the PRC.

51.     The Company's 2016 10-K stated the following about Defendant Mei:

**Mei Bing** was appointed as Chief Financial Officer, effective November 14, 2016, and was elected as a director of the Company on December 16, 2016. Mr. Mei is a seasoned financial executive with over 15 years of distinguished corporate executive career with large multinational enterprises and middle market companies in the U.S. and China. Prior to joining the Company, Mr. Mei served as Chief Financial Officer and Board Secretary of Skystar Bio-Pharmaceutical Company, a publicly traded leading biotechnology company in China since July 2011. From June 2015 through June 2016, Mr. Mei also served as an Independent Non-Executive Member of the Board of Directors and Chairman of Audit Committee of PharmaMax Corporation in China. From January 2006 through July 2011, Mr. Mei served as Chief Financial Officer of Avineon, Inc., a multinational technology company in the U.S., where he managed the Company's global financial operations in North America, Asia and Europe. Previously, Mr. Mei served as Controller of Arrowhead Global Solutions, Inc. (now part of Harris Corporation), a global provider of satellite communications to remote and harsh environments in the U.S. In addition, Mr. Mei served as Controllers of PICS, Inc. and Thompson Hospitality Corporation, a member of the Compass Group family of companies. Mr. Mei received a B.S. in Economics from Zhejiang University in Hangzhou, China and holds an M.B.A. from The Fuqua School of Business at Duke University where he graduated with distinction as a Fuqua Scholar. Mr. Mei is a Certified Public Accountant (CPA) in the State of Maryland, a Certified Management Accountant (CMA), a Chartered Global Management Accountant (CGMA), and a Certified Valuation Analyst (CVA).

**Defendant Lewin**

52.     Defendant Jerry Lewin ("Lewin") has served as a director of the Company since November 2010. Defendant Lewin is a member of the Audit Committee. According to the 2016 Proxy Statement, as of October 17, 2016, Defendant Lewin beneficially owned 50,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 17, 2016 was $5.40, Lewin owned about $270,000 worth of Kandi stock.

14

53.     For the fiscal year ended December 31, 2015, Defendant Lewin received $50,500 in compensation from the Company.  This included $24,000 in salary and $26,500 in stock awards. According to the Company's 2016 10-K, for the fiscal year ended December 31, 2016, Defendant Lewin received $50,500 in compensation from the Company.  This included $24,000 in salary and $26,500 in stock awards.

54.     Upon information and belief, Defendant Lewin is a citizen of the state of New York.

55.     The Company's 2016 Proxy Statement stated the following about Defendant Lewin:

> **Jerry Lewin** was appointed as a director of the Company in November 2010. Jerry Lewin currently serves as Senior Vice President of Field Operations for Hyatt Hotels Corporation and is responsible for managing 35 hotels throughout the North American continent. Mr. Lewin has been with Hyatt since 1987. In his capacity as Senior Vice President, Mr. Lewin supervises a number of areas, including finance, sales and marketing, public relations, customer service, engineering, and human resources. Mr. Lewin serves as a member of the Hyatt Hotels Corporation's Managing Committee and sits on the board of directors of the New York City Hotel Association. Since July 2009, Mr. Lewin has served as a director of EFT Biotech Holdings, Inc. Mr. Lewin currently serves as the President of the New York Law Enforcement Foundation and as the President of the NY State Troopers PBA Signal 30 Fund. Mr. Lewin has served in various management capacities for several hotel companies in San Francisco, Oakland, Los Angeles, San Diego and Las Vegas. Mr. Lewin received his Bachelor of Science degree from Cornell University and completed the Executive Development Program at J.L. Kellogg Graduate School of Management at Northwestern University. Mr. Lewin's leadership skills and extensive management experience qualifies him to serve on our Board and led the Board to conclude that he should be nominated to serve another term as a director.

## **Defendant Yu**

56.     Defendant Henry Yu ("Yu") has served as a director of the Company since July 1, 2011. Defendant Yu is the Chair of the Audit Committee and a member of the Compensation Committee the Nominating and Corporate Governance Committee. According to the 2016 Proxy Statement, as of October 17, 2016, Defendant Yu beneficially owned 50,000 shares of the

Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on October 17, 2016 was $5.40, Yu owned about $270,000 worth of Kandi stock.

57.    For the fiscal year ended December 31, 2015, Defendant Yu received $42,100 in compensation from the Company.  This included $24,000 in salary and $18,100 in stock awards. According to the Company's 2016 10-K, for the fiscal year ended December 31, 2016, Defendant Yu received $42,100 in compensation from the Company.  This included $24,000 in salary and $18,100 in stock awards.

58.    Upon information and belief, Defendant Yu is a citizen of the state of Georgia.

59.    The Company's 2016 Proxy Statement stated the following about Defendant Yu:

**Henry Yu** was appointed as a director of the Company on July 1, 2011. Mr. Yu serves as a Managing Director & Regional Manager of Global Financial Institutions (Asia) of Fifth Third Bank. Prior to his current position, Mr. Yu served as Senior Vice President of the East West Bank from July 2011 to September 2012. Prior to that, Mr. Yu served as the President of Shanghai Bosun Capital Advisors in Shanghai, China from January to June 2011. From January 2008 to December 2010, Mr. Yu served as Head of Business Development at Standard Chartered Bank in China. From November 1999 to December 2007, Mr. Yu served as Managing Director of Global Trade Solutions of SunTrust Bank in Atlanta, Georgia. From January 1995 to November 1999, Mr. Yu served as Group Vice President of Comerica Bank in Chicago, Illinois. Mr. Yu started his banking career in 1981 with Bank of America in HK. Currently, Mr. Yu serves as Chair of the Advisory Board of the National Association of Chinese-Americans and serves as an Advisor to China's Federation of Overseas Chinese. Mr. Yu is currently a member of the Foundation Board Trustees of Georgia Perimeter College, board member of Georgia State University's China Task Force, and member of the Asian Studies Board of the Kennesaw State University. From 2003 to 2007, Mr. Yu held Series 7 and 62 Certifications from the Financial Industry Regulatory Authority. Mr. Yu received his Bachelor of Arts degree in Economics from the University of Michigan in 1978 and his MBA in Finance from the University of Detroit in 1980. Mr. Yu's leadership skills and extensive financial experience qualifies him to serve on our Board and led the Board to conclude that he should be nominated to serve another term as a director.

**Defendant Chen**

60.     Defendant Liming Chen ("Chen") has served as a director of the Company since May 1, 2012. Defendant Chen is the Chair of the Compensation Committee and a member of the Audit Committee and the Nominating and Corporate Governance Committee.

61.     For the fiscal year ended December 31, 2015, Defendant Chen received $9,615 in compensation from the Company, all in cash. According to the Company's 2016 10-K, for the fiscal year ended December 31, 2016, Defendant Chen received $9,029 in compensation from the Company, all in cash.

62.     Upon information and belief, Defendant Chen is a citizen of the PRC.

63.     The Company's 2016 Proxy Statement stated the following about Defendant Chen:

> **Chen Liming** was appointed as a director of the Company on May 1, 2012. Mr. Chen serves as an advisor to AA Wind & Solar Energy Development Group, LLC. Prior to his current position, from February 2009 to October 2010, Mr. Chen participated in a joint venture with Mr. Qiu Youmin, the former designer of Geely Automobile Co., Ltd., and assisted in the development of super mini three seat pure electric vehicles. From June 2008 to July 2009, he participated in the development of Lithium Iron Phosphate Battery with Shanghai Yuankai Group. Mr. Chen served as a Professor of Electrical Engineering at Zhejiang University from 1983 to 1997. In addition, Mr. Chen served as a visiting scholar in the Electrical Engineering Department at Columbia University in New York City from 1981 to 1983 and as a professor in Electrical Engineering at Zhejiang University from 1960 to 1981. Mr. Chen received his bachelor degree from Southeast University in Jiangsu, China in 1960. Mr. Chen's experience in the automobile and mini-car industries, extensive electrical engineering experience and knowledge, and knowledge of current corporate finance and accounting techniques and market activities qualifies him to serve on our Board and led the Board to conclude that that he should be nominated to serve another term as a director.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

64.     By reason of their positions as officers, directors, and/or fiduciaries of Kandi and because of their ability to control the business and corporate affairs of Kandi, the Individual Defendants owed Kandi and its shareholders fiduciary obligations of trust, loyalty, good faith,

and due care, and were and are required to use their utmost ability to control and manage Kandi in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Kandi and its shareholders so as to benefit all shareholders equally.

65.     Each director and officer of the Company owes to Kandi and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

66.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Kandi, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

67.     To discharge their duties, the officers and directors of Kandi were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

68.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Kandi, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the

Company has been ratified by the remaining Individual Defendants who collectively comprised Kandi's Board at all relevant times.

69.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

70.    To discharge their duties, the officers and directors of Kandi were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Kandi were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Kandi's own Code of Ethics and internal guidelines;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Kandi conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)       establish and maintain systematic and accurate records and reports of the business and internal affairs of Kandi and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)       maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Kandi's operations would comply with all applicable laws and Kandi's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)       exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)       refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)       examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

71.       Each of the Individual Defendants further owed to Kandi and the shareholders the duty of loyalty requiring that each favor Kandi's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

72.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Kandi and were at all times acting within the course and scope of such agency.

73.     Because of their advisory, executive, managerial, and directorial positions with Kandi, each of the Individual Defendants had access to adverse, non-public information about the Company.

74.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Kandi.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

75.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

76.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

77.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate

applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Kandi was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

78.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

79.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Kandi, and was at all times acting within the course and scope of such agency.

## CODE OF ETHICS

80.     Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

81. The Code of Ethics provides, as to "Compliance is Everyone's Business," that:

Ethical business conduct is critical to our business. As a director, officer or employee, your responsibility is to respect and adhere to these practices. Many of these practices reflect legal or regulatory requirements. Violations of these laws and regulations can create significant liability for you, the Company, its directors, officers, and other employees.

Part of your job and ethical responsibility is to help enforce this Code of Business Conduct and Ethics. You should be alert to possible violations and promptly report possible violations to the CFO.

You must cooperate in any internal or external investigations of possible violations.

Reprisal, threats, retribution or retaliation against any person who has in good faith reported a violation or a suspected violation of law, this Code of Business Conduct or other Company policies, or against any person who is assisting in any investigation or process with respect to such a violation, is prohibited.

Violations of law, this Code of Business Conduct and Ethics, or other Company policies or procedures should be reported to the CFO.

82.     The Code of Ethics provides, as to "Applicable Laws," that:

All Company directors, officers, employees, agents and contractors must comply with all applicable laws, regulations, rules and regulatory orders. Company directors, officers and employees located outside of the United States must comply with laws, regulations, rules and regulatory orders of the United States, including the Foreign Corrupt Practices Act and the U.S. Export Control Act, in addition to applicable local laws. Each director, officer, employee, agent and contractor must acquire appropriate knowledge of the requirements relating to his or her duties sufficient to enable him or her to recognize potential dangers and to know when to seek advice from the CFO on specific Company policies and procedures. Violations of laws, regulations, rules and orders may subject the director, officer, employee, agent or contractor to individual criminal or civil liability, as well as to discipline by the Company. Such individual violations may also subject the Company to civil or criminal liability or the loss of business.

83.     The Code of Ethics provides, as to "Conflicts of Interest," that:

Each of us has a responsibility to the Company, our stockholders and each other.

Although this duty does not prevent us from engaging in personal transactions and investments, it does demand that we avoid situations where a conflict of interest might occur or appear to occur. The Company is subject to scrutiny from many different individuals and organizations.

We should always strive to avoid even the appearance of impropriety.

84.     The Code of Ethics provides, as to "Related Parties," that:

The Company must report all such material related party transactions under applicable accounting rules, federal securities laws, and SEC rules and regulations, and securities market rules.

85.     The Code of Ethics provides, as to "Use of Company's Assets," that:

Protecting the Company's assets is a key fiduciary responsibility of every director, officer, employee, agent and contractor…. All Company directors,

officers, employees, agents and contractors are responsible for the proper use of Company assets, and must safeguard such assets against loss, damage, misuse or theft.

86.     The Code of Ethics provides, as to "Maintaining and Managing Records," that:

The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions and to ensure full, fair, accurate, timely, and understandable disclosure in any reports the Company is required to file.

87.     The Code of Ethics provides, as to "Accounting Practices," that:

The Company's responsibilities to its stockholders and the investing public require that all transactions be fully and accurately recorded in the Company's books and records in compliance with all applicable laws. False or misleading entries, unrecorded funds or assets, or payments without appropriate supporting documentation and approval are strictly prohibited and violate Company policy and the law.

Additionally, all documentation supporting a transaction should fully and accurately describe the nature of the transaction and be processed in a timely fashion.

88.     The Code of Ethics provides, as to "Government Relations," that:

It is the Company's policy to comply fully with all applicable laws and regulations governing contact and dealings with government employees and public officials, and to adhere to high ethical, moral and legal standards of business conduct. This policy includes strict compliance with all local, state, federal, foreign and other applicable laws, rules and regulations.

89.     In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' scheme to issue materially false and misleading statements to the public and their scheme to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste corporate assets, unjust enrichment, and violations of the securities laws.  In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to (1) comply with the

applicable laws and regulations, (2) protect corporate assets, (3) ensure completeness and accuracy of all Company records, (4) avoid conflicts of interest, (5) report violations of the Code of Ethics, and (6) ensure full, fair, accurate, timely, and understandable disclosure in any reports the Company is required to file.

**INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

90.     Kandi is an automotive manufacturing company based in Jinhua, China. Before 2013, the Company was mainly engaged in the development, production and distribution of the off-road vehicle products. Due to increasing market demand for new energy vehicles and strong government policy supports, starting in the year 2013, the Company gradually shifted its main business focus to the development and manufacturing of pure EV products and parts.

**The Company's Fraudulent Subsidiary Scheme**

91.     In 2013, the Company teamed with Geely to set up the JV Company, or Joint Venture, for the purpose of manufacturing EVs.  Pursuant to the joint venture agreement, all of the Company's EV production was to be transferred to the JV Company. This transfer was completed at the end of 2014.  In March 2014, the JV Company changed its name to Kandi Electric Vehicles Group Co., Ltd.

92.     Beginning in 2015, the majority of the Company's revenue and profit were generated from the sale of EV parts.  At the time, lucrative subsidies were given out by China's central and provincial governments to manufacturers and purchaser of EVs, and the Company entered into the joint venture with Geely in order to take advantage of them.  Kandi has derived almost all of its revenue from its stake in the Joint Venture since they entered into it.  The Company, however, was "double dipping" in the two subsidies.  In early 2016, Chinese officials began to learn of the subsidy scheme engaged in by the Company and several other

manufacturers. The "double dipping" of the Company and other manufacturers has caused the Chinese government to reduce the subsidy program and mandate to eventually remove the program altogether by phasing out subsidies over the next four years.

93.    Prior to Chinese officials becoming aware of the subsidy scheme, Kandi ran a specific business model. The Company would sell auto parts to the JV Company, and the JV Company would produce the EVs and sell them to ZZY. ZZY purportedly used the EVs purchased from the JV Company to run a car share operation. However, this business model was filled with conflicts as 9.5% of ZZY is owned by Kandi, and an additional 13% of ZZY is owned by the Company's Chairman, Defendant Xiaoming Hu.

94.    The Company's business model allowed the Company to directly or indirectly obtain both of the subsidies offered by the Chinese government (one for manufacturers and one for purchasers of EVs), as the JV Company was eligible for the manufacturer subsidy and ZZY, which was created for this purpose, was able to take advantage of the other subsidy as a purchaser for the JV Company. Thus, Kandi would manufacture parts for EVs, sell them to the JV Company, which would then manufacture EVs, and ZZY would buy the EVs. This allowed the Company to "double dip." As noted in a *Seeking Alpha* article published on August 2016 titled, "Kandi Technologies: Chinese EV Clunker Begins to Break Down Amid Subsidy Scandal, 70% Downside," the benefits the Company derived from both subsidies could be worth more than the cost of building the EVs.

**<u>Kandi's Equity Investment in the JV Company</u>**

95.    The Company's 2016 10-K disclosed the following regarding the JV Company and the Company's equity investment in the JV Company:

> In March 2013, pursuant to a joint venture agreement (the "JV Agreement") entered into between Kandi Vehicles and Shanghai Maple Guorun Automobile Co., Ltd. ("Shanghai Guorun"), a 99%-owned subsidiary of Geely Automobile

Holdings Ltd. ("Geely"), the parties established Zhejiang Kandi Electric Vehicles Co., Ltd. (the "JV Company") to develop, manufacture and sell electric vehicles ("EVs") and related auto parts. Each of Kandi Vehicles and Shanghai Guorun has 50% ownership interest in the JV Company. For JV Company's better development, Zhejiang Geely Holding Group, the parent company of Geely, became the direct holding company of the JV Company on October 26, 2016 by completing the purchase of the 50% equity of the JV Company held by Shanghai Guorun with a premium price, or a purchase price exceeding the cash amount of the aggregate of the original investment and the shared profits over the years. In the fourth quarter of 2013, Kandi Vehicles entered into an ownership transfer agreement with the JV Company pursuant to which Kandi Vehicles transferred 100% of its ownership in Kandi Changxing to the JV Company. As a result, the Company indirectly has 50% economic interest in Kandi Changxing through its 50% ownership interest in the JV Company after this transfer. In November 2013, Kandi Electric Vehicles Jinhua Co., Ltd. ("Kandi Jinhua") was formed by the JV Company. The JV Company has 100% ownership interest in Kandi Jinhua, and the Company, indirectly through its 50% ownership interest in the JV Company, has 50% economic interest in Kandi Jinhua. In November 2013, Zhejiang JiHeKang Electric Vehicle Sales Co., Ltd. ("JiHeKang") was formed by the JV Company. The JV Company has 100% ownership interest in JiHeKang, and the Company, indirectly through its 50% ownership interest in the JV Company, has 50% economic interest in JiHeKang. In December 2013, the JV Company entered into an ownership transfer agreement with Shanghai Guorun pursuant to which the JV Company acquired 100% ownership of Kandi Electric Vehicles (Shanghai) Co., Ltd. ("Kandi Shanghai"). As a result, Kandi Shanghai is a wholly-owned subsidiary of the JV Company, and the Company, indirectly through its 50% ownership interest in the JV Company, has 50% economic interest in Kandi Shanghai. In January 2014, Kandi Electric Vehicles Jiangsu Co., Ltd. ("Kandi Jiangsu") was formed by the JV Company. The JV Company has 100% ownership interest in Kandi Jiangsu, and the Company, indirectly through its 50% ownership interest in the JV Company, has 50% economic interest in Kandi Jiangsu. In addition, In July 2013, Zhejiang ZuoZhongYou Electric Vehicle Service Co., Ltd. (the "Service Company") was formed. The JV Company had a 19% ownership interest in the Service Company. In March 2014, the JV Company changed its name to Kandi Electric Vehicles Group Co., Ltd. In August 2015, the JV Company transferred its shares of the Service Company to Shanghai Guorun and Kandi Vehicles for 9.5% respectively. As the result, the JV Company no longer has any ownership of the Service Company since the transfer. In November 2015, Hangzhou Puma Investment Management Co., Ltd. ("Puma Investment") was formed by the JV Company. The JV Company has 50% ownership interest in Puma Investment and the Company, indirectly through its 50% ownership interest in the JV Company, has 25% economic interest in Puma Investment. In November 2015, Hangzhou JiHeKang Electric Vehicle Service Co., Ltd. ("JiHeKang Service Company") was formed by the JV Company. The JV Company has 100% ownership interest in JiHeKang Service Company and the Company, indirectly through its 50% ownership interest in the JV Company, has

50% economic interest in JiHeKang Service Company. In August 2016, Jiangsu JiDian Electric Vehicle Sales Co., Ltd. ("Jiangsu JiDian") was formed by JiHeKang and is engaged in the car sales business. Since JiHeKang is 100% owned by the JV Company, the JV Company has a 100% ownership interest in Jiangsu JiDian, and the Company, indirectly through its 50% ownership interest in the JV Company, has a 50% economic interest in Jiangsu JiDian. In October 2016, JiHeKang acquired Tianjin BoHaiWan Vehicle Sales Co., Ltd. ("Tianjin BoHaiWan"), which is engaged in the car sales business. Since JiHeKang is 100% owned by the JV Company, the JV Company has a 100% ownership interest in Tianjin BoHaiWan, and the Company, indirectly through its 50% ownership interest in the JV Company, has a 50% economic interest in Tianjin BoHaiWan. In November 2016, Changxing Kandi Vehicle Maintenance Co., Ltd. ("Changxing Maintenance") was formed by Kandi Changxing and is engaged in the car repair and maintenance business. Since Kandi Changxing is 100% owned by the JV Company, the JV Company has a 100% ownership interest in Changxing Maintenance, and the Company, indirectly through its 50% ownership interest in the JV Company, has a 50% economic interest in Changxing Maintenance

As of December 31, 2016, the JV Company consolidated the following entities on its financial statements: (1) 100% interest in Kandi Changxing; (2) 100% interest in Kandi Jinhua; (3) 100% interest in JiHeKang; (4) 100% interest in Kandi Shanghai; (5) 100% interest in Kandi Jiangsu; (6) 100% interest in JiHeKang Service; (7) 100% interest in Jiangsu JiDian; (8) 100% interest in Tianjin BoHaiWan; and (9) 100% interest in Changxing Maintenance. The Company accounted for its investments in the JV Company under the equity method of accounting as the Company has 50% ownership interest in the JV Company. Therefore, the Company's consolidated net income for the three months and year ended December 31, 2016, included equity income from the JV Company during such periods.

**False and Misleading Statements of Material Fact During the Relevant Period**

96.    During the Relevant Period, the Individual Defendants caused the Company to continuously issue false and misleading statements and to conceal the material deficiencies in the Company's disclosure controls and internal controls over financial reporting.

97.    The statements referenced below in ¶¶ 99-181 were materially false and misleading at the time when they were made because the Company failed to: 1) correctly classify certain cash and noncash activities related to notes receivable, notes payable, accounts receivable and accounts payable in the Company's statements of cash flows; 2) disclose the amount of

related party transactions on the face of the Company's balance sheets and income statements; 3) transfer the $7.5 million of construction-in-progress recorded in 2014 back to the advances to suppliers or prepayments to reflect the changed completion status of its Hainan facility; 4) properly report the income taxes for each reporting period during the Relevant Period; 5) include separate audited financial statements for its equity investment in the JV Company; 6) disclose its engagement in the Fraudulent Subsidiary Scheme; and 7) disclose that the Company's previously issued financial statements for the first three quarters for the year ended December 31, 2016 and the years ended December 31, 2015 and 2014, contained numerous other sections that the Company was required to adjust; 8) disclose that the Company lacked effective disclosure controls and internal controls over financial reporting; and 9) disclose that the Company lacked sufficient expertise to ensure the accuracy and completeness of its accounting treatment and financial reporting.

98.    Moreover, the Company failed to disclose that the Company had to readjust its public filings with regard to: 1) the classification of notes receivable and notes payable in the Company's statements of cash flow and certain related party accounts on its Balance Sheets and its Consolidated Statements of Income (Loss) and Comprehensive Income (Loss); 2) audited financial statements for the Company's equity investment in the Joint Venture; 3) Kandi's unaudited quarterly data for the first three quarters ended December 31, 2016 and 2015; 4) the section titled "Construction-in-Progress of the Notes to the Company's Consolidated Financial Statements;" 5) the section titled "Taxes of the Notes to the Company's Consolidated Financial Statements;" 6) the section titled "Summarized Information of Investment in the Joint Venture of the Notes to the Company's Consolidated Financial Statements;" and 7) the section titled "Taxes of the Notes to the Company's Consolidated Financial Statements."

**November 14, 2013 10-Q**

99.     On November 14, 2013, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter ended September 30, 2013 ("3Q 2013 10-Q"), which was signed by Defendants Hu and Zhu.

100.    The Company stated the following with regard to the effectiveness of its controls and procedures:

**Item 4.   Controls and Procedures**

**Evaluation of Controls and Procedures**

The Company maintains a system of disclosure controls and procedures that is designed to ensure that information required to be disclosed by the Company in this Form 10-Q, and in other reports required to be filed under the Securities Exchange Act of 1934 (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the rules and forms for such filings. Management of the Company, under the direction of the Company's Chief Executive Officer and Chief Financial Officer, reviewed and performed an evaluation of the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15a(e) and 15d-15(e) under the Exchange Act) as of September 30, 2013. ***Based on that review and evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and is accumulated and communicated to management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.***

**Changes in Internal Control over Financial Reporting**

There were no changes to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Inherent Limitations on Effectiveness of Controls**

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls and procedures will prevent

or detect all errors and all fraud. Disclosure controls and procedures, no matter how well designed, operated and managed, can provide only reasonable assurance that the objectives of the disclosure controls and procedures are met. Because of the inherent limitations of disclosure controls and procedures, no evaluation of such disclosure controls and procedures can provide absolute assurance that all control issues and instances of fraud, if any, have been detected.

(Emphasis added.)

101.    Attached to the 3Q 2013 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) of the Exchange Act, Section 302 of the Sarbanes-Oxley Act of 2002 ("Sox"), and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sox, ("Sox Certifications"), signed by Defendants Hu and Zhu, attesting to the accuracy of the 3Q 2013 10-Q .

### The 2013 10-K

102.    On March 17, 2014, the Company filed an annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2013 (the "2013 10-K"), which was signed by Defendants Hu, Zhu, Chen, Lewin, and Yu, and non-parties Ni Guangzheng ("Ni"), who has since passed away, and Qian Jingsong ("Qian").

103.    The Company stated the following with regard to the effectiveness of its controls and procedures:

**Item 9A. Controls and Procedures.**

**(a) Evaluation of Disclosure Controls and Procedures**

As of the end of the period covered by this report, we conducted an evaluation under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer of our disclosure controls and procedures (as defined in Rule 13a-15(e) and Rule 15d-15(f) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")). ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2012 our disclosure controls and procedures were effective to ensure that information required to be disclosed in our periodic reports filed or submitted under the Securities Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and (ii) accumulated and communicated to our***

31

*management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding disclosure.*

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls and procedures will prevent or detect all errors and all fraud. Disclosure controls and procedures, no matter how well designed, operated and managed, can provide only reasonable assurance that the objectives of the disclosure controls and procedures are met. Because of the inherent limitations of disclosure controls and procedures, no evaluation of such disclosure controls and procedures can provide absolute assurance that all control issues and instances of fraud, if any, have been detected.

**(b) <u>Management's Annual Report on Internal Control Over Financial Reporting</u>**

Our management is responsible for establishing and maintaining a system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles. All internal control systems, no matter how well designed, have inherent
limitations.

We conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2012, the last day of our fiscal year. This assessment was based on criteria established in the framework *Internal Control—Integrated Framework,* issued by the Committee of Sponsoring Organizations of the Treadway Commission and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. ***Based on our assessment, management has concluded that our internal control over financial reporting was effective as of the end of the fiscal year to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles.*** We reviewed the results of management's assessment with the Audit Committee of our Board of Directors. This annual report on Form 10-K does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm.

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal control over financial reporting that occurred during the quarter ended December 31, 2012 that have materially

affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

104.    Attached to the 2013 10-K were Sox Certifications signed by Defendants Hu and Zhu, attesting to the accuracy of the 2013 10-K.

**May 12, 2014 10-Q**

105.    On May 12, 2014, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter ended March 31, 2014 ("1Q 2014 10-Q"), which was signed by Defendants Hu and Zhu.

106.    The Company stated the following with regard to the effectiveness of its controls and procedures:

**Item 4. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

The Company has evaluated, under the supervision of the Company's Chief Executive Officer and the Chief Financial Officer, the effectiveness of disclosure controls and procedures as of March 31, 2014. This is done in order to ensure that information the Company is required to disclose in reports that are filed or submitted under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is: (i) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and (ii) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were not effective as of March 31, 2014, due to significant deficiencies in internal controls, which, in the aggregate, lead to a conclusion that a material weakness exists in the control environment as follows:

1. Lack of adequate policies and procedures in internal audit function, which may potentially result in: (1) lack of communication between internal audit department and the Audit Committee and the Board of Directors; (2) insufficient internal audit work to ensure that the Company's policies and procedures have been carried out as planned.

2. There was no self-assessment performed by the Audit Committee to assess the effectiveness of the Audit Committee in oversight of management.

3. Inadequate design of internal controls over the approval procedures for related party transactions.

**Changes in Internal Control over Financial Reporting**

During the first quarter of 2014, we made arrangements to insure the efficient and timely communication between the internal control audit department and the Audit Committee. The internal audit department was restructured that its head has reported directly to Audit Committee on major accounting items to enhance the independence and objectivity of the department. Currently, the internal audit department has also revaluated the policies and procedures in internal audit function, and made necessary remediation. The new internal audit policies and procedures are in the process of approval and are expected to be approved by the end of May 2014.

During the first quarter of 2014, our Board of Directors also revaluated the approval procedures for related party transactions, and has prepared a new detail approval procedure for related party transactions. This is in the process of finalization, which is expected to be approved by our Board of Directors by the end of May 2014.

Other than with respect to the ongoing remediation of the material weakness pursuant to the plan described above, there were no changes to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

107.    Attached to the 1Q 2014 10-Q were Sox Certifications signed by Defendants Hu and Zhu, attesting to the accuracy of the 1Q 2014 10-Q.

**August 11, 2014 10-Q**

108.    On August 11, 2014, the Company filed a quarterly report on Form 10-Q with the SEC for the second quarter ended June 30, 2014 ("2Q 2014 10-Q"), which was signed by Defendants Hu and Zhu.

109.    The Company stated the following with regard to the effectiveness of its controls and procedures:

**Item 4. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

The Company maintains a system of disclosure controls and procedures that is designed to ensure that information required to be disclosed by the Company in this Form 10-Q, and in other reports required to be filed under the Securities Exchange Act of 1934 (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the rules and forms for such filings. Management of the Company, under the direction of the Company's Chief Executive Officer and Chief Financial Officer, reviewed and performed an evaluation of the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15a(e) and 15d-15(e) under the Exchange Act) as of September 30, 2013. ***Based on that review and evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and is accumulated and communicated to management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.***

**Changes in Internal Control over Financial Reporting**

There were no changes to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the
period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Inherent Limitations on Effectiveness of Controls**

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls and procedures will prevent or detect all errors and all fraud. Disclosure controls and procedures, no matter how well designed, operated and managed, can provide only reasonable assurance that the objectives of the disclosure controls and procedures are met. Because of the inherent limitations of disclosure controls and procedures, no evaluation of such disclosure controls and procedures can provide absolute assurance that all control issues and instances of fraud, if any, have been detected.

(Emphasis added.)

110.    Attached to the 2Q 2014 10-Q were Sox Certifications signed by Defendants Hu and Zhu, attesting to the accuracy of the 2Q 2014 10-Q.

**November 10, 2014 10-Q**

111.    On November 10, 2014, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter ended September 30, 2014 ("3Q 2014 10-Q"), which was signed by Defendants Hu and Zhu.

112.    The Company stated the following with regard to the effectiveness of its controls and procedures:

**Item 4. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of September 30, 2014. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.*** Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act (a) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) is accumulated and communicated to management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives as described above.

**Changes in Internal Control over Financial Reporting**

During the quarter ended September 30, 2014, we continued to implement the remediation measures according to our new Internal Audit Activity Charter that were approved on May 30, 2014. In addition, the Audit Committee conducted a self-assessment to assess our effectiveness in oversight of management and updated the Audit Committee Charter.

Other than those set forth above, there was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

113.    Attached to the 3Q 2014 10-Q were Sox Certifications signed by Defendants Hu and Zhu, attesting to the accuracy of the 3Q 2014 10-Q.

### <u>The 2014 10-K</u>

114.    On March 16, 2015, the Company filed an annual report on Form 10-K with the SEC for the year ended December 31, 2014 (the "2014 10-K"), which was signed by Defendants Hu, Zhu, Chen, Lewin, and Yu, and non-parties Ni and Qian.

115.    The 2014 10-K contained a Consolidated Statements of Cash Flows table ("2014 Statements of Cash Flows") in which the Company reported incorrect cash flow figures for the year of 2014. First, for the year 2014, the Company mistakenly reported $15,254,847, which represented the settlement of the trade receivables with notes receivables, as an issuance of notes receivables in cash flow from investing activities in the 2014 Statements of Cash Flows. This classification was erroneous because the receipt of notes receivable for the settlement of trade receivables was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 2014 Statements of Cash Flows. In fact, the total amount of cash flow from the issuance of notes receivable for the year 2014 was not $24,705,489, but rather $9,450,642. Second, for the year 2014, the Company mistakenly reported $14,311,483 as repayments of notes receivable in the investing section of the 2014 Statements of Cash Flows, which, in fact, represented the assignment of the notes receivable to the Company's suppliers to settle the accounts payables. This classification was incorrect because the assignment of the notes receivable to the Company's suppliers to settle the accounts payables was supposed to be

reported as a noncash activity in the non-cash disclosures section. In fact, the total amount of cash flow from the repayment of notes receivable for the year 2014 was $15,043,109, instead of $9,450,642. Third, for the year 2014, the Company mistakenly reported $5,707,027, which represented the settlement of accounts payable with notes payable, as the proceeds from notes payable in the financing section of the 2014 Statements of Cash Flows. This classification was incorrect because the settlement of accounts payable with notes payable was supposed to be reported as a noncash activity in the non-cash disclosures section. In fact, the total amount of cash flow from the proceeds from notes payable for the year 2014 was not $13,781,830, but rather $0.

116.    In addition to the above disclosure failures, the Company also failed to disclose the dollar amount of related party transactions on the face of the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) ("2014 Consolidated Statements of Income") contained in the 2014 10-K. Rule 4-08(k) of Regulation S-X requires a reporting company to identify related party transactions and to state the amounts of such transactions "on the face of the balance sheet, income statement, or statement of cash flows." In order to comply with this rule, Kandi was expected to separately identify revenue from the JV Company and any other related parties and revenue from unrelated parties in the 2014 Consolidated Statements of Income. However, the Company reported the total revenue for 2014 as one line item without identifying which part of the revenue came from related parties.

117.    Ironically, with all these disclosure and reporting failures, the Company nonetheless asserted, in Item 9A of the 2014 10-K, the following regarding the effectiveness of its controls and procedures:

**Item 9A. Controls and Procedures.**

**(a) Evaluation of Disclosure Controls and Procedures**

The Company has evaluated, under the supervision of the Company's Chief Executive Officer and the Chief Financial Officer, the effectiveness of disclosure controls and procedures as of December 31, 2014. This is done in order to ensure that information the Company is required to disclose in reports that are filed or submitted under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is: (i) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and (ii) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2014.***

**(b) Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under Exchange Act. ***The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.***

The Company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

…

Management conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2014, the last day of our fiscal year. This assessment was based on criteria established in the framework Internal Control—Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and included an evaluation of elements such as the design and operating

effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. *Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were effective as of December 31, 2014.*

**Remediation of Previously Reported Material Weakness**

As of December 31, 2014, the management evaluated the material weakness in our internal control that was disclosed in Item 9A of our Annual Report on Form 10-K for the year ended December 31, 2013 (the "2013 Form 10-K") and related implementation of corrective measures in 2014. *In May 2014, the Audit Committee reviewed and approved the Company's policies and procedures related to remediating inadequate internal control environment that was disclosed in Item 9A of the 2013 Form 10-K,* of which Audit Committee Charter and Amended Business Ethics and Codes of Conduct have been posted on our website. The internal auditor reports directly to the Company's audit committee. *The Chairman of the Audit Committee and management representatives met with the internal auditor and the independent auditor who conducts the audit of internal control over financial reporting. The Audit Committee also reviewed and approved the amended approval procedures and guidelines for related-party transactions (internal audit process). This new rule has been implemented by the management.* In addition, *the Audit Committee conducted a self-assessment to assess our effectiveness in oversight of management and updated the Audit Committee Charter. The management believes that the progresses made met the remediation requirements and were sufficient to remediate the material weakness in our internal control that was disclosed in Item 9A of our 2013 Form 10-K.*

We reviewed the results of management's assessment with the Audit Committee of our Board of Directors.

*Our independent registered public accounting firm, AWC (CPA) Limited, has audited the effectiveness of our internal control over financial reporting as of December 31, 2014 as stated in their report which is attached to the auditors' report included under item 8 of this report.*

**(c) <u>Changes in Internal Control Over Financial Reporting</u>**

Except for the changes noted above, *there had been no other changes in the Company's internal control over financial reporting identified in connection with the above evaluation that occurred during the last fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.*

(Emphasis added.)

118.    The report of the Company's former auditor, AWC (CPA) Limited ("AWC"), was included under Item 8 of the 2014 10-K. The AWC report provided investors with the following assurances:

> We have audited the accompanying consolidated balance sheet of Kandi Technologies Group, Inc. and subsidiaries ("the Company") as of December 31, 2014 and 2013 and the related consolidated statements of income and comprehensive income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2014. We have also audited the internal control over financial reporting of the Company as of December 31, 2014, based on criteria established in the Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on these consolidated financial statements and an opinion on the Company's internal control over financial reporting based on our audit.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects.
>
> …
>
> *In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Kandi Technologies Group, Inc. as of December 31, 2014 and 2013 and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2014, in conformity with US generally accepted accounting principles.*
>
> *Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).*

(Emphasis added.)

119.    Attached to the 2014 10-K were Sox Certifications signed by Defendants Hu and

Zhu, attesting to the accuracy of the 2014 10-K.

**The 2015 Proxy Statement**

120.    On April 10, 2015, the Company filed a Schedule 14A with the SEC (the "2015

Proxy Statement"), which claimed the following concerning the effectiveness of the Company's

risk oversight:

> Our Board is responsible for oversight of the Company's risk management
> practices while management is responsible for the day-to-day risk management
> processes. ***In the Board's opinion, this division of responsibilities is the most
> effective approach for addressing the risks facing the Company.*** The Board
> receives periodic reports from management regarding the most significant risks
> facing the Company. ***In addition, the Audit Committee assists the Board in its
> oversight of our risk assessment and risk management policies. Our Audit
> Committee is empowered to appoint and oversee our independent registered
> public accounting firm, monitor the integrity of our financial reporting
> processes and systems of internal controls and provide an avenue of
> communication among our independent auditors, management, our internal
> auditing department and our Board.***

(Emphasis added.)

121.    The Audit Committee Report included in the 2015 Proxy Statement, which was

signed by Defendants Yu, Lewin, and Chen, stated in pertinent part:

> The Audit Committee has reviewed and discussed the audited financial statements
> with our management and representatives of AWC (CPA) Limited, our
> independent registered public accounting firm. ***The Audit Committee has
> discussed AWC (CPA) Limited's judgments as to the quality, not just the
> acceptability, of our accounting principles and such other matters as are
> required to be discussed with the Audit Committee*** by Statement on Auditing
> Standards No. 114 (which superseded Statement on Auditing Standards No. 61),
> other standards of the Public Company Accounting Oversight Board (United
> States), rules of the SEC, and other applicable regulations. The Audit Committee
> also received the written disclosures and the letter from AWC (CPA) Limited
> required by applicable requirements of the Public Company Accounting
> Oversight Board regarding the firm's independence from our management and
> has discussed with AWC (CPA) Limited its independence. The members of the
> Audit Committee considered whether the services provided by AWC (CPA)
> Limited, for the year ended December 31, 2014, are compatible with maintaining
> their independence. The Board has delegated to the Audit Committee the
> authority to approve the engagement of our independent registered public
> accounting firm.

***Based upon its reviews and discussions, the Audit Committee recommended to our Board that the audited financial statements be included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2014 for filing with the SEC and the Board approved that recommendation.***

(Emphasis added.)

122.    The 2015 Proxy Statement also noted that Compensation for Kandi's named executive officers was based on "performance targets set up pursuant to the [2008 Omnibus Long-term Incentive] Plan . . . [and] the Compensation Committee and the Board approved the grant of common stock for 100,000 shares of common stock to [Defendant Hu] and 60,000 to [Defendant Zhu] in 2014."  The 2015 Proxy Statement failed to disclose material information related to the stock awards received by Kandi's directors and/or executive officers.  Specifically, the 2015 Proxy Statement failed to disclose that such compensation that was awarded was based on financial statements that required adjustment and that, therefore, did not reflect the Company's true performance.

**May 11, 2015 10-Q**

123.    On May 11, 2015, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter ended March 31, 2015 ("1Q 2015 10-Q"), which was signed by Defendants Hu and Wang.

124.    The 1Q 2015 10-Q contained a Consolidated Statements of Cash Flows table ("1Q 2015 Statements of Cash Flows") in which the Company reported incorrect cash flow figures. First, for the three months ended March 31, 2015, $2,762,925 was reported by the Company as an issuance of notes receivables in cash flows from investing activities in the 1Q 2015 Statements of Cash Flows, which, in fact, represented the settlement of money due from the JV Company and related parties with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of money due from the JV Company and related

parties was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 1Q 2015 Statements of Cash Flows. Second, for the three months ended March 31, 2015, $2,572,850 was reported as repayments of notes receivable in cash flows from investing activities in the 1Q 2015 Statements of Cash Flows, which represented the assignment of the notes receivable to the Company's suppliers to settle the accounts payables. This classification was incorrect because the assignment of the notes receivable to the Company's suppliers to settle the accounts payables was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Third, for the three months ended March 31, 2015, $6,663,525 was reported as the proceeds from notes payables in cash flows from financing activities of the 1Q 2016 Statements of Cash Flows, which represented the settlement of accounts payable with notes payables. This classification was incorrect because the settlement of accounts payables with notes payable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section rather than proceeds from notes payable in the financing section. As a result of the above errors, the Company also misstated the notes receivable, accounts payable, and the amount due from the JV Company.

125.    In the 1Q 2015 10-Q, the Company also reported the revenue for the three months ended March 31, 2015 as one line item in the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) without identifying which part of the revenue came from related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the income statement as required by Rule 4-08(k) of Regulation S-X.

126.    Additionally, the Company falsely reported the notes receivable as one line item on the Consolidated Balance Sheet contained in the 1Q 2015 10-Q without identifying separately notes receivable from the JV Company and related parties. By doing so, the Company failed to

disclose the dollar amount of related party transactions on the face of the balance sheet as required by Rule 4-08(k) of Regulation S-X.

127.    Moreover, the Company's Note 19–Taxes of the Notes to the Consolidated Financial Statements was not prepared and reported properly. First, the Company's reported taxes were not properly broken out between current and deferred taxes in the 1Q 2015 10-Q. Second, the Company's reconciliation schedule reported in Note 19 was prepared incorrectly. Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 740-10-50-12 requires a public business entity to disclose a reconciliation between the reported amount of income tax expense (or benefit) from continuing operations and the amount of income tax expense that would result from multiplying the pretax income (or loss) from continuing operations by the domestic statutory tax rate, showing the estimated dollar value of each of the underlying causes for the difference. Accordingly, the Company was supposed to use the PRC statutory rate of 25% to reconcile to the effective tax rate. However, in the 1Q 2015 10-Q, the expected tax expense reported by the Company was computed inappropriately through a combination of applying the U.S. Federal rate of 34%, the PRC rate of 25%, and the Hong Kong rate of 16.5%. Third, the Company failed to properly disclose the amount and nature of each item within "permanent differences" in the reconciliation between the expected and reported tax expense in the 2015 10-K. Pursue to Rule 4-08(h)(2) of Regulation S-X, only reconciling items that are individually less than 5% of the computed amount may be combined in the reconciliation. The nature and amount of each individual reconciling items that is greater than five percent should be separately identified and disclosed. Fourth, the Company's reported loss carried forward and valuation allowance for the three months ended March 31, 2015 was not prepared correctly. Under FASB ASC 740-10-50-2 and 740-10-50-3, public entities are currently

required to separately disclose the totals of deferred tax liabilities, deferred tax assets, the valuation allowance recognized for deferred tax assets, the net change in the total valuation allowance for the year, and the amount and expiration dates of operating losses and tax credit carryforwards. The Company failed to comply with the guidelines. For example, the Company failed to correctly disclose the amount and expiration dates of operating losses carryforwards existing as of the first quarter of 2015 and the associated total valuation allowance.

128.    Despite all the disclosure and reporting failures, the Company claimed, in Item 4 of the 1Q 2015 10-Q, the following regarding the effectiveness of its controls and procedures:

**Evaluation of Disclosure Controls and Procedures**

We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of March 31, 2015. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.***

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act (a) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) is accumulated and communicated to management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives as described above.

**Changes in Internal Control over Financial Reporting**

***There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

129.    Attached to the 1Q 2015 10-Q were Sox Certifications signed by Defendants Hu and Wang, attesting to the accuracy of the 1Q 2015 10-Q.

**August 10, 2015 10-Q**

130.    On August 10, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2015 ("2Q 2015 10-Q"), which was signed by Defendants Hu and Wang.

131.    The 2Q 2015 10-Q contained a Consolidated Statements of Cash Flows table ("2Q 2015 Statements of Cash Flows") in which the Company reported incorrect cash flow figures. First, for the six months ended June 30, 2015, $4,121,797 was reported by the Company as an issuance of notes receivables in cash flows from investing activities in the 2Q 2015 Statements of Cash Flows, which, in fact, represented the settlement of money due from the JV Company and related parties with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of money due from the JV Company and related parties was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 2Q 2015 Statements of Cash Flows. Second, for the six months ended June 30, 2015, $4,944,527 was reported as repayments of notes receivable in cash flows from investing activities in the 2Q 2015 Statements of Cash Flows, which represented the assignment of the notes receivable to the Company's suppliers to settle the accounts payables. This classification was incorrect because the assignment of the notes receivable to the Company's suppliers to settle the accounts payables was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Third, for the six months ended June 30, 2015, $9,937,929 was reported as the proceeds from notes payables in cash flows from financing activities of the 2Q 2015 Statements of Cash Flows, which represented the settlement of accounts payable with notes payables. This classification was incorrect because the settlement of

accounts payables with notes payable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. As a result of the above errors, the Company also misstated the accounts payable and the amount due from the JV Company.

132.    In the 2Q 2015 10-Q, the Company also reported the total revenue for the second quarter of 2015 and the six months ended June 30, 2015 as one line item in the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) without identifying which part of the revenue came from related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the income statement as required by Rule 4-08(k) of Regulation S-X.

133.    Additionally, the Company falsely reported the notes receivable as one line item in the Consolidated Balance Sheet contained in the 2Q 2015 10-Q without identifying separately notes receivable from the JV Company and related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the balance sheet as required by Rule 4-08(k) of Regulation S-X.

134.    Furthermore, the Company's Note 19-Taxes of the Notes to the Consolidated Financial Statements contained in the 2Q 2015 10-Q was not prepared and reported properly. First, the Company's reported taxes were not properly broken out between current and deferred taxes. Second, the Company's reconciliation schedule reported in Note 19 was prepared incorrectly for the same reason as stated above. Third, the Company failed to properly disclose the amount and nature of each item within "permanent differences" in the reconciliation between the expected and reported tax expense in the 2Q 2015 10-Q. Fourth, the Company failed to correctly disclose the amount and expiration dates of operating losses carryforwards existing as of the second quarter of 2015 and the associated valuation allowance.

135.    Despite all the disclosure and reporting failures, the Company claimed, in Item 4 of the 2Q 2015 10-Q, the following regarding the effectiveness of its controls and procedures:

**Evaluation of Disclosure Controls and Procedures**

We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of June 30, 2015. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.***

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act (a) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) is accumulated and communicated to management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives as described above.

**Changes in Internal Control over Financial Reporting**

***There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

136.    Attached to the 2Q 2015 10-Q were Sox Certifications signed by Defendants Hu and Wang, attesting to the accuracy of the 2Q 2015 10-Q.

**November 9, 2015 10-Q**

137.    On November 9, 2015, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2015 ("3Q 2015 10-Q"), which was signed by Defendants Hu and Wang.

138.    The 3Q 2015 10-Q contained a Consolidated Statements of Cash Flows table ("3Q 2015 Statements of Cash Flows") in which the Company reported incorrect cash flow figures. First, for the nine months ended September 30, 2015, $54,355,864 was reported by the Company as an issuance of notes receivables in cash flows from investing activities in the 3Q 2015 Statements of Cash Flows, which represented the settlement of money due from the JV Company and related parties with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of money due from the JV Company and related parties was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 3Q 2015 Statements of Cash Flows. Second, for the nine months ended September 30, 2015, $8,163,199 was reported as an issuance of notes receivables in cash flows from investing activities in the 3Q 2015 Statements of Cash Flows, which represented the settlement of accounts receivable with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of accounts receivable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Third, for the nine months ended September 30, 2015, $55,213,968 was reported as repayments of notes receivable in cash flows from investing activities in the 3Q 2015 Statements of Cash Flows, which represented the assignment of the notes receivable to the Company's suppliers to settle the accounts payables. This classification was incorrect because the assignment of the notes receivable to the Company's suppliers to settle the accounts payables was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Fourth, for the nine months ended September 30, 2015, $9,860,498 was reported as the proceeds from notes payables in cash flows from financing activities of the 3Q 2015 Statements of Cash Flows, which represented the settlement of accounts payable with notes payables. This classification was

incorrect because the settlement of accounts payables with notes payable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. As a result of the above errors, the Company also misstated the accounts receivable, notes receivable, accounts payable and the amount due from the JV Company.

139.    In the 3Q 2015 10-Q, the Company also reported the total revenue for the third quarter of 2015 and the nine months ended September 30, 2015 as one line item in the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) without identifying which part of the revenue came from related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the income statement as required by Rule 4-08(k) of Regulation S-X.

140.    Additionally, the Company falsely reported the notes receivable as one line item in the Consolidated Balance Sheet contained in the 3Q 2015 10-Q without identifying separately notes receivable from the JV Company and related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the balance sheet as required by Rule 4-08(k) of Regulation S-X.

141.    Furthermore, the Company's Note 20-Taxes of the Notes to the Consolidated Financial Statements contained in the 3Q 2015 10-Q was not prepared and reported properly. First, the Company's reported taxes were not properly broken out between current and deferred taxes. Second, the Company's reconciliation schedule reported in Note 20 was prepared incorrectly. Third, the Company failed to properly disclose the amount and nature of each item within "permanent differences" in the reconciliation between the expected and reported tax expense in the 3Q 2015 10-Q. Fourth, the Company failed to correctly disclose the amount and

expiration dates of operating losses carryforwards existing as of the third quarter of 2015 and the

associated valuation allowance.

142.    Despite all the disclosure and reporting failures, the Company claimed, in Item 4

of the 3Q 2015 10-Q, the following regarding the effectiveness of its controls and procedures:

**Evaluation of Disclosure Controls and Procedures**

We have evaluated, under the supervision of our Chief Executive Officer
("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure
controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e)
under the Securities Exchange Act of 1934 (the "Exchange Act")) as of
September 30, 2015. ***Based on this evaluation, our CEO and CFO concluded
that as of the end of the period covered by this report, our disclosure controls
and procedures were effective.***

Disclosure controls and procedures are controls and other procedures that are
designed to ensure that information required to be disclosed in our reports filed or
submitted under the Exchange Act (a) is recorded, processed, summarized and
reported within the time periods specified in the SEC's rules and forms and (b) is
accumulated and communicated to management, including our CEO and CFO, as
appropriate, to allow timely decisions regarding required disclosure. Our
management recognizes that any controls and procedures, no matter how well
designed and operated, can provide only reasonable assurance of achieving their
objectives and management necessarily applies its judgment in evaluating the
cost-benefit relationship of possible controls and procedures. Our disclosure
controls and procedures are designed to provide reasonable assurance of
achieving their objectives as described above.

**Changes in Internal Control over Financial Reporting**

***There was no change to our internal control over financial reporting (as
defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that
occurred during the period covered by this report that have materially affected,
or are reasonably likely to materially affect, our internal control over financial
reporting.***

(Emphasis added.)

143.    Attached to the 3Q 2015 10-Q were Sox Certifications signed by Defendants Hu

and Wang, attesting to the accuracy of the 3Q 2015 10-Q.

**<u>The 2015 10-K</u>**

144.    On March 14, 2016, the Company filed an annual report on Form 10-K with the SEC for the year ended December 31, 2015 ("2015 10-K"), which was signed by Defendants Hu, Wang, Chen, Lewin, and Yu, and non-parties Ni and Qian.

145.    The 2015 10-K contained a Consolidated Statements of Cash Flows table ("2015 Statements of Cash Flows") in which the Company reported cash flow figures for the year of 2013, 2014 and 2015.

146.    As alleged above, certain cash flow figures the Company reported for the year of 2014 were incorrect as the Company failed to correctly classify certain cash and noncash activities related to notes receivable, notes payable, account receivable and accounts payable. Due to the same reasons, certain figures the Company reported for the year of 2015 were also incorrect.

147.    First, for the year 2015, the Company overstated the amount of cash flows from issuance of notes receivables by $122,440,599 as the Company classified the settlement of the trade receivables with notes receivables as issuance of notes receivables in the investing section of the 2015 Statements of Cash Flows.  This classification was erroneous because the receipt of notes receivable for the settlement of trade receivables was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 2015 Statements of Cash Flows. In fact, the total amount of cash flow from the issuance of notes receivable for year 2015 was not $131,852,319, but rather $9,411,720. Second, for year 2015, the Company overstated the amount of cash flows from repayments of notes receivable by $120,815,961 because the Company incorrectly classified the collections of the notes receivables or the assignment of the notes receivable to the Company's suppliers to settle the accounts payables as repayments of notes receivables in cash flow from investing activities. This classification was incorrect because

the cash receipt from the collection of notes receivables or the assignment of the notes receivable to the Company's suppliers to settle the accounts payables was supposed to be reported as a noncash activity in the non-cash disclosures section. In fact, the total amount of cash flow from the repayment of notes receivable for year 2015 was not $127,226,115, but rather $6,410,154. Third, for the year 2015, the Company mistakenly reported $13,781,830, which represented the settlement of accounts payable with notes payable, as the proceeds from notes payable in the financing section of the 2015 Statements of Cash Flows. This classification was incorrect because the settlement of accounts payable with notes payable was supposed to be reported as a noncash activity in the non-cash disclosures section. In fact, the total amount of cash flow from the proceeds from notes payable for the year 2014 was not $13,781,830, but rather $0. As a result of the above errors, the Company also misstated the accounts receivable, the notes receivable, the amount due from the JV Company, and the accounts payable for 2015.

148.   Additionally, in connection with the relocation of the Company's Hainan facility in early 2016 and the Company's revised contract terms and technical requirements resulting therefrom, approximately $7.5 million of construction-in-progress recorded in 2014 was supposed to be transferred back to and recorded as the advances to suppliers or prepayments in the 2015 financial statements and balance sheets. However, the Company failed to make the adjustment in the 2015 Statements of Cash Flows to reflect the completion status change.

149.   Similar to what the Company did in the 2014 10-K, the Company also reported the total revenue for 2015 as one line item in the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) contained in the 2015 10-K ("2015 Consolidated Statements of Income") without identifying which part of the revenue came from related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the

54

income statement as required by Rule 4-08(k) of Regulation S-X. In order to comply with this rule, Kandi was expected to separately identify revenue from the JV Company and any other related parties and revenue from unrelated parties in the 2015 Consolidated Statements of Income.

150.    Moreover, the Company falsely reported the notes receivable as one line item on the Consolidated Balance Sheet contained in the 2015 10-K ("2015 Balance Sheet") without identifying separately notes receivable from the JV Company and related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the balance sheet as required by Rule 4-08(k) of Regulation S-X.

151.    Furthermore, the Company's Note 20 – Taxes of the Notes to the Consolidated Financial Statements was not prepared and reported properly. First, the Company's reported taxes were not properly broken out between current and deferred taxes in the 2015 10-K. Second, the Company's reconciliation schedule reported in Note 20 was prepared incorrectly. The Company was supposed to use the PRC statutory rate of 25% to reconcile to the effective tax rate. Third, the Company failed to properly disclose the amount and nature of each item within "permanent differences" in the reconciliation between the expected and reported tax expense in the 2015 10-K. Fourth, the Company failed to correctly disclose the amount and expiration dates of operating losses carryforwards existing as of the year ended December 31, 2015 and the associated valuation allowance. Fifth, the Company included, by mistake, "unaudited" headings on the tables of the statutory to actual tax provision reconciliation, the 2015 presentation of net deferred tax liabilities, and the table presenting tax benefit (holiday) credit and net per share effect in Note 20 – Taxes in the 2015 10-K.

152.    Despite all the disclosure and reporting failures, the Company nonetheless asserted, in Item 9A of the 2015 10-K, the following regarding the effectiveness of its controls and procedures:

**Item 9A. Controls and Procedures.**

**(a) <u>Evaluation of Disclosure Controls and Procedures</u>**

The Company has evaluated, under the supervision of the Company's Chief Executive Officer and the Chief Financial Officer, the effectiveness of disclosure controls and procedures as of December 31, 2015. This is done in order to ensure that information the Company is required to disclose in reports that are filed or submitted under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is: (i) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and (ii) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2015.***

**(b) <u>Management's Annual Report on Internal Control Over Financial Reporting</u>**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under Exchange Act. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.

The Company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

…

Management conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2015, the last day of our fiscal year. This assessment was based on criteria established in the framework Internal Control—Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. ***Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were effective as of December 31, 2015.***

We reviewed the results of management's assessment with the Audit Committee of our Board of Directors.

Our independent registered public accounting firm, AWC (CPA) Limited, has audited the effectiveness of our internal control over financial reporting as of December 31, 2015 as stated in their report which is attached to the auditors' report included under item 8 of this report.

**(c) <u>Changes in Internal Control Over Financial Reporting</u>**

***There had been no changes in the Company's internal control over financial reporting identified in connection with the above evaluation that occurred during the last fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.***

(Emphasis added.)

153.   The report of the Company's former auditor AWC provided the following

assurances:

We have audited the accompanying consolidated balance sheet of Kandi Technologies Group, Inc. and subsidiaries ("the Company") as of December 31, 2015 and 2014 and the related consolidated statements of income and comprehensive income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2015. We have also audited the internal control over financial reporting of the Company as of December 31, 2015, based on criteria established in the Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report

on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on these consolidated financial statements and an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

…

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Kandi Technologies Group, Inc. as of December 31, 2015 and 2014 and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2015, in conformity with US generally accepted accounting principles.***

***Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2015, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).***

(Emphasis added.)

154.    The Company also described its taxes in the section titled, "NOTE 20 – TAXES":

(a) Corporation Income Tax

In accordance with the relevant tax laws and regulations of the PRC, applicable corporate income tax ("CIT") rate is 25%. However, the Kandi Vehicle, qualified as a high technology company in China, was entitled to pay a reduced income tax rate of 15%. The applicable corporate income tax rate of each of the Company's three subsidiaries, Kandi New Energy, Yongkang Scrou and Kandi Hainan, the JV Company and its subsidiaries and the Service Company was 25%.

58

The Company, qualified as a high technology company in China, was entitled to pay a reduced CIT rate of 15%. After combining with the research and development tax credit of 25% on certain qualified research and development expenses, the final effective reduced income tax rate was 16.88%. The combined tax benefits were 51.26%. The actual effective income tax rate was reduced from 25% to 12.19% of the 2015 taxable corporate income.

According to the PRC CIT reporting system, the CIT sales cut-off base is concurrent with the value-added tax ("VAT"), which should reported to the State Administration of Taxation ("SAT") on a quarterly basis. Since the VAT and CIT are accounted for on a VAT tax basis that recorded all sales on a "State provided official invoices" reporting system, the Company is reporting the CIT according to the SAT prescribed tax reporting rules. Under the VAT tax reporting system, sales cut-off is not done on an accrual basis but rather on a VAT taxable reporting basis. Therefore, when the Company adopted U.S. GAAP using an accrual basis, the sales cut-off CIT timing (due to the VAT reporting system) creates a temporary sales cutoff timing difference. This difference is reflected in the deferred tax assets or liabilities calculations on the income tax estimate reported elsewhere on the report. Effective January 1, 2007, the Company adopted ASC 740, Income Taxes. The interpretation addresses the determination of whether tax benefits claimed or expected to be claimed on a tax return should be recorded in the financial statements.

Under ASC 740, the Company may recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position should be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. ASC 740 also provides guidance on de-recognition, classification, interest and penalties on income taxes,
accounting in interim periods and requires increased disclosures. As of December 31, 2015, the Company did not have a liability for unrecognized tax benefits. The Company files income tax returns to the U.S. Internal Revenue Services ("IRS") and states where the Company has operations. The Company is subject to U.S. federal or state income tax examinations by the IRS and relevant state tax authorities for years after 2006. During the periods open to examination, the Company has net operating loss carry forwards ("NOLs") for U.S. federal and state tax purposes that have attributes from closed periods. Since these NOLs may be utilized in future periods, they remain subject to examination. The Company also files certain tax returns in China. As of December 31, 2015, the Company was not aware of any pending income tax examinations by U.S. and China tax authorities.

The Company's policy is to record interest and penalties on uncertain tax provisions as income tax expense. As of December 31, 2015, the Company has no

accrued interest or penalties related to uncertain tax positions. The Company has not recorded a provision for U.S. federal income tax for the year ended December 31, 2015 due to the net operating loss in 2015 and an accumulated net operating loss carry forward from prior years in the United States.

Income tax expenses for the years ended December 31, 2015, 2014 and 2013 is summarized as follows:

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | **2015** | **2014** | **2013** |
| Current: | | | |
| Provision for CIT | $   6,127,228 | $   2,414,412 | $   1,593,994 |
| Provision for Federal Income Tax | - | - | - |
| Deferred: | | | |
| Provision for CIT | - | - | - |
| Income tax expense (benefit) | $   6,127,228 | $   2,414,412 | $   1,593,994 |

The Company's income tax expense differs from the "expected" tax expense for the years ended December 31, 2015, 2014 and 2013 (computed by applying the U.S. Federal Income Tax rate of 34% and PRC Corporation Income Tax rate of 25%, respectively to income before income taxes) as follows:

| | For the Years Ended December 31, (Unaudited) | | |
|---|---|---|---|
| | **2015** | **2014** | **2013** |
| Computed "expected" expense | $   (4,013,791) | $   929,405 | $   (1,381,713) |
| Favorable tax rate | (912,548) | (611,672) | (1,378,429) |
| Permanent differences | 3,408,181 | (929,318) | 361,230 |
| Valuation allowance | 7,645,386 | 3,025,997 | 3,992,906 |
| Income tax expense (benefit) | $   6,127,228 | $   2,414,412 | $   1,593,994 |

The tax effects of temporary differences that give rise to the Company's net deferred tax assets and liabilities as of December 31, 2015, 2014 and 2013 are summarized as follows:

| | December 31, 2015 (Unaudited) | December 31, 2014 | December 31, 2013 |
|---|---|---|---|
| Current portion: | | | |
| Deferred tax assets (liabilities): | | | |
| Expense | $   (272,953) | $   (80,016) | $   47,224 |
| Subtotal | (272,953) | (80,016) | 47,224 |
| | | | |
| Deferred tax assets (liabilities): | | | |
| Sales cut-off difference derived from Value Added Tax reporting system to calculate PRC | 290,850 | (26,226) | (33,518) |

| Corporation Income Tax in accordance with the PRC State Administration of Taxation | | | |
|---|---|---|---|
| Other | (2,392,821) | (124,622) | 0 |
| Subtotal | (2,101,971) | (150,848) | (33,518) |
| | | | |
| Total deferred tax assets (liabilities) – current portion | (2,374,924) | (230,864) | 13,706 |
| | | | |
| Non-current portion: | | | |
| Deferred tax assets (liabilities): | | | |
| Depreciation | (353,115) | (551,697) | 81,076 |
| Loss carried forward | 7,645,386 | 3,025,997 | 3,992,906 |
| Valuation allowance | (7,645,386) | (3,025,997) | (3,992,906) |
| Subtotal | (353,115) | (551,697) | 81,076 |
| | | | |
| Deferred tax liabilities: | | | |
| Accumulated other comprehensive gain | (1,240,467) | (1,715,028) | (1,009,477) |
| Subtotal | (1,240,467) | (1,715,028) | (1,009,477) |
| | | | |
| Total deferred tax assets – non-current portion | (1,593,582) | (2,266,725) | (928,401) |
| | | | |
| Net deferred tax assets (liabilities) | $ (3,968,506) | $ (2,497,589) | $ (914,695) |

(b) Tax Holiday Effect

For the years ended December 31, 2015, 2014 and 2013, the PRC corporate income tax rate was 25%. Certain subsidiaries of the Company are entitled to tax exemptions (tax holidays) for the years ended December 31, 2015, 2014 and 2013.

The combined effects of the income tax expense exemptions and reductions available to the Company for the years ended December 31, 2015, 2014 and 2013 are as follows:

| | For the Years Ended December 31, (Unaudited) | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Tax benefit (holiday) credit | $ 912,548 | $ 611,672 | $ 1,378,429 |
| Basic net income per share effect | $ 0.020 | $ 0.010 | $ 0.040 |

155.   The 2015 10-K also discussed the Company's construction-in-progress accounting in the section titled, "NOTE 16 – CONSTRUCTION-IN-PROGRESS":

As of December 31, 2015, a total amount of advances to a supplier of RMB 353,000,000, or $54,368,753, made by Kandi Hainan to Nanjing Shangtong Auto Technologies Co., Ltd. ("Nanjing Shangtong") for equipment purchases was

included in Construction in Process ("CIP"). None of the CIP was transferred to property, plant and equipment as of December 31, 2015.

Because the government of Hainan Province is enforcing a new plan to centralize the manufacturing in designated industry park, the Wanning facility will be reallocated from Wanning City to Haikou City. In addition, all related expenses and assets disposal caused by the relocation were compensated by the local government.

No depreciation is provided for CIP until such time as the facility is completed and placed into operation.

The contractual obligation under CIP of the Company as of December 31,2015 is as follow:

| | Total CIP as of December 31, 2015 | Contracted but not provided for | Total contract amount |
|---|---|---|---|
| Kandi Hainan facility | $ 54,368,753 | $ 6,468,803 | $ 60,837,556 |
| Total | $ 54,368,753 | $ 6,468,803 | $ 60,837,556 |

As of December 31, 2015 and 2014, the Company had CIP amounting to $54,368,753 and $58,510,051, respectively.

No interest expense has been capitalized for CIP for the years ended December 31, 2015, 2014 and 2013, respectively.

156.    In the 2015 10-K, the Company additionally provided information regarding its interest and investment in the JV Company, in "NOTE 24 – SUMMARIZED INFORMATION OF INVESTMENT IN THE JV COMPANY":

In March 2013, pursuant to a joint venture agreement (the "JV Agreement") entered into between Kandi Vehicles and Shanghai Maple Guorun Automobile Co., Ltd. ("Shanghai Guorun"), a 99%-owned subsidiary of Geely Automobile Holdings Ltd. ("Geely"), the parties established Zhejiang Kandi Electric Vehicles Co., Ltd. (the "JV Company") to develop, manufacture and sell electric vehicles ("EVs") and related auto parts. Each of Kandi Vehicles and Shanghai Guorun has 50% ownership interest in the JV Company. In the fourth quarter of 2013, Kandi Vehicles entered into an ownership transfer agreement with the JV Company pursuant to which Kandi Vehicles transferred 100% of its ownership in Kandi Changxing to the JV Company. As a result, the Company indirectly has 50% economic interest in Kandi Changxing through its 50% ownership interest in the JV Company after this transfer. In November 2013, Zhejiang Kandi Electric Vehicles Jinhua Co., Ltd. ("Kandi Jinhua") was formed by the JV Company. The JV Company has 100% ownership interest in Kandi Jinhua, and the Company, indirectly through its 50% ownership interest in the JV Company, has 50% economic interest in Kandi Jinhua. In November 2013, Zhejiang JiHeKang

Electric Vehicle Sales Co., Ltd. ("JiHeKang") was formed by the JV Company. The JV Company has 100% ownership interest in JiHeKang, and the Company, indirectly through its 50% ownership interest in the JV Company, has 50% economic interest in JiHeKang. In December 2013, the JV Company entered into an ownership transfer agreement with Shanghai Guorun pursuant to which the JV Company acquired 100% ownership of Kandi Electric Vehicles (Shanghai) Co., Ltd. ("Kandi Shanghai"). As a result, Kandi Shanghai is a wholly-owned subsidiary of the JV Company, and the Company, indirectly through its 50% ownership interest in the JV Company, has 50% economic interest in Kandi Shanghai. In January 2014, Zhejiang Kandi Electric Vehicles Jiangsu Co., Ltd. ("Kandi Jiangsu") was formed by the JV Company. The JV Company has 100% ownership interest in Kandi Jiangsu, and the Company, indirectly through its 50% ownership interest in the JV Company, has 50% economic interest in Kandi Jiangsu. In addition, In July 2013, Zhejiang ZuoZhongYou Electric Vehicle Service Co., Ltd. (the "Service Company") was formed. The JV Company has a 19% ownership interest in the Service Company. In March 2014, the JV Company changed its name to Kandi Electric Vehicles Group Co., Ltd. In August 2015, the JV Company transferred its shares of the Service Company to Shanghai Guorun and Kandi Vehicles for 9.5% respectively. As the result, the JV Company no longer has any ownership of the Service Company since the transfer. In November 2015, Hangzhou Puma Investment Management Co,. Ltd. ("Puma Investment") was formed by the JV Company. The JV Company has 50% ownership interest in Puma Investment and the Company, indirectly through its 50% ownership interest in the JV Company, has 25% economic interest in Puma Investment. In November 2015, Hangzhou JiHeKang Electric Vehicle Service Co., Ltd. ("JiHeKang Service Company") was formed by the JV Company. The JV Company has 100% ownership interest in JiHeKang Service Company and the Company, indirectly through its 50% ownership interest in the JV Company, has 50% economic interest in JiHeKang Service Company.

As of the year ended December 31, 2015, the JV Company consolidated the following entities on its financial statements: (1) 100% interest in Kandi Changxing; (2) 100% interest in Kandi Jinhua; (3) 100% interest in JiHeKang; (4) 100% interest in Kandi Shanghai; and (5) 100% interest in Kandi Jiangsu;(6) 100% interest in JiHeKang Service; and (7) 50% interest in Puma Investment.

The Company accounted for its investments in the JV Company under the equity method of accounting as the Company has 50% ownership interest in the JV Company. Therefore, the Company's consolidated net income for the year Ended December 31, 2015 and 2014 included equity income from the JV Company during such periods.

The combined results of operations and financial position of the JV Company are summarized below:

|  | Years ended December 31, | | |
|  | **2015** | **2014** | **2013** |
|---|---|---|---|
| Condensed income statement information: | | | |
| Net sales | $ 362,715,996 | $ 215,537,203 | $ 15,212,347 |

| | | | |
|---|---:|---:|---:|
| Gross income | 59,635,845 | 41,889,144 | (1,279,914) |
| % of net sales | 16.4% | 19.4% | -8.4% |
| Net income | 23,323,128 | 7,526,164 | (3,020,756) |
| % of net sales | 6.4% | 3.5% | -19.9% |
| Company's equity in net income of JV | $ 11,661,564 | $ 3,763,082 | $ (1,510,378) |

| | Three months ended December 31, | | |
|---|---:|---:|---:|
| | **2015** | **2014** | **2013** |
| Condensed income statement information: | | | |
| Net sales | $ 164,750,714 | $ 88,773,410 | $ 15,212,347 |
| Gross income | 27,677,165 | 27,944,246 | (1,279,914) |
| % of net sales | 16.8% | 31.5% | -8.4% |
| Net income | 19,322,347 | 743,892 | (2,780,723) |
| % of net sales | 11.7% | 0.8% | -18.3% |
| Company's equity in net income of JV | $ 9,661,173 | $ 371,946 | $ (1,390,362) |

| | December 31, 2015 | December 31, 2014 |
|---|---:|---:|
| Condensed balance sheet information: | | |
| Current assets | $ 455,368,595 | $ 262,543,256 |
| Noncurrent assets | 191,145,583 | 194,229,114 |
| Total assets | $ 646,514,178 | $ 456,772,370 |
| Current liabilities | 429,487,683 | 280,779,432 |
| Noncurrent liabilities | 36,348,514 | 9,006,787 |
| Equity | 180,677,981 | 166,986,151 |
| Total liabilities and equity | $ 646,514,178 | $ 456,772,370 |

For the year ended December 31, 2015, the JV Company's revenues were $362,715,996, an increase of 68.28% from $215,537,203 for the year ended December 31, 2014. For the three months ended December 31, 2015, the JV Company's revenues were $164,750,714, an increase of 85.59% from $88,773,410 for the three months ended December 31, 2014. The revenue was primarily derived from the sales of EV products in the PRC with a total of 24,220 units sold during the year 2015, among which, a total of 12,100 units of EV products were sold during the three months ended December 31, 2015. The growth of sales of EV products was mainly driven by the demand from the MPT program. For the year ended December 31, 2015, the JV Company recorded a net profit of $23,323,128 as compared to $7,526,164 for the year ended December 31, 2014. For the three months ended December 31, 2015, the JV Company recorded a net profit of $19,322,347 as compared to $743,892 for the three months ended December 31, 2014. As the Company only has 50% ownership interest in the JV Company and accounted for its investments in the JV Company under the equity method of accounting, the Company didn't consolidate the JV Company's financial results but included equity income from the JV Company during such

periods, which were a share of profit of $11,661,564 and $3,763,082 for the years ended December 31, 2015 and 2014, respectively.

Note: The following table illustrates the captions used in the Company's Income Statements for its equity basis investments in the JV Company.

Changes in the Company's equity method investment in JV Company for the year ended December 31, 2015 and 2014 are as follows:

| | Years ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Investment in JV Company, beginning of the period, | $ 83,309,095 | $ 79,331,930 |
| Share of profit | 11,661,564 | 3,763,082 |
| Intercompany transaction elimination | (1,135) | (184,138) |
| Year 2014 unrealized profit realized | 181,426 | 911,322 |
| Exchange difference | (4,813,051) | (513,101) |
| Investment in JV Company, end of the period | $ 90,337,899 | $ 83,309,095 |

Sales to the Company's customers, the JV Company and its subsidiaries, for the year ended December 31, 2015 were $152,247,082 or 76% of the Company's total revenue for the year, an increase of 29.3% of the sales to the JV Company from the previous year. Sales to the JV Company and its subsidiaries for the three months ended December 31, 2015 were $45,787,956 or 78% of total revenue for that three months period. The sales to the JV Company and its subsidiaries were primarily the sales of battery packs, body parts, EV drive motors, EV controllers, air conditioning units and other auto parts, the breakdown of the sales to the JV Company and its subsidiaries [sic] as follows:

| | Years ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| JV Company | $ 67,729,570 | $ - |
| Kandi Changxing | 44,019,899 | 65,342,342 |
| Kandi Shanghai | 39,708,548 | 39,412,740 |
| Kandi Jinhua | 789,065 | 12,952,070 |
| Total sales to JV | $ 152,247,082 | $ 117,707,152 |

The following tables summarize the effects of transactions including sales and purchases with JV:

| | Years ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Sales to JV | $ 152,247,082 | $ 117,707,152 |
| Purchase from JV | $ 55,179 | $ 356,609 |

65

As of the years ended 2015 and 2014, the amount due from the JV Company and its subsidieries [sic], net was $76,172,471 and $51,450,612, respectively, of which the majority was the balances with the JV Company, Kandi Jinhua, Kandi Changxing and Kandi Shanghai. The breakdown was as below:

| December 31, | | December 31, | |
|---|---|---|---|
| | **2015** | | **2014** |
| Kandi Shanghai | $         (4,488,379) | $          6,978,618 |
| Kandi Changxing | 3,249,445 | 7,359,202 |
| Kandi Jinhua | 6,218,177 | 12,736,420 |
| Kandi Jiangsu | 11,453 | - |
| JV Company | 71,181,775 | 24,376,372 |
| Consolidated JV | $          76,172,471 | $          51,450,612 |

Within the receivables from the JV Company, the $23,102,869 was a one-year entrusted loan that Kandi Vehicle lent to the JV Company from December 16, 2015 to June 15, 2016 carrying an annual interest rate determined by using the People's Bank of China floating benchmark lending rate on the date of withdraw plus 5% of that rate. The rate will not be adjusted after the withdraw during the lending period, which was 8.7%. The loan was organized by Bank of Communications Hangzhou Zhongan Branch as the agent bank between Kandi Vehicle and the JV Company. Entrusted loans are commonly found in China, where direct borrowing and lending between commercial enterprises are restricted.

157.     Attached to the 2015 10-K were Sox Certifications signed by Defendants Hu and Wang, attesting to the accuracy of the 2015 10-K.

**May 10, 2016 10-Q**

158.     On May 10, 2016, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter ended March 31, 2016 ("1Q 2016 10-Q"), which was signed by Defendants Hu and Wang.

159.     The 1Q 2016 10-Q contained a Consolidated Statements of Cash Flows table ("1Q 2016 Statements of Cash Flows") in which the Company reported incorrect cash flow figures. First, for the three months ended March 31, 2016, $31,350,559 was reported by the Company as an issuance of notes receivables in cash flows from investing activities in the 1Q 2016 Statements of Cash Flows, which represented the settlement of money due from the JV

Company and related parties with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of money due from the JV Company and related parties was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 1Q 2016 Statements of Cash Flows. Second, for the three months ended March 31, 2016, $10,413,273 was reported as an issuance of notes receivables in cash flows from investing activities in the 1Q 2016 Statements of Cash Flows, which represented the settlement of accounts receivable with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of accounts receivable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Third, for the three months ended March 31, 2016, $40,855,454 was reported as repayments of notes receivable in cash flows from investing activities in the 1Q 2016 Statements of Cash Flows, which represented the assignment of the notes receivable to the Company's suppliers to settle the accounts payables. This classification was incorrect because the assignment of the notes receivable to the Company's suppliers to settle the accounts payables was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Fourth, for the three months ended March 31, 2016, $2,063,766 was reported as the proceeds from notes payables in cash flows from financing activities of the 1Q 2016 Statements of Cash Flows, which represented the settlement of accounts payable with notes payables. This classification was incorrect because the settlement of accounts payables with notes payable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section rather than proceeds from notes payable in the financing section. As a result of the above errors, the Company also misstated the accounts receivable and the amount due from the JV Company for the three months ended March 31, 2016.

160.    In the 1Q 2016 10-Q, the Company also reported the total revenue for the three months ended March 31, 2016 as one line item in the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) without identifying which part of the revenue came from related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the income statement as required by Rule 4-08(k) of Regulation S-X.

161.    Moreover, the Company falsely reported the notes receivable as one line item in the Consolidated Balance Sheet contained in the 1Q 2016 10-Q without identifying separately notes receivable from the JV Company and related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the balance sheet as required by Rule 4-08(k) of Regulation S-X. In addition, in the 1Q 2016 10-Q, the Company also failed to transfer the $7.5 million of construction-in-progress recorded in 2014 back to the advances to suppliers or prepayments to reflect the changed completion status of its Hainan facility.

162.    Furthermore, the Company's Note 19-Taxes of the Notes to the Consolidated Financial Statements contained in the 1Q 2016 10-Q was not prepared and reported properly. First, the Company's reported taxes were not properly broken out between current and deferred taxes. Second, the Company's reconciliation schedule reported in Note 19 was prepared incorrectly. The Company was supposed to use the PRC statutory rate of 25% to reconcile to the effective tax rate pursuant to FASB ASC 740-10-50-12. However, in the 1Q 2016 10-Q, the expected tax expense reported by the Company was computed inappropriately through a combination of applying the U.S. Federal rate of 34%, the PRC rate of 25%, and the Hong Kong rate of 16.5%. Third, the Company failed to properly disclose the amount and nature of each item within "permanent differences" in the reconciliation between the expected and reported tax

expense in the 1Q 2016 10-Q. Fourth, the Company failed to correctly disclose the amount and expiration dates of operating losses carryforwards existing as of the first quarter of 2016 and the associated valuation allowance.

163.    Despite all the disclosure and reporting failures, the Company claimed, in Item 4 of the 1Q 2016 10-Q, the following regarding the effectiveness of its controls and procedures:

**Evaluation of Disclosure Controls and Procedures**

We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of March 31, 2015. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.***

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act (a) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) is accumulated and communicated to management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives as described above.

**Changes in Internal Control over Financial Reporting**

***There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

164.    Attached to the 1Q 2016 10-Q were Sox Certifications signed by Defendants Hu and Wang, attesting to the accuracy of the 1Q 2016 10-Q.

<u>**August 9, 2016 10-Q**</u>

165.    On August 9, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2016 ("2Q 2016 10-Q"), which was signed by Defendants Hu and Wang.

166.    The 2Q 2016 10-Q contained a Consolidated Statements of Cash Flows table ("2Q 2016 Statements of Cash Flows") in which the Company reported incorrect cash flow figures. First, for the six months ended June 30, 2016, $34,866,384 was reported by the Company as an issuance of notes receivables in cash flows from investing activities in the 2Q 2016 Statements of Cash Flows, which represented the settlement of money due from the JV Company and related parties with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of money due from the JV Company and related parties was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 2Q 2016 Statements of Cash Flows. Second, for the six months ended June 30, 2016, $12,714,237 was reported as an issuance of notes receivables in cash flows from investing activities in the 2Q 2016 Statements of Cash Flows, which represented the settlement of accounts receivable with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of accounts receivable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Third, for the six months ended June 30, 2016, $49,046,178 was reported as repayments of notes receivable in cash flows from investing activities in the 2Q 2016 Statements of Cash Flows, which represented the assignment of the notes receivable to the Company's suppliers to settle the accounts payables. This classification was incorrect because the assignment of the notes receivable to the Company's suppliers to settle the accounts payables was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Fourth, for the six months ended June

70

30, 2016, $229,450 was reported as repayments of notes receivable in cash flows from investing activities of the 2Q 2016 Statements of Cash Flows, which represented the cash receipts from the collection of notes receivables. This classification was incorrect because the cash receipt from the collection of notes receivables was supposed to be reported as an activity in the cash flow from operation activities section of the 2Q 2016 Statements of Cash Flows. Fifth, for the six months ended June 30, 2016, $4,796,570 was reported as the proceeds from notes payables in cash flows from financing activities of the 2Q 2016 Statements of Cash Flows, which represented the settlement of accounts payable with notes payables. This classification was incorrect because the settlement of accounts payables with notes payable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section rather than proceeds from notes payable in the financing section. As a result of the above errors, the Company also misstated the accounts receivable, notes receivable, accounts payable and the amount due from the JV Company.

167.    In the 2Q 2016 10-Q, the Company also reported the total revenue for the second quarter of 2016 and the six months ended June 30, 2016 as one line item in the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) without identifying which part of the revenue came from related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the income statement as required by Rule 4-08(k) of Regulation S-X.

168.    Moreover, the Company falsely reported the notes receivable as one line item in the Consolidated Balance Sheet contained in the 2Q 2016 10-Q without identifying separately notes receivable from the JV Company and related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the balance sheet as

required by Rule 4-08(k) of Regulation S-X. In addition, in the 2Q 2016 10-Q, the Company also failed to transfer the $7.5 million of construction-in-progress recorded in 2014 back to the advances to suppliers or prepayments to reflect the changed completion status of its Hainan facility.

169.   Furthermore, the Company's Note 18-Taxes of the Notes to the Consolidated Financial Statements contained in the 2Q 2016 10-Q was not prepared and reported properly. First, the Company's reported taxes were not properly broken out between current and deferred taxes. Second, the Company's reconciliation schedule reported in Note 18 was prepared incorrectly. Third, the Company failed to properly disclose the amount and nature of each item within "permanent differences" in the reconciliation between the expected and reported tax expense in the 2Q 2016 10-Q. Fourth, the Company failed to correctly disclose the amount and expiration dates of operating losses carryforwards existing as of the second quarter of 2016 and the associated valuation allowance.

170.   Despite all the disclosure and reporting failures, the Company claimed, in Item 4 of the 2Q 2016 10-Q, the following regarding the effectiveness of its controls and procedures:

**Evaluation of Disclosure Controls and Procedures**

We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of June 30, 2016. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.***

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act (a) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) is accumulated and communicated to management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure. Our

management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives as described above.

**Changes in Internal Control over Financial Reporting**

***There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

171.     Attached to the 2Q 2016 10-Q were Sox Certifications signed by Defendants Hu and Wang, attesting to the accuracy of the 2Q 2016 10-Q.

**2016 Proxy Statement**

172.     On November 2, 2016, the Company filed the 2016 Proxy Statement with the SEC. Concerning the effectiveness of the Company's risk oversight, the Company claimed in the 2016 Proxy Statement, in pertinent part:

Our Board is responsible for oversight of the Company's risk management practices while management is responsible for the day-to-day risk management processes. ***In the Board's opinion, this division of responsibilities is the most effective approach for addressing the risks facing the Company.*** The Board receives periodic reports from management regarding the most significant risks facing the Company. ***In addition, the Audit Committee assists the Board in its oversight of our risk assessment and risk management policies. Our Audit Committee is empowered to appoint and oversee our independent registered public accounting firm, monitor the integrity of our financial reporting processes and systems of internal controls and provide an avenue of communication among our independent auditors, management, our internal auditing department and our Board.***

(Emphasis added.)

173.    Notably, the 2016 Proxy Statement contained an Audit Committee Report signed

by Defendants Yu, Lewin and Chen, which stated, in pertinent part:

> The Audit Committee has reviewed and discussed the audited financial statements
> with our management and representatives of AWC (CPA) Limited, our former
> independent registered public accounting firm. ***The Audit Committee has
> discussed AWC (CPA) Limited judgments as to the quality, not just the
> acceptability, of our accounting principles and such other matters as are
> required to be discussed with the Audit Committee*** by Statement on Auditing
> Standards No. 114 (which superseded Statement on Auditing Standards No. 61),
> other standards of the Public Company Accounting Oversight Board (United
> States), rules of the SEC, and other applicable regulations. The Audit Committee
> also received the written disclosures and the letter from AWC (CPA) Limited
> required by applicable requirements of the Public Company Accounting
> Oversight Board regarding the firm's independence from our management and
> has discussed with AWC (CPA) Limited its independence. The members of the
> Audit Committee considered whether the services provided by AWC (CPA)
> Limited, for the year ended December 31, 2015, are compatible with maintaining
> its independence. The Board has delegated to the Audit Committee the authority
> to approve the engagement of our independent registered public accounting firm.
>
> ***Based upon its reviews and discussions, the Audit Committee recommended to
> our Board that the audited financial statements be included in our Annual
> Report on Form 10-K for the fiscal year ended December 31, 2015 for filing
> with the SEC and the Board approved that recommendation.***

(Emphasis added.)

174.    The 2016 Proxy Statement also noted in connection to performance awards

provided to Kandi's executive officers and/or directors, that "[o]n April 23, 2015 and June 7,

2015, the Company granted 550,000 shares and 120,000 shares, respectively, to the senior

management and key employees as year 2014 performance awards." The 2016 Proxy Statement

failed to disclose material information related to the stock awards received by Kandi's directors

and/or executive officers.  Specifically, the 2016 Proxy Statement failed to disclose that such

compensation that was awarded was based on financial statements that required adjustment and

that, therefore, did not reflect the Company's true performance.

**November 9, 2016 10-Q**

175.    On November 9, 2016, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2016 ("3Q 2016 10-Q"), which was signed by Defendants Hu and Wang.

176.    The 3Q 2016 10-Q contained a Consolidated Statements of Cash Flows table ("3Q 2016 Statements of Cash Flows") in which the Company reported incorrect cash flow figures. First, for the nine months ended September 30, 2016, $46,791,213 was reported by the Company as an issuance of notes receivables in cash flows from investing activities in the 3Q 2016 Statements of Cash Flows, which represented the settlement of money due from the JV Company and related parties with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of money due from the JV Company and related parties was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 3Q 2016 Statements of Cash Flows. Second, for the nine months ended September 30, 2016, $15,198,694 was reported as an issuance of notes receivables in cash flows from investing activities in the 3Q 2016 Statements of Cash Flows, which represented the settlement of accounts receivable with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of accounts receivable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Third, for the nine months ended September 30, 2016, $61,497,480 was reported as repayments of notes receivable in cash flows from investing activities in the 3Q 2016 Statements of Cash Flows, which represented the assignment of the notes receivable to the Company's suppliers to settle the accounts payables. This classification was incorrect because the assignment of the notes receivable to the Company's suppliers to settle the accounts payables was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Fourth, for the

nine months ended September 30, 2016, $918,018 was reported as repayments of notes receivable in cash flows from investing activities of the 3Q 2016 Statements of Cash Flows, which represented the cash receipts from the collection of notes receivables. This classification was incorrect because the cash receipt from the collection of notes receivables was supposed to be reported as an activity in the cash flow from operation activities section of the 3Q 2016 Statements of Cash Flows. Fifth, for the nine months ended September 30, 2016, $5,187,040 was reported as the proceeds from notes payables in cash flows from financing activities of the 3Q 2016 Statements of Cash Flows, which represented the settlement of accounts payable with notes payables. This classification was incorrect because the settlement of accounts payables with notes payable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section rather than proceeds from notes payable in the financing section. As a result of the above errors, the Company also misstated the accounts receivable, notes receivable, accounts payable and the amount due from the JV Company.

177.    In the 3Q 2016 10-Q, the Company also reported the total revenue for the third quarter of 2016 and the nine months ended September 30, 2016 as one line item in the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) without identifying which part of the revenue came from related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the income statement as required by Rule 4-08(k) of Regulation S-X.

178.    Additionally, the Company falsely reported the notes receivable as one line item in the Consolidated Balance Sheet contained in the 3Q 2016 10-Q without identifying separately notes receivable from the JV Company and related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the balance sheet as

required by Rule 4-08(k) of Regulation S-X. Moreover, in the 3Q 2016 10-Q, the Company also failed to transfer the $7.5 million of construction-in-progress recorded in 2014 back to the advances to suppliers or prepayments to reflect the changed completion status of its Hainan facility.

179.    Furthermore, the Company's Note 18-Taxes of the Notes to the Consolidated Financial Statements contained in the 3Q 2016 10-Q was not prepared and reported properly. First, the Company's reported taxes were not properly broken out between current and deferred taxes. Second, the Company's reconciliation schedule reported in Note 18 was prepared incorrectly. Third, the Company failed to properly disclose the amount and nature of each item within "permanent differences" in the reconciliation between the expected and reported tax expense in the 3Q 2016 10-Q. Fourth, the Company failed to correctly disclose the amount and expiration dates of operating losses carryforwards existing as of the third quarter of 2016 and the associated valuation allowance.

180.    Despite all the disclosure and reporting failures, the Company claimed, in Item 4 of the 3Q 2016 10-Q, the following regarding the effectiveness of its controls and procedures:

**Evaluation of Disclosure Controls and Procedures**

We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of September 30, 2016. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.***

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act (a) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) is accumulated and communicated to management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure. Our

management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives as described above.

**Changes in Internal Control over Financial Reporting**

***There was no change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

181.    Attached to the 3Q 2016 10-Q were Sox Certifications signed by Defendants Hu and Wang, attesting to the accuracy of the 3Q 2016 10-Q.

**The Truth Emerges**

182.    On November 14, 2016, the Company announced the abrupt resignation of Defendant Wang as the CFO.

183.    On this news, shares of Kandi fell $0.40 per share or over 10% from its previous closing price to close at $3.50 per share on November 14, 2016.

184.    On March 13, 2017, the Company filed a Form 8-K with the SEC ("3-13-17 8-K") revealing that the Company's previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 could not be relied upon and would need to be restated. Specifically, the 3-13-17 8-K stated, in pertinent part:

**Item 4.02        Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

(a)        During the course of Kandi Technologies Group, Inc.'s (the "Company") preparation of its Annual Report on Form 10-K for the year ended December 31, 2016, and during preparation of responses to comments from the staff of the

Securities and Exchange Commission ("SEC"), Division of Corporate Finance, *the Company's management identified certain areas in the Company's previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 (the "Previously Issued Financial Statements"), that require adjustment as described below and in more detail in the Company's annual report on Form 10-K/A for the fiscal year ended December 31, 2015 ("Form 10-K/A"), to be filed with the SEC. As a result, on March 7, 2017, the board of directors (the "Board") of the Company, based on the recommendation of the Company's audit committee, and in consultation with management, concluded that the Company's Previously Issued Financial Statements should no longer be relied upon.* The Company will, in the Form 10-K/A, restate the Previously Issued Financial Statements, *which restatement will include separate audited financial statements for the JV Company (the "Restatements")*. The Restatements will have no effect on the net income of the Company as reported in the Previously Issued Financial Statements. The Company will endeavor to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016, pursuant to SEC's rules (including timing guidelines), and will file the Form 10-K/A as soon as practicably possible.

The Restatements will include separate audited financial statements for the Company's equity investment in the JV Company, corrections to the classification of notes receivable and notes payable in the Company's statements of cash flow, revisions in the Company's financial statement presentation to separately identify certain related party accounts on the face of the Balance Sheets and the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss), certain amendments to Note 20 – Taxes of the Notes to the Company's Consolidated Financial Statements, the adjustment of previously recorded construction-in-progress back to prepayment in Note 16 - Construction-in-Progress of the Notes to the Company's Consolidated Financial Statements, expansions of two tables of sales to and purchases from the JV Company in Note 24 - Summarized Information of Investment in the JV Company of the Notes to the Company's Consolidated Financial Statements from two years to three years, and the removal of "unaudited" labels from certain tables in Note 20 - Taxes of the Notes to the Company's Consolidated Financial Statements.

The Company will also amend its unaudited quarterly data for the first three quarters ended December 31, 2016, as set forth in its upcoming Annual Report on Form 10-K for the year ended December 31, 2016. The Company has not filed and does not intend to file amendments to its Quarterly Reports on Form 10-Q for the quarterly periods affected. Accordingly, investors should no longer rely upon the Company's previously released financial statements for those periods or any earnings releases or other communications relating to those periods. The Company's Quarterly Reports on Form 10-Q for fiscal year 2017 will include restated results for the corresponding interim periods of fiscal year 2016.

*In addition, in conjunction with the Restatements, the Company is reassessing its internal controls over its financial reporting and compliance programs. The result of this reassessment could lead the Company to conclude that there were deficiencies in its internal controls over financial reporting that constitute material weaknesses and could therefore affect its conclusions regarding effectiveness as previously expressed in Item 9A, Controls and Procedures, of the Company's Annual Report on Form 10-K for the year ended December 31, 2015. Accordingly, management's report on internal controls over financial reporting as of December 31, 2015, and the associated report of AWC (CPA) Limited, the Company's former principal accountant ("AWC"), should no longer be relied upon.* The Public Company Accounting Oversight Board revoked the registration of AWC on May 18, 2016. The Company dismissed AWC and engaged BDO China Shu Lun Pan Certified Public Accountants LLP ("BDO China") as its new independent registered public accounting firm on April 12, 2016, as previously reported. The Company is committed to maintaining an effective control environment and making all necessary changes to enhance control effectiveness.

The chair of the Company's audit committee, on behalf of the audit committee, and the management have discussed the matters disclosed in this Item 4.02(a) of this Current Report on Form 8-K with BDO China.

(Emphasis added.)

185.     On this news, shares of Kandi fell $0.30 per share, or approximately 6%, from its previous closing price to close at $4.05 per share on March 14, 2017.

186.     On March 16, 2017, the Company filed the 2016 10-K with the SEC, in which the Company restated its consolidated financial statements as of and for the years ended December 31, 2015 and 2014 and its unaudited quarterly financial data for the first three quarters for the year ended December 31, 2016 and 2015. The adjustments made as a result of the restatements were discussed in Note 26 - Restatements of Certain Accounts in Previously Issued Financial Statements and Note 27 - Unaudited Quarterly Financial Data, of the Notes to Consolidated Financial Statements included in the 2016 10-K.

187.     In the 2016 10-K, the Company again warned investors that they should not rely upon the Company's previously released financial statements for those periods affected by the restatements and any earning releases or other communications relating to those periods. The

Company stated that it would not file an amendment to the annual report for the fiscal year ended December 31, 2015 on Form 10-K/A to duplicate the content of the restatements contained in the 2016 10-K.

188.    In addition, the Company acknowledged the following regarding its controls and procedures under Item 9A of the 2016 10-K:

**(a) Evaluation of Disclosure Controls and Procedures**

The Company has evaluated, under the supervision of the Company's Chief Executive Officer and the Chief Financial Officer, the effectiveness of disclosure controls and procedures as of December 31, 2016. This is done in order to ensure that information the Company is required to disclose in reports that are filed or submitted under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is: (i) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and (ii) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2016.***

**(b) Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting ("ICFR") as defined in Rules 13a-15(f) and 15d-15(f) under Exchange Act. The Company's ICFR is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP.

…

Management conducted an assessment of the effectiveness of our system of ICFR as of December 31, 2016, the last day of our fiscal year of 2016. This assessment was based on criteria established in Internal Control—Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in 2013 (the "2013 COSO Framework") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment.

***According to the SEC rules and guidance on internal control over financial reporting, a material weakness is a deficiency, or a combination of deficiencies, in ICFR such that there is a reasonable possibility that a material misstatement to the annual or interim financial statements will not be prevented or detected on a timely basis.***

Based on management's evaluation under the 2013 COSO Framework, management identified the following material weaknesses as of December 31, 2016 in the Company's ICFR, principally related to the Company's period-end financial reporting.

   i. *Accounting and finance personnel. The company lacks sufficient expertise relating to technical knowledge of certain US GAAP accounting and SEC disclosures to ensure accuracy and completeness of accounting treatment and financial reporting. The weakness was largely due to the lack of requisite U.S. GAAP and SEC compliance experience with our finance personnel responsible for the preparation of U.S. GAAP based financial statements and disclosures pursuant to the SEC rules and regulations.*


   ii. *Disclosure requirements for equity investments. The Company did not have sufficient expertise to ensure the completeness of the disclosure of financial statements for equity investments. The procedures in the control framework designed by the Company's internal department in its accounting manual (the "Accounting Manual") used to identify the requirements to file separate audited financial statements for equity investments was not adequately performed during each reporting period. The weakness resulted in the addition of separate audited financial statements of the JV Company to this Form 10-K.*


   iii. *Disclosure of related party transactions.  The Company did not have sufficient expertise to ensure that proper disclosure of related party transactions.  The procedures in the Accounting Manual for the preparation of the financial statements were not adequately performed during each reporting period. The weakness resulted in the restatement of consolidated balance sheet and consolidated income statement to separately identify certain accounts with the JV Company and related parties on the face of consolidated balance sheet and consolidated income statement in this Form 10-K.*

   iv. *Presentation of the statement of cash flows. The Company did not have effective controls to ensure the proper classification and reporting of certain cash and non-cash activities related to accounts receivable, accounts payable, notes receivable and notes payable on the statement of cash flows. The procedures in the Accounting Manual for the preparation of the statement of cash flows were not adequately performed during each reporting period. The weakness resulted in the reclassification of the statement of cash flows line items and related financial disclosures in this Form 10-K.*

   v. *Accounting for income taxes. The Company did not have sufficient expertise to ensure the accuracy of the accounting and reporting of income taxes and related disclosures. The procedures in the Accounting Manual for the identification of the tax rates and calculation of the income taxes were not adequately performed during each reporting period. The weakness resulted in the correction in accounting for income taxes in this Form 10-K.*

*Based on the material weaknesses as laid out above, management concluded*

> *that the Company's internal control over financial reporting was not effective as of December 31, 2016 based on the 2013 COSO Framework.*

(Emphasis added.)

189.    On this news, Kandi's share price fell $0.35, or 8.6%, to close at $3.70 per share on March 16, 2017.

### Summary of Defendants' Misconduct

190.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

191.    In breach of their fiduciary duties owed to Kandi, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact and to engage in the Fraudulent Subsidiary Scheme. Specifically, the Individual Defendants caused the Company to: 1) fail to correctly classify certain cash and noncash activities related to notes receivable, notes payable, accounts receivable and accounts payable in the Company's statements of cash flows; 2) fail to disclose the amount of related party transactions on the face of the Company's balance sheets and income statements; 3) fail to transfer the $7.5 million of construction-in-progress recorded in 2014 back to the advances to suppliers or prepayments to reflect the changed completion status of its Hainan facility; 4) fail to properly report the income taxes for each reporting period during the Relevant Period; 5) fail to include separate audited financial statements for its equity investment in the JV Company; 6) fail to disclose its engagement in the Fraudulent Subsidiary Scheme; 7) fail to disclose that the Company's previously issued financial statements for the first three quarters for the year ended December 31, 2016 and the years ended December 31, 2015 and 2014, contained numerous other sections that the Company was required to adjust; 8) fail to disclose that the

Company lacked effective disclosure controls and internal controls over financial reporting; and 9) fail to disclose that the Company lacked sufficient expertise to ensure the accuracy and completeness of its accounting treatment and financial reporting.

192.    Moreover, the Company failed to disclose that the Company had to readjust its public filings with regard to: 1) the classification of notes receivable and notes payable in the Company's statements of cash flow and certain related party accounts on its Balance Sheets and its Consolidated Statements of Income (Loss) and Comprehensive Income (Loss); 2) audited financial statements for the Company's equity investment in the Joint Venture; 3) Kandi's unaudited quarterly data for the first three quarters ended December 31, 2016 and 2015; 4) the section titled "Construction-in-Progress of the Notes to the Company's Consolidated Financial Statements;" 5) the section titled "Taxes of the Notes to the Company's Consolidated Financial Statements;" 6) the section titled "Summarized Information of Investment in the Joint Venture of the Notes to the Company's Consolidated Financial Statements;" and 7) the section titled "Taxes of the Notes to the Company's Consolidated Financial Statements."

## DAMAGES TO KANDI

193.    As a direct and proximate result of the Individual Defendants' conduct, Kandi will lose and expend many millions of dollars.

194.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO-Chairman, CFO, and former CFOs and with government investigations and actions as well as amounts paid to outside lawyers, accountants, and investigators in connection thereto.

195.    Such costs include, but are not limited to, those necessary to enhance the internal controls and corporate governance of the Company.

196.     Such losses include the failure of the JV Company to make any sales of EVs.

197.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

198.     As a direct and proximate result of the Individual Defendants' conduct, Kandi has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

199.     Plaintiff brings this action derivatively and for the benefit of Kandi to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Kandi, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violation of Section 14(A) of the Exchange Act, as well as the aiding and abetting thereof.

200.     Kandi is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

201.     Plaintiff is, and continuously has been since 2012, that is, before the beginning of the Relevant Period, a shareholder of Kandi common stock.  Plaintiff will adequately and fairly represent the interests of Kandi in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

202.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

203.    A pre-suit demand on the Board of Kandi is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following seven individuals: Individual Defendants Hu, Wang, Mei, Lewin, Yu, and Chen (collectively, the "Directors") and non-party Yi Lin.  Plaintiff needs only to allege demand futility as to four of the seven directors that were on the Board at the time this action was commenced.

204.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of 1) their failure to maintain effective disclosure controls and internal controls over financial reporting, 2) the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, and 3) their Fraudulent Subsidiary Scheme, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

205.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the conduct alleged herein.  The fraudulent schemes were intended to make the Company appear more stable, profitable, and attractive to investors.  As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

206.    Additional reasons that demand on Defendant Hu is futile follow.  Defendant Hu was the Company's Chairman and CEO at all relevant times, and is thus, as the Company admits, a non-independent director. Indeed, Defendant Hu receives millions of dollars in

compensation from the Company annually. For example, Defendant Hu received total compensation of $3,842,504 for 2015 and $3,087,831 for 2016. Defendant Hu was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings, all of which he signed. His large Company stock holding, worth approximately $70.9 million, and comprising a 27.54% ownership interest in the Company, before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. Moreover, Defendant Hu is a defendant in the Securities Class Actions. Defendant Hu is also involved in certain related-party transactions.  He and the Company both have ownership interests in the Service Company, which owes the Company $40,606,162. Additionally, his son engages in business with the Company and currently owes Kandi $620,410. He may fear retaliatory action from the Service Company or his son should he take action against the other Directors.  As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  For these reasons, too, Defendant Hu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

207.    Additional reasons that demand on Defendant Wang is futile follow.  Defendant Gagnon was a Company director since May 20, 2015. From May 1, 2015 to November 14, 2016, Defendant Wang also served as the Company's CFO. Currently, Defendant Wang is the CSO of the Company. Thus, Defendant Wang was and is still beholden to and dependent on the Company, the Board, and controlling shareholder Defendant Hu for his employment. Indeed, the

Company acknowledges that Defendant Wang is not considered an independent director under the NASDAQ listing rules. Defendant Wang received millions of dollars in compensation from the Company annually. For example, Defendant Wang received total compensation of $1,613,074 for 2015 and $1,801,700 for 2016. Defendant Hu was ultimately responsible for the false and misleading statements and omissions that were made, including those contained in the SEC filings, most of which he signed. Moreover, Defendant Wang is a defendant in the Securities Class Actions. As a trusted Company director, Defendant Wang conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Wang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

208.   Additional reasons that demand on Defendant Mei is futile follow.  Defendant Mei was a Company director since December 16, 2016. Currently, Defendant Mei also serves as the CFO of the Company. Thus, like Defendants Wang and Hu, Defendant Mei is beholden to and dependent on the Company, the Board, and controlling shareholder Defendants Hu for his employment. As the Company acknowledges, Defendant Mei is not considered an independent director under the NASDAQ listing rules. Indeed, Defendant Mei is going to receive millions of compensation from the Company annually, including an annual salary in the amount of $180,000, an annual living allowance in the amount of $20,000, an aggregate of 10,000 shares of the Company's common stock in four equal quarterly installments of 2,500 shares under the Company's 2008 Omnibus Long-Term Incentive Plan or any available plan in the future, and an

equity incentive at each year end based on the Company's results of operations and his performance. Moreover, Defendant Mei is also a defendant in the Securities Class Actions. As a top financial officer and as a trusted Company director, Defendant Mei conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Mei breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209.    Additional reasons that demand on Defendant Lewin is futile follow.  Defendant Lewin has served as a director of Kandi since 2010 and is a member of the Company's Audit Committee. Thus, Defendant Lewin is especially culpable for the false and misleading statements and omissions of material fact that were made in the Company's SEC filings and for the failure to maintain effective disclosure controls and internal control over financial reporting. Moreover, Defendant Lewin's large Company stock holding, worth approximately $270,000 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted director and a member of the Audit Committee, Defendant Lewin conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In fact, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2014 10-K, the 2015 10-K and the Audit Committee Reports contained in the 2015

and 2016 Proxy Statements. For these reasons, too, Defendant Lewin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

210.   Additional reasons that demand on Defendant Yu is futile follow.  Defendant Yu has served as a director of Kandi since 2011 and is the Chair of the Company's Audit Committee. Thus, Defendant Yu is especially culpable for the false and misleading statements and omissions of material fact that were made in the Company's SEC filings and for the failure to maintain effective disclosure controls and internal control over financial reporting. Moreover, Defendant Yu's large Company stock holding, worth approximately $270,000 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted director, the Chair of the Audit Committee and a member of the Compensation Committee and the Nominating and Corporate Governance Committee, Defendant Yu conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In fact, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2014 10-K, the 2015 10-K and the Audit Committee Reports contained in the 2015 and 2016 Proxy Statements. For these reasons, too, Defendant Yu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

211.   Additional reasons that demand on Defendant Chen is futile follow.  Defendant Chen has served as a director of Kandi since 2012. He is a member of the Audit Committee and

the Nominating and Corporate Governance Committee. Thus, Defendant Chen is especially culpable for the false and misleading statements and omissions of material fact that were made in the Company's SEC filings, for the failure to maintain effective disclosure controls and internal control over financial reporting, and for the Board's failure to properly exercise corporate governance oversight. As a trusted director, the Chair of the Compensation Committee and a member of the Audit Committee and the Nominating and Corporate Governance Committee, Defendant Chen conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In fact, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2014 10-K, the 2015 10-K and the Audit Committee Reports contained in the 2015 and 2016 Proxy Statements. For these reasons, too, Defendant Chen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212.    Demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other, and especially to controlling shareholder Defendant Hu. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

213.    Additionally, the Directors, as members of the Board, were and are subject to the Code of Ethics.  The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict with the Company's interests or adversely affect the Company's reputation.  The Directors did not comply with the requirements of the Code of Ethics.  The Directors violated the Code of Ethics because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  Because the Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

214.    The members of the Company's Audit Committee, Defendants Yu, Lewin, and Chen, failed to uphold the Audit Committee Charter, which states that:

> the primary function of the Audit Committee . . . is to assist the Board . . . in fulfilling its oversight responsibilities by: (1) reviewing the financial reports and other financial related information released by the Company to the public . . . .; (2) reviewing the Company's system of disclosure controls and procedures, internal controls over financial reporting, and compliance with ethical standards adopted by the Company; (3) reviewing the Company's accounting and financial reporting processes and the audits of the financial statements of the Company . . . .

Pursuant to their duties, the Audit Committee members knew or should have known that the Company had made the false and misleading statements and omissions as described herein. By allowing such statements and omissions to be made, Defendants Yu, Lewin and Chen caused Kandi to breach their fiduciary duties and violate federal securities law.  Thus, demand is excused as to Defendants Yu, Lewin and Chen.

215.    The members of the Company's Compensation Committee, Defendants Chen and Yu, failed to uphold the Compensation Committee Charter, which states that they had the

responsibility to "review and make recommendations to the Board . . . regarding all forms of compensation to be provide to the executive officers and directors of Kandi . . . including stock compensation and loans, and all bonus and stock compensation to all employees." Their responsibilities also included:

> 3.1 Reviewing and making recommendations to the Board regarding the compensation policy for executive officers of and directors of the Company, and such other officers of the Company as directed by the Board;

> 3.2 Reviewing and making recommendations to the Board regarding all forms of compensation (including all "plan" compensation, as such term is defined in Item 402(a)(7) of Regulation S-K promulgated by the Securities and Exchange Commission, and all non-plan compensation) to be provided to the executive officers of the Company;

> 3.3 Reviewing and making recommendations to the Board regarding general compensation goals and guidelines for the Company's employees and the criteria by which bonuses to the Company's employees are determined . . . .

During the Relevant Period, the Compensation Committee members awarded Company shares to Kandi's executive officers and/or Board members, specifically Defendants Hu and Wang, based on the purported performance of the Company. As such, the Compensation Committee members approved excessive compensation to be awarded to certain of the Company's officers and directors based on a false and misleading portrayal of the Company's performance. Moreover, once it came to light that the financial information relied upon to award compensation to these officers and directors was improper, the Compensation Committee members failed to claw back the compensation wrongly awarded. Thus, any demand as to Defendants Chen and Yu is futile, and thus excused.

216. Kandi has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for

Kandi any part of the damages Kandi suffered and will continue to suffer thereby.  Thus, any demand on the Directors would be futile.

217.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

218.   The acts complained of herein constitute violations of fiduciary duties owed by Kandi's officers and directors, and these acts are incapable of ratification.

219.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Kandi.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."   As a result, if the Directors were to sue themselves or certain of the officers of Kandi, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance

policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

220.    If there is no directors' and officers' liability insurance, then the Directors will not cause Kandi to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

221.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(A) of the Securities Exchange Act of 1934

222.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

224.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

225.    Under the direction and watch of the Directors, the 2015 and 2016 Proxy Statements failed to disclose that the Company: 1) failed to correctly classify certain cash and noncash activities related to notes receivable, notes payable, accounts receivable and accounts payable in the Company's statements of cash flows; 2) failed to disclose the amount of related party transactions on the face of the Company's balance sheets and income statements; 3) failed to transfer the $7.5 million of construction-in-progress recorded in 2014 back to the advances to suppliers or prepayments to reflect the changed completion status of its Hainan facility; 4) failed to properly report the income taxes for each reporting period during the Relevant Period; 5) failed to include separate audited financial statements for its equity investment in the JV Company; 6) engaged in the Fraudulent Subsidiary Scheme; 7) failed to disclose that the Company's previously issued financial statements for the first three quarters for the year ended December 31, 2016 and the years ended December 31, 2015 and 2014, contained numerous other sections that the Company was required to adjust; 8) failed to disclose that the Company lacked effective disclosure controls and internal controls over financial reporting; and 9) failed to disclose that the Company lacked sufficient expertise to ensure the accuracy and completeness of its accounting treatment and financial reporting.

226.    Moreover, the Company failed to disclose in the 2015 and 2016 Proxy Statements that the Company had to readjust its public filings with regard to: 1) the classification of notes receivable and notes payable in the Company's statements of cash flow and certain related party accounts on its Balance Sheets and its Consolidated Statements of Income (Loss) and Comprehensive Income (Loss); 2) audited financial statements for the Company's equity

investment in the Joint Venture; 3) Kandi's unaudited quarterly data for the first three quarters ended December 31, 2016 and 2015; 4) the section titled "Construction-in-Progress of the Notes to the Company's Consolidated Financial Statements;" 5) the section titled "Taxes of the Notes to the Company's Consolidated Financial Statements;" 6) the section titled "Summarized Information of Investment in the Joint Venture of the Notes to the Company's Consolidated Financial Statements;" and 7) the section titled "Taxes of the Notes to the Company's Consolidated Financial Statements."

227.    The Individual Defendants also caused the 2015 and 2016 Proxy Statements to be false and misleading in that they stated that the Company's division of responsibilities "is the most effective approach for addressing the risks facing the Company." Indeed, the Individual Defendants' failure to maintain effective oversight, disclosure controls and internal controls over financial reporting, and the Company's dissemination of the materially false and misleading statements evidenced that the Individual Defendants failed to practice and/or uphold sound corporate governance practices.

228.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2015 and 2016 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2015 and 2016 Proxy Statements, including but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

229.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2015 and 2016 Proxy Statements.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

230.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

231.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Kandi's business and affairs.

232.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

233.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Kandi.

234.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

235.     In further breach of their fiduciary duties owed to Kandi, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements and omissions of material fact.  The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

236.     The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Kandi's securities.

237.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein, including the Fraudulent Subsidiary Scheme, and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, including the Fraudulent Subsidiary Scheme, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and, *inter alia*, for the purpose and effect of artificially inflating the price of Kandi's securities.

238.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

239.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Kandi has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

240.     Plaintiff on behalf of Kandi has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

241.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

242.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Kandi.

243.     The Individual Defendants either benefitted financially from the improper conduct and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Kandi that was tied to the performance or artificially inflated valuation of Kandi, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

244.     Plaintiff, as a shareholder and a representative of Kandi, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

245.     Plaintiff on behalf of Kandi has no adequate remedy at law.

<u>FOURTH CLAIM</u>

**Against Individual Defendants for Abuse of Control**

246.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

247.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Kandi, for which they are legally responsible.

248.     As a direct and proximate result of the Individual Defendants' abuse of control, Kandi has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Kandi has

sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

249.    Plaintiff on behalf of Kandi has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

250.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

251.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Kandi in a manner consistent with the operations of a publicly-held corporation.

252.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Kandi has sustained and will continue to sustain significant damages.

253.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

254.    Plaintiff, on behalf of Kandi, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

255.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

256.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Kandi to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend and remedy

unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

257.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

258.    Plaintiff on behalf of Kandi has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Kandi, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Kandi;

(c)    Determining and awarding to Kandi the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Kandi and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Kandi and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

102

2. a provision to permit the shareholders of Kandi to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Kandi restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: May 24, 2017                          Respectfully submitted,


/s/Phillip Kim
Phillip Kim (PK 9384)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, New York 10016
Tel: 212.686.1060
Fax: 212.202.3827
Email: pkim@rosenlegal.com


*Counsel for Plaintiff*

<u>VERIFICATION</u>

I, Richard Baker, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 24 day of May, 2017.

_____
Richard Baker