**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (PK 9384)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD BAKER, DERIVATIVELY ON BEHALF OF KANDI TECHNOLOGIES GROUP, INC., | Case No. 1:17-cv-04399-ER |
| Plaintiff, | **VERIFIED FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** |
| v. | **(1) BREACH OF FIDUCIARY DUTY;** |
| XIAOMING HU, XIAOYING ZHU, CHENG WANG, BING MEI, JERRY LEWIN, HENRY YU, and LIMING CHEN, | **(2) UNJUST ENRICHMENT;** **(3) ABUSE OF CONTROL;** **(4) GROSS MISMANAGEMENT;** **(5) WASTE OF CORPORATE ASSETS; AND** |
| Defendants, | **(6) VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| And | |
| KANDI TECHNOLOGIES GROUP, INC., | **JURY TRIAL DEMANDED** |
| Nominal Defendant. | |

Plaintiff Richard Baker ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Kandi Technologies Group, Inc. ("Kandi" or the "Company"), files this Verified First Amended Shareholder Derivative Complaint against Individual Defendants Xiaoming Hu ("Hu"), Xiaoying Zhu ("X. Zhu"), Cheng Wang ("Wang"), Bing Mei ("Mei"), Jerry Lewin ("Lewin"), Henry Yu (Yu"), and Liming Chen ("Chen") (collectively, the "Individual Defendants," and together with Kandi, the "Defendants") for breaches of their fiduciary duties as

directors and/or officers of Kandi, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his amended complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Kandi, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Kandi's directors and officers starting on November 15, 2013 and through the present (the "Relevant Period").

2. Kandi is an automotive manufacturing company based in China with primary business operations comprised of designing, developing, manufacturing and commercializing electric vehicles ("EV"), EV parts, and off-road vehicles.

3. In September 2013, the Chinese government announced a major expansion of government subsidies for EVs, pursuant to which EV manufacturers would receive subsidy payments from the central government – up to $9,800 per passenger car and $81,600 per electric bus, paid to the manufacturers on a quarterly basis – and EV purchasers would receive subsidy payments from local governments.

4. In response, the Individual Defendants reconstituted Kandi's main line of business to, in essence, defraud the Chinese government's subsidy program so as to make the Company look more profitable than it was, and to enrich the Individual Defendants, including, among others, Chairman and CEO Defendant Hu.

5. To execute the scheme, Kandi manufactured EV parts (predominantly battery packs) and sold them to a newly-formed joint-venture company (the "JV Company," 50% owned by Kandi), which manufactured EVs and sold them to a third company ("ZZY" or the "Service Company"), also partly owned by Kandi, as well as Hu, which operated a car-sharing program called "EV-Share." The JV Company would receive EV manufacturing subsidies from the central government, and ZZY would receive EV purchasing subsidies from local governments. This "double dipping" business model was filled with conflicts, as 9.5% of ZZY was and is owned by Kandi and an additional 13% of ZZY was and is owned by Defendant Hu – a fact the Individual Defendants caused the Company to belatedly disclose, as detailed below. The aforementioned scheme is referred to herein as the "Fraudulent Subsidy Scheme".

6. But the Fraudulent Subsidy Scheme could only work, and the Company's revenue and profits could only stay afloat, if the Company and its subsidiaries and business partners would continue to receive these generous EV subsidies: it depended on ZZY receiving purchasing subsidies so that it could buy EVs from the JV Company, and on the JV Company receiving manufacturing subsidies so that it could buy EV parts from Kandi.

7. In early 2016, the Chinese government commenced a fraud investigation into its EV subsidy program, and subsidy payments for EVs sold in 2015 and 2016 were suspended pending the investigation. Yet while the Individual Defendants caused Kandi to continue to assure investors such investigation would not effect the prospects of the Company, they knew the

opposite to be the case: JV Company sold ***zero EVs*** in the first quarter of 2016, and the Individual Defendants knew that prospects for receiving future subsidies were quickly fading.

8. The suspension of these subsidy payments devastated the JV Company's and ZZY's cash flow positions, preventing the JV Company from paying Kandi on time, which in turn impacted Kandi's ability to pay its own vendors and suppliers.

9. Ultimately, the Fraudulent Subsidy Scheme and misconduct engaged in by other EV manufacturers caused the Chinese government to reduce the subsidy program, and then phase it out altogether. Moreover, on September 8, 2016, the Chinese Ministry of Finance announced penalties against five automakers for fraudulently obtaining $150 million in illegal subsidies. The next day, news reports indicated that an additional 20 companies were also found to have committed violations, including Geely Automobile Holdings Ltd. ("Geely")—Kandi's partner for the JV Company.[1]

10. To conceal the impact of the subsidy suspensions on the Company's cash flows, and to avoid recording expenses resulting from the fact its receivables could not be collected, the Individual Defendants started to assign Kandi's outstanding receivables (primarily from the JV Company) to its own vendors and suppliers, without ever receiving or remitting actual cash. But the Individual Defendants caused the Company to misclassify this trickery in its financial reporting as "cash" activity – even though Kandi had neither received nor paid out any cash in connection with that activity – and improperly reflected those sums as such in the Statements of Cash Flows in Kandi's financial statements. Consequently, Kandi's financial statements materially overstated the amount of cash flowing in and out of the Company, misleading investors as to the Company's

[1] On July 25, 2016, Geely announced that it was going to sell its 50% stake in the JV Company at a valuation that was barely above book value.

cash flow position and creating a false impression that the Company was both (a) receiving payments to settle notes receivable in a timely manner and (b) paying, in cash, its own obligations (liabilities) to its own vendors and suppliers.

11. Moreover, to further conceal the fact that the Company could not collect receivables from the JV Company, the Individual Defendants caused the Company to secretly extend the credit terms offered to the JV Company, allowing it to make payments as late as ***720 days after delivery*** – in stark contrast to the typical 90-to-120-day credit terms for customers in previous years.

12. This fraudulent mischaracterization of cash inflows and outflows went on for years and amounted to hundreds of millions of dollars – comprising the heart of the Company's business – and flatly contradicted the Company's actual accounting and transactions in real time. Thus, its impact and effect on the Company would have been unmistakable to the Individual Defendants, who (a) filed and certified the Company's accounting statements – as Chief Executive Officer ("CEO") and Chief Financial Officers ("CFOs") – and/or (b) were assigned to monitor and control the Company's accounting statements as Company directors who served on the Company's Audit Committee (the "Audit Committee").

13. Moreover, during the Relevant Period, the Individual Defendants also caused and/or permitted the Company to make other material Generally Accepted Accounting Principles ("GAAP") and SEC rule violations in its financial reporting, similarly designed to conceal or obscure the fall-out on the Company from the suspension of the subsidies, as detailed further herein.

14. As a result, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact adverse to the investing public during the Relevant Period. Specifically, the Individual Defendants failed to

and/or caused the Company to fail to: (a) correctly classify hundreds of millions of dollars of cash and noncash activities related to notes receivable, notes payable, accounts receivable and accounts payable in the Company's statements of cash flows; (b) identify certain related party accounts on the face of the Company's balance sheets and income statements; (c) transfer the $7.5 million of construction-in-progress recorded in 2014 back to the advances to suppliers or prepayments to reflect the changed completion status of its Hainan facility; (d) properly report the income taxes for each reporting period during the Relevant Period; (e) include separate audited financial statements for its equity investment in the JV Company; (f) disclose the Fraudulent Subsidy Scheme; (g) disclose that the Company's financial statements for the first three quarters for the year ended December 31, 2016 and the years ended December 31, 2015 and 2014, contained numerous GAAP and SEC rule violations that the Company was required to adjust; (h) disclose and misrepresent the circumstances of the termination of its auditor AWC; (i) timely disclose critical changes in its credit terms with affiliated entities that were designed to further conceal the cessation of subsidies; (j) timely disclose Defendant Hu's interest in the Service Company; (k) timely disclose related-party transactions with a company called "Kandi USA," which was controlled by Defendant Hu's son and owed the Company significant debt; (l) disclose that the Company lacked effective disclosure controls and internal controls over financial reporting; and (m) disclose that the Company lacked sufficient expertise to ensure the accuracy and completeness of its accounting treatment and financial reporting.

15. Ultimately, in 2017, after the SEC discovered the Company's improper accounting and false and misleading statements, Kandi had to restate its financial statements ***all the way back to 2014***.

16. Kandi's internal controls were also in shambles throughout the Relevant Period. The Individual Defendants caused Kandi to fail to disclose material internal control deficiencies, including a lack of effective controls over financial reporting to ensure: (a) the completeness of disclosures regarding equity investments; (b) proper disclosure of the financial statements of the JV Company; (c) the proper classification and reporting of certain cash and non-cash activities related to notes receivable and notes payable on the Company's Statement of Cash Flows; (d) identification of certain related party accounts on the face of its balance sheets and income statements; and (e) the accuracy of the accounting and reporting of income taxes and related disclosures.

17. Tellingly, in 2014, the Individual Defendants had claimed that they were addressing internal control deficiencies at the Company and, by the third quarter of 2014, claimed they had fixed them. Three years later, when the Company restated its financials in 2017 following an SEC inquiry, it was forced to concede its controls had been ineffective all along.

18. In addition, in May 2016 and well before the Company restated its financial reports, Kandi's auditor, Albert Wong & Co. LLP, later known as AWC (CPA) Limited ("AWC"), was banned from the auditing industry because it failed to investigate obvious signs of fraud engaged in by Kandi's management. Also tellingly, the Audit Committee agreed to terminate AWC as auditor of the Company *a month* before it was banned from the auditing industry, indicating that the Individual Defendants knew full well that that auditor was not reliable at best and fraudulent at worst before its misconduct was revealed to the public.

19. Also during the Relevant Period, while the Individual Defendants were engaged in the misconduct alleged herein, the Individual Defendants awarded the Company's management excessive and unjust compensation. For example, for the fiscal year ended December 31, 2015,

the Company awarded management stock-based compensation that comprised ***68%*** of Kandi's operating expenses and ***78%*** of its gross profits.

20. In addition, Defendant Hu was unjustly enriched directly from the Fraudulent Subsidy Scheme by recouping duplicative subsidies by virtue of his overlapping interests in the Company, the JV Company (through his significant ownership of Kandi), and the Service Company.

21. By late 2016, the truth of the Individual Defendants' gross misconduct began to emerge in full. On November 14, 2016, the Company announced the abrupt resignation of Defendant Wang, the Company's CFO at the time. On December 28, 2016, the SEC began to catch-on, sending a comment letter to Kandi with questions regarding the Company's financial statements: seeking clarification as to Kandi's accounts receivable, the expected impact of reductions in government subsidies on "sales to the JV Company and on your equity in its earnings," and why "the amount due from the JV Company has been steadily increasing" so quickly.

22. Approximately four months later, on March 13, 2017, the Company unexpectedly announced in a Form 8-K filed with the SEC that the Company's previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 could no longer be relied upon and would need to be restated. The Company also revealed that "there were deficiencies in its internal controls over financial reporting that constitute material weaknesses" during those same reporting periods.

23. On March 16, 2017, the Company filed an annual report on Form 10-K with the SEC for fiscal year ended December 31, 2016 (the "2016 10-K"), in which the Company restated its consolidated financial statements for the years ended December 31, 2015 and 2014 and its

unaudited quarterly financial data for the first three quarters for the year ended December 31, 2016 and 2015 (the "Restatement"). The Company acknowledged its previous failures and inabilities to make proper, accurate and complete financial disclosures and identified material weaknesses that had been residing in the Company's internal controls over financial reporting since at least 2014.

24. Due to the Individual Defendants' misconduct, Kandi, its CEO-Chairman (Defendant Hu), its current CFO (Defendant Mei), and two of its former CFOs (Defendants X. Zhu and Wang) have been named as defendants in four federal securities fraud class action lawsuits that have since been consolidated in this Court (the "Securities Class Action").

25. The Securities Class Action – along with the need to undertake internal investigations, the need to restate its financial reports, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets in the Fraudulent Subsidy Scheme, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, and the general loss of good will – has subjected and will continue to subject the Company to many millions of dollars of damages.

26. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud in the Fraudulent Subsidy Scheme and the accounting misconduct, their glaring and knowing failure to implement or enforce effective controls, the substantial likelihood of their liability in the Securities Class Action, and their unmistakable track record of being beholden to the primary wrongdoer and beneficiary of the fraud Defendant Hu (who is not only the Company's top officer and Chairman, but who effectively controls the Company's operations, transactions, and finances through his ownership of and control over a significant portion of the Company's shares), a majority of the

Board of Directors (the "Board") cannot consider a demand to commence litigation against Defendant Hu and themselves on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

27. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

28. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

29. Additionally, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff is a citizen of Pennsylvania and none of the Defendants is a citizen of Pennsylvania, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

30. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

31. Venue is proper in this district because a portion of the transactions and wrongs complained of herein, including the Defendants' participation in the wrongful acts detailed herein, have occurred in this district. In addition, the Defendants have conducted substantial business in this district, and have derived substantial compensation from their activities in this district.

## PARTIES

**Plaintiff**

32. Plaintiff is a current shareholder of Kandi common stock. Plaintiff has continuously held Kandi common stock since 2012 and throughout the Relevant Period. Plaintiff is a citizen of Pennsylvania.

**Nominal Defendant Kandi**

33. Kandi is a Delaware corporation with its principal executive offices at Jinhua City Industrial Zone, Jinhua, Zhejiang Province, People's Republic of China ("PRC") 321016. Kandi's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "KNDI."

**Defendant Hu**

34. Defendant Hu has served as the Company's Chairman of the Board, CEO, and President since June 2007. According to the Company's Schedule 14A filed with the SEC on November 2, 2016 (the "2016 Proxy Statement"), as of October 17, 2016, Defendant Hu beneficially owned 13,138,077 shares of the Company's common stock, which was about 27.54% of the Company's issued and outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on October 17, 2016 was $5.40, Hu owned about $70,945,615 worth of Kandi stock as of that date. Hu's significant interest in the Company continues to this day: According to the Company's Schedule 14A filed with the SEC on November 16, 2018 (the "2018 Proxy Statement"), Hu beneficially owned 13,907,449 shares of the Company's common stock, which was about 27% of the Company's issued and outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on October 31, 2018 was $4.81, Hu owned about $66,894,829 worth of Kandi stock as of that date. Accordingly, Hu – both directly and indirectly – owned and still owns a substantial

portion of the Company's shares during the Relevant Period, and thus had and has effective control over all aspects of the Company's operations, transactions, and finances.

35. For the fiscal year ended December 31, 2015, Defendant Hu received $3,842,504 in compensation from the Company. This included $29,076 in salary, $1,195,000 in stock awards, and $2,618,428 in option awards. For the fiscal year ended December 31, 2016, Defendant Hu received $3,087,831 in compensation from the Company. This included $27,331 in salary and $3,060,500 in option awards. And for the fiscal year ended December 31, 2017, Defendant Hu received $1,778,200 in compensation from the Company. This included $26,983 in salary, $425,000 in stock awards, and $1,326,217 in option awards

36. The Company disclosed in the 2018 Proxy Statement that Defendant Hu is not considered an independent director under the NASDAQ listing rules.

37. Upon information and belief, Defendant Hu is a citizen of the PRC.

38. The Company's 2016 Proxy Statement stated the following about Defendant Hu:

> **Hu Xiaoming** was appointed as our Chief Executive Officer, President and Chairman of the Board in June 2007. Prior to joining the Company, from October 2003 to April 2005, Mr. Hu served as the Project Manager (Chief Scientist) in the WX Pure Electric Vehicle Development Important Project of Electro-vehicle in the State 863 Plan. From October 1984 to March 2003, Mr. Hu served as: (i) Factory Director of the Yongkang Instrument Factory, (ii) Factory Director of the Yongkang Mini Car Factory, (iii) Chairman and General Manager of the Yongkang Vehicle Company, (iv) General Manager of the Wan Xiang Electric Vehicle Developing Center and (v) the General Manager of the Wan Xiang Battery Company. Mr. Hu personally owned 4 invention patents and 7 utility model patents, which he transferred to the Company in fiscal year 2012. Mr. Hu's experience as our Chief Executive Officer and President, as well as Chairman of the Board, and extensive scientific and operational knowledge and expertise qualifies him to serve as Chairman of the Board and led the Board to conclude that he should be nominated to serve another term as a director.

39. Defendant Hu has a 13% ownership interest in the Service Company, in which the Company has a 9.5% ownership interest. According to the 2016 Proxy Statement, Service Company owed Kandi $40,606,162.

40. Defendant Hu's son, Wangyuan Hu, is the sole officer and shareholder of Eliteway Motorsports, which imported the Company's products to the U.S. As of December 31, 2014, Eliteway Motorsports owed Kandi $620,410.

**Defendant X. Zhu**

41. Defendant X. Zhu was the Company's CFO from June 2007 until her resignation on April 30, 2015.

42. According to the Company's 2016 Proxy Statement, for the fiscal year ended December 31, 2015, Defendant X. Zhu received $1,310,090 in compensation from the Company. This included $26,844 in salary, $119,500 in stock awards, and $1,163,746 in option awards.

43. Upon information and belief, Defendant X. Zhu is a citizen of the PRC.

44. The Company's annual report filed with the SEC on March 16, 2015 (the "2014 10-K") stated the following about Defendant X. Zhu:

> **Zhu Xiaoying** was appointed as our Chief Financial Officer and a director of the Company in June 2007. In addition, since September 2003, Ms. Zhu has served as Chief Financial Officer of Zhejiang Kandi Vehicles Co., Ltd., our wholly-owned operating subsidiary. From January 2000 to September 2003, Ms. Zhu served as the Accounting Manager for Zhejiang Yonkang Automobile Manufacture Co. Ms. Zhu graduated from Hangzhou Electronic Engineering University. Ms. Zhu acquired CIA certificate in 2010 and EMBA certificate from Hong Kong Polytechnic University in 2011.

**Defendant Wang**

45. Defendant Wang was the Company's CFO from May 1, 2015 until his resignation on November 14, 2016. Defendant Wang currently serves as the Chief Strategy Officer ("CSO")

of the Company. He also served as the Company's director from May 20, 2015 through at the earliest October 12, 2017 and at the latest November 15, 2017.

46. For the fiscal year ended December 31, 2015, Defendant Wang received $1,613,074 in compensation from the Company. This included $80,717 in salary, $77,675 in stock awards, and $1,454,682 in option awards. For the fiscal year ended December 31, 2016, Defendant Wang received $1,801,700 in compensation from the Company. This included $101,422 in salary and $1,700,278 in option awards. For fiscal year ended December 31, 2017, Defendant Wang received $15,547 in compensation (in the form of salary) from the Company.

47. Moreover, pursuant to the Form 8-K filed by the Company with the SEC on November 18, 2016 ("11/18/16 8-K"), the compensation to Defendant Wang for his role as the CSO followed the same terms pursuant to the employment contract between the Company and Defendant Wang dated March 20, 2015. Under Defendant Wang's 2015 employment agreement, Defendant Wang shall receive an annual salary in the amount of RMB1,200,000 (approximately $193,080) and an annual bonus in the amount of at least RMB300,000 (approximately $48,271) at each year end based on the Company's results of operations and his performance, which may be in the form of equity.

48. The Company disclosed in the 2016 Proxy Statement that Defendant Wang is not considered an independent director under the NASDAQ listing rules.

49. Upon information and belief, Defendant Wang is a citizen of the PRC.

50. The Company's 2016 Proxy Statement stated the following about Defendant Wang:

> **Wang Cheng (Henry)** was appointed as Chief Financial Officer, effective May 1, 2015. Mr. Wang has over 20 years of international financial management experience. Before joining the Company, Mr. Wang served as CFO for Shanghai Always Marketing Service Co., LTD., one of the largest field marketing service agencies in China, leading its procurement and finance departments since May 2014. Prior to that, Mr. Wang worked for Renesola Ltd. (NYSE: SOL), an

international leading brand and technology provider of green energy products, initially as Vice President of Finance since January 2010, ascending to CFO in July 2011. Mr. Wang holds both certifications as Certified Public Accountants ("CPA") in China and Certified Internal Auditor ("CIA"). He earned a Master's degree in Law from Renmin University of China and a Master's of Business Administration from the Open University of Hong Kong. Mr. Wang's prior experience in accounting and finance qualifies him to serve a director of the Company and led the Board to conclude that he should be nominated to serve us as a director.

**Defendant Mei**

51. Defendant Mei has served as the Company's CFO since November 14, 2016. He was also elected as a Company director on December 16, 2016. Defendant Mei's last day as a Company director is December 28, 2018. According to the Company's 2016 10-K, Defendant Mei's three-year term employment agreement entered with the Company in November 2016 granted him the right to receive an aggregate 10,000 shares of common stock each year, vested in four equal quarterly installments of 2,500 shares.

52. For the fiscal year ended December 31, 2016, Defendant Mei received $30,000 in compensation from the Company. For the fiscal year ended December 31, 2017, Defendant Mei received $215,000 in compensation from the Company, which included $180,000 in salary and $35,000 in stock awards.

53. The Company disclosed in the 2018 Proxy Statement that Defendant Mei is not considered an independent director under the NASDAQ listing rules.

54. Upon information and belief, Defendant Mei is a citizen of the PRC.

55. The Company's 2016 10-K stated the following about Defendant Mei:

**Mei Bing** was appointed as Chief Financial Officer, effective November 14, 2016, and was elected as a director of the Company on December 16, 2016. Mr. Mei is a seasoned financial executive with over 15 years of distinguished corporate executive career with large multinational enterprises and middle market companies in the U.S. and China. Prior to joining the Company, Mr. Mei served as Chief Financial Officer and Board Secretary of Skystar Bio-Pharmaceutical Company, a publicly traded leading biotechnology company in China since July 2011. From

> June 2015 through June 2016, Mr. Mei also served as an Independent Non-Executive Member of the Board of Directors and Chairman of Audit Committee of PharmaMax Corporation in China. From January 2006 through July 2011, Mr. Mei served as Chief Financial Officer of Avineon, Inc., a multinational technology company in the U.S., where he managed the Company's global financial operations in North America, Asia and Europe. Previously, Mr. Mei served as Controller of Arrowhead Global Solutions, Inc. (now part of Harris Corporation), a global provider of satellite communications to remote and harsh environments in the U.S. In addition, Mr. Mei served as Controllers of PICS, Inc. and Thompson Hospitality Corporation, a member of the Compass Group family of companies. Mr. Mei received a B.S. in Economics from Zhejiang University in Hangzhou, China and holds an M.B.A. from The Fuqua School of Business at Duke University where he graduated with distinction as a Fuqua Scholar. Mr. Mei is a Certified Public Accountant (CPA) in the State of Maryland, a Certified Management Accountant (CMA), a Chartered Global Management Accountant (CGMA), and a Certified Valuation Analyst (CVA).

**Defendant Lewin**

56. Defendant Lewin has served as a director of the Company since November 2010. Defendant Lewin is a member of the Audit Committee. According to the 2016 Proxy Statement, as of October 17, 2016, Defendant Lewin beneficially owned 50,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 17, 2016 was $5.40, Lewin owned about $270,000 worth of Kandi common stock as of that date.

57. Upon information and belief, Defendant Lewin is a citizen of the state of New York.

58. The Company's 2016 Proxy Statement stated the following about Defendant Lewin:

> **Jerry Lewin** was appointed as a director of the Company in November 2010. Jerry Lewin currently serves as Senior Vice President of Field Operations for Hyatt Hotels Corporation and is responsible for managing 35 hotels throughout the North American continent. Mr. Lewin has been with Hyatt since 1987. In his capacity as Senior Vice President, Mr. Lewin supervises a number of areas, including finance, sales and marketing, public relations, customer service, engineering, and human resources. Mr. Lewin serves as a member of the Hyatt Hotels Corporation's Managing Committee and sits on the board of directors of the New York City Hotel Association. Since July 2009, Mr. Lewin has served as a director of EFT Biotech Holdings, Inc. Mr. Lewin currently serves as the President of the New York

> Law Enforcement Foundation and as the President of the NY State Troopers PBA Signal 30 Fund. Mr. Lewin has served in various management capacities for several hotel companies in San Francisco, Oakland, Los Angeles, San Diego and Las Vegas. Mr. Lewin received his Bachelor of Science degree from Cornell University and completed the Executive Development Program at J.L. Kellogg Graduate School of Management at Northwestern University. Mr. Lewin's leadership skills and extensive management experience qualifies him to serve on our Board and led the Board to conclude that he should be nominated to serve another term as a director.

**Defendant Yu**

59. Defendant Yu has served as a director of the Company since July 1, 2011. Defendant Yu is the Chair of the Audit Committee and a member of the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2016 Proxy Statement, as of October 17, 2016, Defendant Yu beneficially owned 50,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 17, 2016 was $5.40, Yu owned about $270,000 worth of Kandi stock as of that date.

60. Upon information and belief, Defendant Yu is a citizen of the state of Georgia.

61. The Company's 2016 Proxy Statement stated the following about Defendant Yu:

> **Henry Yu** was appointed as a director of the Company on July 1, 2011. Mr. Yu serves as a Managing Director & Regional Manager of Global Financial Institutions (Asia) of Fifth Third Bank. Prior to his current position, Mr. Yu served as Senior Vice President of the East West Bank from July 2011 to September 2012. Prior to that, Mr. Yu served as the President of Shanghai Bosun Capital Advisors in Shanghai, China from January to June 2011. From January 2008 to December 2010, Mr. Yu served as Head of Business Development at Standard Chartered Bank in China. From November 1999 to December 2007, Mr. Yu served as Managing Director of Global Trade Solutions of SunTrust Bank in Atlanta, Georgia. From January 1995 to November 1999, Mr. Yu served as Group Vice President of Comerica Bank in Chicago, Illinois. Mr. Yu started his banking career in 1981 with Bank of America in HK. Currently, Mr. Yu serves as Chair of the Advisory Board of the National Association of Chinese-Americans and serves as an Advisor to China's Federation of Overseas Chinese. Mr. Yu is currently a member of the Foundation Board Trustees of Georgia Perimeter College, board member of Georgia State University's China Task Force, and member of the Asian Studies Board of the Kennesaw State University. From 2003 to 2007, Mr. Yu held Series 7

> and 62 Certifications from the Financial Industry Regulatory Authority. Mr. Yu received his Bachelor of Arts degree in Economics from the University of Michigan in 1978 and his MBA in Finance from the University of Detroit in 1980. Mr. Yu's leadership skills and extensive financial experience qualifies him to serve on our Board and led the Board to conclude that he should be nominated to serve another term as a director.

**Defendant Chen**

62. Defendant Chen has served as a director of the Company since May 1, 2012. Defendant Chen is the Chair of the Compensation Committee and a member of the Audit Committee and the Nominating and Corporate Governance Committee.

63. Upon information and belief, Defendant Chen is a citizen of the PRC.

64. The Company's 2016 Proxy Statement stated the following about Defendant Chen:

> **Chen Liming** was appointed as a director of the Company on May 1, 2012. Mr. Chen serves as an advisor to AA Wind & Solar Energy Development Group, LLC. Prior to his current position, from February 2009 to October 2010, Mr. Chen participated in a joint venture with Mr. Qiu Youmin, the former designer of Geely Automobile Co., Ltd., and assisted in the development of super mini three seat pure electric vehicles. From June 2008 to July 2009, he participated in the development of Lithium Iron Phosphate Battery with Shanghai Yuankai Group. Mr. Chen served as a Professor of Electrical Engineering at Zhejiang University from 1983 to 1997. In addition, Mr. Chen served as a visiting scholar in the Electrical Engineering Department at Columbia University in New York City from 1981 to 1983 and as a professor in Electrical Engineering at Zhejiang University from 1960 to 1981. Mr. Chen received his bachelor degree from Southeast University in Jiangsu, China in 1960. Mr. Chen's experience in the automobile and mini-car industries, extensive electrical engineering experience and knowledge, and knowledge of current corporate finance and accounting techniques and market activities qualifies him to serve on our Board and led the Board to conclude that that he should be nominated to serve another term as a director.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

65. By reason of their positions as officers, directors, and/or fiduciaries of Kandi and because of their ability to control the business and corporate affairs of Kandi, the Individual Defendants owed Kandi and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Kandi in a

fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Kandi and its shareholders so as to benefit all shareholders equally.

66. Each director and officer of the Company owes to Kandi and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

67. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Kandi, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

68. To discharge their duties, the officers and directors of Kandi were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

69. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Kandi, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Kandi's Board at all relevant times.

70. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

71. To discharge their duties, the officers and directors of Kandi were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Kandi were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Kandi's own Code of Ethics and internal guidelines;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Kandi conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Kandi and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Kandi's operations would comply with all applicable laws and Kandi's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

72. Each of the Individual Defendants further owed to Kandi and the shareholders the duty of loyalty requiring that each favor Kandi's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

73. At all times relevant hereto, the Individual Defendants were the agents of each other and of Kandi and were at all times acting within the course and scope of such agency.

74. Because of their advisory, executive, managerial, and directorial positions with Kandi, each of the Individual Defendants had access to adverse, non-public information about the Company.

75. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Kandi.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

76. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

77. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

78. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred

under the authority of the Board, each of the Individual Defendants who is a director of Kandi was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

79. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

80. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Kandi, and was at all times acting within the course and scope of such agency.

## CODE OF ETHICS

81. Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

82. The Code of Ethics provides, as to "Compliance is Everyone's Business," that:

> Ethical business conduct is critical to our business. As a director, officer or employee, your responsibility is to respect and adhere to these practices. Many of these practices reflect legal or regulatory requirements. Violations of these laws and regulations can create significant liability for you, the Company, its directors, officers, and other employees.
>
> Part of your job and ethical responsibility is to help enforce this Code of Business Conduct and Ethics. You should be alert to possible violations and promptly report possible violations to the CFO.
>
> You must cooperate in any internal or external investigations of possible violations.

Reprisal, threats, retribution or retaliation against any person who has in good faith reported a violation or a suspected violation of law, this Code of Business Conduct or other Company policies, or against any person who is assisting in any investigation or process with respect to such a violation, is prohibited.

Violations of law, this Code of Business Conduct and Ethics, or other Company policies or procedures should be reported to the CFO.

83. The Code of Ethics provides, as to "Applicable Laws," that:

All Company directors, officers, employees, agents and contractors must comply with all applicable laws, regulations, rules and regulatory orders. Company directors, officers and employees located outside of the United States must comply with laws, regulations, rules and regulatory orders of the United States, including the Foreign Corrupt Practices Act and the U.S. Export Control Act, in addition to applicable local laws. Each director, officer, employee, agent and contractor must acquire appropriate knowledge of the requirements relating to his or her duties sufficient to enable him or her to recognize potential dangers and to know when to seek advice from the CFO on specific Company policies and procedures. Violations of laws, regulations, rules and orders may subject the director, officer, employee, agent or contractor to individual criminal or civil liability, as well as to discipline by the Company. Such individual violations may also subject the Company to civil or criminal liability or the loss of business.

84. The Code of Ethics provides, as to "Conflicts of Interest," that:

Each of us has a responsibility to the Company, our stockholders and each other.

Although this duty does not prevent us from engaging in personal transactions and investments, it does demand that we avoid situations where a conflict of interest might occur or appear to occur. The Company is subject to scrutiny from many different individuals and organizations.

We should always strive to avoid even the appearance of impropriety.

85. The Code of Ethics provides, as to "Related Parties," that:

The Company must report all such material related party transactions under applicable accounting rules, federal securities laws, and SEC rules and regulations, and securities market rules.

86. The Code of Ethics provides, as to "Use of Company's Assets," that:

Protecting the Company's assets is a key fiduciary responsibility of every director, officer, employee, agent and contractor…. All Company directors, officers, employees, agents and contractors are responsible for the proper use of Company assets, and must safeguard such assets against loss, damage, misuse or theft.

87. The Code of Ethics provides, as to "Maintaining and Managing Records," that:

> The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions and to ensure full, fair, accurate, timely, and understandable disclosure in any reports the Company is required to file.

88. The Code of Ethics provides, as to "Accounting Practices," that:

> The Company's responsibilities to its stockholders and the investing public require that all transactions be fully and accurately recorded in the Company's books and records in compliance with all applicable laws. False or misleading entries, unrecorded funds or assets, or payments without appropriate supporting documentation and approval are strictly prohibited and violate Company policy and the law.
>
> Additionally, all documentation supporting a transaction should fully and accurately describe the nature of the transaction and be processed in a timely fashion.

89. The Code of Ethics provides, as to "Government Relations," that:

> It is the Company's policy to comply fully with all applicable laws and regulations governing contact and dealings with government employees and public officials, and to adhere to high ethical, moral and legal standards of business conduct. This policy includes strict compliance with all local, state, federal, foreign and other applicable laws, rules and regulations.

90. In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' scheme to issue materially false and misleading statements to the public and their scheme to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste corporate assets, unjust enrichment, and violations of the securities laws. In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to (1) comply with the applicable laws and regulations, (2) protect corporate assets, (3) ensure completeness and accuracy of all Company records, (4) avoid conflicts of interest, (5) report violations of the Code of Ethics, and (6) ensure

full, fair, accurate, timely, and understandable disclosure in any reports the Company is required to file.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background of Company

91 Kandi is an automotive manufacturing company based in Jinhua, China. Before 2013, the Company was mainly engaged in the development, production and distribution of the off-road vehicle products. Due to increasing market demand for new energy vehicles and strong government policy supports, starting in the year 2013, the Company gradually shifted its main business focus to the development and manufacturing of pure EV products and parts.

### The Company's Past History of Scandals Through Defendant Hu

91. Prior to the start of the Relevant Period, the Company (through Defendant Hu) had already established a documented track record of the type of misconduct that continued throughout the Relevant Period.

92. In 2009, the Chinese government announced that it was undertaking to turn the country into the world leader in EVs by 2012. In response, and to take advantage of these subsidies, in early 2009 Kandi introduced an electric car called the "CoCo".

93. But the Company was caught making misrepresentations on CoCo sales. In its quarterly report, filed with the SEC on August 16, 2010 on Form 10-Q for the second quarter of 2010, Kandi reported selling 1,005 units of CoCo in that quarter. But an investigation soon found that Kandi had "greatly overstated its sales figures" and that none of "Kandi's own electric-vehicle dealers . . . could account for the sales volume the company has claimed in its Securities and Exchange Commission filings and earnings reports."[2] Thereafter, Kandi admitted in its annual

[2] Justin McLachlan, *Kandi Technologies Corp.: Where are the Cocos?*, Sharesleuth, May 2, 2011, http://sharesleuth.com/investigations/2011/05/ (last accessed on December 28, 2018).

report on Form 10-K for 2011 (filed with the SEC on March 30, 2012) that it had only sold a total of 658 EVs in the whole of 2010 – far fewer than the 1,005 that it had previously claimed to sell in just the second quarter of that year.

94. Meanwhile, Defendant Hu was involved in, as described by the SEC, a "secret agreement . . . to manipulate the trading of Kandi stock to increase its price." On May 5, 2014, the SEC brought fraud charges against several stock promoters, accusing them of "orchestrat[ing] manipulative trading in . . . Kandi Technologies in 2009 and 2010" and of "conducting illegal reverse merger schemes" to bring two other China-based companies "into the U.S. markets so they could manipulate trading and reap millions of dollars in illicit profits."[3] The SEC clearly implicated Defendant Hu as coordinating with those stock promoters to promote the scheme.

**<u>The Chinese Government Implements EV Subsidy Program</u>**

95. In September 2013, the Chinese government announced a long-anticipated subsidy policy, under which EV manufacturers would receive subsidy payments from the central government, and EV purchasers would receive subsidy payments from local governments. The new policy was described by Kandi in a September 19, 2013 press release as follows:

> The subsidy policy, which covers the pure electric vehicles, plug-in hybrid electric vehicles and fuel cell battery vehicles, aims to increase the efforts on promotion of new energy vehicle procurement with government agencies, public organizations and public transportation areas. According to the Notice, the central government will provide, based on certain technical requirement, up to RMB 60,000 (approximately USD 9,800) for the purchase of an all-electric passenger vehicle and up to RMB 500,000 (approximately USD 81,700) for the purchase of an electric bus. The subsidy payments will be distributed to the manufacturers on a quarterly basis in advance and the subsidies will then be paid by the manufacturers directly to the consumers.

[3] Press Release, SEC, *SEC Charges Toronto-Based Consultant and Four Others in Reverse Merger Schemes Involving China-Based Companies* (May 5, 2014), https://www.sec.gov/news/press-release/2014-91 (last accessed on December 28, 2018).

**The Fraudulent Subsidy Scheme**

96. The Individual Defendants sought the maximum ways to exploit the new subsidies by structuring a series of affiliated entities that would capture duplicative subsidies, create the impression that the Company was more profitable than it was, and enrich the Individual Defendants, including Defendant Hu.

97. The scheme was spun as furthering the public interest. At a seminar with "top Chinese government officials, and other environmental and transportation experts" in May 2012, Kandi presented an "innovative plan for a comprehensive Pure EV rental system for reducing traffic, parking and pollution problems in cities throughout China." Under the plan, Hangzhou, the capital of Zhejiang Province, would be "the first test site for a new transportation system which would make available 100,000 self-driven Pure EV rentals at centrally operated 'smart' vertical parking and charging facilities to be constructed at key locations throughout Hangzhou."

98. The Chinese Government appeared to like the plan. On October 1, 2012, Kandi issued a press release announcing a definitive "sales contract… to provide the first 5,000 EVs for the currently largest pure EV commercialization launch in China -- the 20,000 pure EV leasing program in Hangzhou." The press release quoted Defendant Hu as stating:

> We are very excited about the first 5,000 EV sales contract. Working closely with reliable and high-value partners such as SGCC, CALB and Hangzhou municipal government is central to our marketing strategy and Kandi is very proud to be a part of what is so far the largest pure EV commercialization program to be launched by our partners. Additionally, it is noteworthy that Kandi received a 3,000 pure EV order in Jinhua City last year. Kandi is on its way to become the one of leading pure EV providers in China.

99. Kandi next established a joint venture company, the JV Company, in March 2013 to purportedly "engage in the investment, research and development, production, marketing and sales of electronic vehicles in China." The JV Company was formed under to a joint venture

agreement between Zhejiang Kandi Vehicles Co., Ltd. ("Kandi Vehicles"), a wholly-owned subsidiary of Kandi, and Shanghai Maple Guorun Automobile Co., Ltd. ("Shanghai Maple"), a 99%-owned subsidiary of Geely.[4]

100. Pursuant to the joint venture agreement, all of the Company's EV production was to be transferred to the JV Company. This transfer was completed at the end of 2014.

101. Then, in early 2014, the JV Company established several wholly-owned operating subsidiaries, including (1) Zhejiang Kandi Electric Vehicles Jinhua Co., Ltd., engaged in "EV manufacturing"; (2) Zhejiang JiHeKang Electric Vehicle Sales Co., Ltd., engaged in "car sales"; and (3) Zhejiang Kandi Electric Vehicles Jiangsu Co., Ltd., engaged in "EV research and development, manufacturing and sales." The JV Company also acquired Kandi Electric Vehicles (Changxing) Co., Ltd., which purported to specialize in "the production of EVs," from Kandi Vehicles.

102. Finally, in July 2013, the JV Company helped establish the Service Company, which was "engaged in various pure EV leasing businesses including the EV-Share Program."

103. The resulting business model allowed the Company to directly or indirectly obtain both of the subsidies offered by the Chinese government (one for manufacturers and one for purchasers of EVs), as the JV Company was eligible for the manufacturer subsidy, and the Service Company was able to take advantage of the other subsidy as a purchaser for the JV Company. Thus, Kandi would manufacture parts for EVs, sell them to the JV Company, which would then manufacture EVs, and the Service Company would buy the EVs.

104. Thus, in sum, the Company would sell auto parts to the JV Company, and the JV Company would produce the EVs and sell them to the Service Company. The Service Company

[4] In March 2014, the JV Company changed its name to Kandi Electric Vehicles Group Co., Ltd.

purportedly used the EVs purchased from the JV Company to run a car share operation. In the process, Company affiliates would capture subsidies twice, thereby making the Company appear more profitable than it was.

105. This business model was filled with other conflicts. No less than 9.5% of the Service Company, which obtained duplicative subsidies, was owned by Kandi, and an additional 13% of Service Company was owned by Defendant Hu. In fact, Defendant Hu's conflicted ownership in the Service Company *was not even disclosed by the Company until March 2016*, as detailed below.

106. Additional conflicts were rampant in the structure of the scheme. For example, the Company could sell faulty or incomplete cars or car parts to its affiliated entities, whereby those entities could capture subsidies, but ultimately return the vehicle to its affiliate. As the *Wall Street Journal* reported on January 24, 2016[5]:

> Nearly every major Chinese car maker is churning out electric cars these days in hopes of capitalizing on regulatory largesse. One problem: Regulators are wary it is being misused. One suspected strategy involves manufacturers selling faulty or incomplete cars to related parties who pocket the subsidies and then return the cars. That could explain why wholesale shipments of electric cars between January and November were 56% above retail sales, according to LMC Automotive data. By contrast, in the broader car market, wholesale was 6% higher than retail. The Ministry of Finance says misused funds could be clawed back as officials step up scrutiny. This would affect one of China's fastest growing auto segments. Subsidies make up to 35% of what consumers pay. In 2015, wholesale shipments of electric and hybrid vehicles -- including buses -- were more than quadruple their 2014 level. The broader car market limped ahead by 4.7%.

107. Moreover, true accounting of the subsidies could be concealed through coordinated manipulation between the affiliated entities that captured them. Indeed, as a January 2015 *Seeking*

---

[5] Abheek Bhattacharya, China Risks Electric-Car Shakedown, Wall St. J., Jan. 24, 2016 https://www.wsj.com/articles/china-risks-electric-car-shakedown-1453668015 (last accessed on December 28, 2018).

*Alpha* article[6] explained, due to Kandi's failure to file separate financial statements for the JV Company during the Relevant Period (as discussed further below), "Kandi's JV is a black box, which makes it perfect for playing accounting games." The article elaborated as follows:

> Why is it relevant that Kandi controls ZZY? Because if Kandi CEO Xiaoming Hu is both the buyer (as controller of the JV) and seller (as controller of ZZY) in these transactions, then he can easily manipulate and time sales to meet or exceed revenue expectations. With the concomitant inflated revenues in hand, Kandi's management can then sell inflated shares to the public. KNDI's CEO Hu can, with a snap of his fingers, create as many sales as is plausible to KNDI's unsophisticblaated retail investor base by "selling" and "delivering" EVs to ZZY, with ZZY returning unpaid receivables or notes in lieu of cash to the Kandi JV.
>
> But if ZZY is 81% owned by another investor group, then the risk of monetizing the EVs should be transferred to ZZY and the "Shanghai venture capitalists" when the EVs are sold, right? Well, that's assuming two things. First, it assumes that ZZY actually has been sufficiently capitalized. Kandi has provided absolutely no information on the terms of the ZZY partnership or who the other investors are, aside from their corporate names. Second, it assumes that ZZY has paid the JV in cash or mostly in cash. If the JV received payment from ZZY in the form of receivables or other notes, and ZZY hasn't been sufficiently capitalized by the "Shanghai venture capitalists," then the risk of the EVs not being monetized by ZZY will remain with the JV if ZZY is ultimately unable to ***pay the receivables***. Even worse, if the EVs are monetized (through the leasing program or subsidies), the lion's share of the upside (81%) would remain, in this scenario, with the ZZY "partners" - a real "heads I win, tails you lose" deal for the "Shanghai venture capitalists." Well, if the JV were only receiving IOUs from ZZY, it would be clear from the financial statements, right? Wrong. ***Kandi has chosen to account*** for its JV partnership using the equity method of accounting, which means that it doesn't have to provide a detailed cash flow statement, income statements, or a balance sheet of the JV in its filings, nor does it need to consolidate it with its statements. All it is required to show is the JV's net income and add Kandi's share of this net income in Kandi's calculation of its own net income. In other words, ***Kandi's JV is a black box***, which makes it perfect for playing accounting games. In Kandi's latest 10-Q, it provided only a highly simplified balance sheet for the JV….Kandi's cash flow problems (Kandi is owed more than $50m by the JV) and attendant need to raise cash via dilutive share offerings is consistent with the theory that ZZY is paying the JV mostly with receivables.

(Emphasis added.)

---

[6] Seeking Alpha, *The Potemkin Parking Lot: Related Party Transactions And Questionable Revenue Recognition At Kandi Technologies*, Jan. 26, 2015, https://seekingalpha.com/article/2849366-the-potemkin-parking-lot-related-party-transactions-and-questionable-revenue-recognition-at-kandi-technologies (last accessed on December 28, 2018).

108. In early 2016, Chinese officials began to learn that the Company, its affiliated companies, and other manufacturers had engaged in the manipulative practices outlined above, causing the Chinese government to reduce the subsidy program and mandate to eventually remove the program altogether by phasing out subsidies over the next four years.

109. Nevertheless, and as detailed further below, the Individual Defendants caused the Company to continue concealing and/or misrepresenting the halt of critical subsidies well into 2016, spinning the Company as thriving when it was in fact failing.

**The SEC Scrutinizes Kandi's Financial Statements From the Beginning**

110. Rushing to take advantage of a spike in its stock price following the Chinese government's official announcement of the subsidy policy in September 2013, on September 20, 2013, Kandi filed a shelf registration statement on Form S-3, listing an additional 1,255,462 shares for issuance.

111. The registration statement drew the SEC's scrutiny. On October 17, 2013, the SEC sent a comment letter to Kandi regarding its September 20, 2013 Form S-3. Kandi responded to the SEC on October 29, 2013, and then filed an amended Form S-3 on October 30, 2013.

112. On November 12, 2013, the SEC sent a comment letter to Kandi regarding the Company's Form 10-K filed with the SEC for the fiscal year ended December 31, 2012 (the "2012 10-K") and quarterly report on Form 10-Q filed with the SEC for the second quarter ended March 31, 2013 (the "2013 2Q 10-Q"). Among other things, the SEC raised questions and sought clarification regarding Kandi's reported "$80.8 million" investment in the JV Company; its "dependence . . . upon a single customer, or a few customers;" its very large balance of "outstanding gross accounts receivable" but without any "allowance for doubtful accounts";

related-party transaction issues; and the nature of China's "local government's policies that encourage the development of EVs."

113. The correspondence with the SEC over Kandi's financial statements continued until at least May 2014. Through that correspondence, the SEC zeroed in on apparent related-party transactions between the Company and entity called "Kandi USA." Defendant Hu's son was the sole shareholder and officer of Kandi USA, and Kandi USA was Kandi's fifth largest customer in 2012. Nevertheless, Kandi recorded its transactions with Kandi USA as under the pseudonym "Eliteway Motorsport," and the Company failed to list Eliteway Motorsport or Kandi USA at all in its 2012 Form 10-K. The Company's Form 10-K, filed with the SEC on March 17, 2014 for the fiscal year ended December 31, 2013 (the "2013 10-K"), then described "Kandi USA Inc. carrying trade name of Eliteway Motorsports" as a "customer" but not as a related party.

114. In its responses to additional SEC inquiries on January 17, 2014 as well as February 24, 2014, Kandi (among other things) had repeatedly insisted that Eliteway Motorsports, a customer that provided 11% of Kandi's sales in the first half of 2012, was somehow not a "related party" even though "Mr. Hu Wangyuan is the sole shareholder and an officer of Eliteway Motorsports (previously known as Kandi USA, Inc.), which is one of the US importers for our products, and is the adult son of our Chairman and CEO Mr. Hu Xiaoming." The SEC was not convinced, and Kandi ultimately had to file with the SEC, on May 16, 2014, an amended annual report on Form 10-K/A for 2013 (the "2013 10-K/A"), which correctly listed Eliteway Motorsports as a related party. Only in the 2014 10-K did the Company finally properly list Kandi USA as a related party.

115. Separately, the 2013 10-K disclosed for the first time that Kandi had been "furnishing documents" to the SEC in response to a "document subpoena issued on November 21, 2013 regarding a matter known as *In the Matter of Kandi Technologies Group, Inc*."

116. The press noted that Kandi had failed to disclose the investigation previously, instead mentioning it in the middle of a long list of potential risk factors in the 2013 10-K. The fact that the "SEC has issued a subpoena indicates that the probe has moved beyond the informal stage and now is classified as a formal investigation; According to a guide on the SEC's website, its enforcement attorneys cannot issue subpoenas unless the commission authorizes a formal investigation."[7]

117. The SEC ultimately brought fraud charges on May 5, 2014 against several stock promoters, alleging manipulation of Kandi stock in 2009 and 2010. Notably, the SEC alleged that Kandi's CEO (Defendant Hu) had reached a "secret agreement… to manipulate the trading of Kandi stock to increase its price to at least $3 per share within three months."[8]

118. Upon information and belief, these various SEC inquiries also led the Company to disclose in the 2013 10-K that its internal controls for financial reporting were inadequate, as discussed further below.

**<u>The Individual Defendants Cause the Company to Engage in Accounting Fraud</u>**

119. To conceal the devastating impact on the Company from the cessation of subsidies, the Individual Defendants then caused the Company to engage in an elaborate accounting fraud.

---

[7] Chris Carey, *SEC probe of Kandi Technologies has risen to a formal investigation* (Mar. 28, 2014), http://sharesleuth.com/short-takes/reverse-mergers/2014/03/sec-probe-of-kandi-technologies-has-risen-to-a-formal-investigation (last accessed on December 28, 2018).

[8] Press Release, SEC, *SEC Charges Toronto-Based Consultant and Four Others in Reverse Merger Schemes Involving China-Based Companies* (May 5, 2014), https://www.sec.gov/news/press-release/2014-91 (last accessed on December 28, 2018).

120. In short, the Individual Defendants caused the Company to represent that Kandi had received hundreds of millions of dollars in cash in affiliated transactions after the subsidies ceased. In fact, Kandi was effectively receiving notes receivables, in essence "IOUs", from the JV Company in lieu of cash, and then was settling its accounts payable to suppliers not in cash but by *assigning* those notes receivable, primarily from the JV Company. Such practice, if properly disclosed, would have indicated to investors that the JV Company was giving Kandi notes receivable instead of paying on time in cash, which in turn deprived Kandi of cash it needed to pay its own suppliers on time. As would be revealed later by the SEC and in the Restatement, such accounting machinations amounted to fundamental violations of GAAP.

121. The timing of this accounting manipulation plausibly suggests the subsidies had ceased *as early as 2015*, because the Company had already changed its credit terms with its affiliated companies, presumably to account for delayed payments, by that year. As later disclosed in the 2016 10-K, "As of December 31, 2016 and December 31, 2015, the credit terms with the Company's customers were typically 210 to 720 days and 150 to 180 days respectively after delivery." This was a sharp increase from previous years: according to the 2014 10-K, "As of December 31, 2014 and 2013, the credit terms with the Company's customers were typically 90 to 120 days after delivery." Kandi did not disclose this sharp increase until a whole year later, when it filed with the SEC its 2016 10-K on March 16, 2017.

122. Moreover, throughout the Relevant Period, Kandi's financial statements were not in accordance with GAAP requirements and SEC rules because (as detailed further below) the Individual Defendants caused Kandi to fail to properly reflect, on the face of the balance sheets and income statements, the amount of revenues that emanated from purported sales to related parties.

123. On December 28, 2016, the SEC (once again) began to question the Company's financial statements in light of this glaring misconduct. Among other things, the SEC raised questions and sought clarification regarding the expected impact of delays or reductions in government subsidies and the sharp increases over the Relevant Period in Kandi's receivables and in the "amount due from the JV Company, net." Regarding the JV Company, the SEC asked:

> We note from the disclosure here and similar disclosure in your Form 10-Q for the quarterly period ended September 30, 2016, that the amount due from the JV Company has been steadily increasing from $51.4 million at December 31, 2014, to $76.1 million at December 31, 2015, and further to $114.8 million at September 30, 2016. Please disclose how and when you expect to recover these amounts.

124. Kandi's response to the SEC on January 25, 2017 made clear that the increase in receivables was the result of delays in the JV Company's receipt of subsidy payments:

> The delay in receipt of such subsidy payments reduced the JV Company's ability to collect its receivable from its business partner so that it was unable to settle its receivable amounts with us in a timely fashion. The subsidy review is now complete and we expect that the subsidy payment process will resume and the JV Company's cash position will improve and enable it to pay down the balance owed to us.

125. Put another way, the JV Company could not timely make payments to Kandi unless and until it received those subsidy payments.

126. Following additional inquiry, on February 8, 2017, the SEC responded that the Company had been mischaracterizing its cash flow activity in violation of accounting rules. The SEC's February 8, 2017 comment letter also insisted that Kandi file an amended Form 10-K for 2015 in order "to file separate audited financial statements for the JV company pursuant to Rule 3-09(a) of Regulation S-X for the same periods that would be required under Rules 3-01 and 3-02 of Regulation S-X as if the investee were a registrant." In addition, the SEC stated that "management should undertake to have the registrant's financial statements reaudited by a PCAOB-registered firm in connection with filing the amended 2015 Form 10-K."

127. The Company's Restatement, described further below, followed on March 16, 2017.

**The Company's Auditor Permitted The Accounting Misconduct To Flourish**

128. For years, the Company's supposed public accountant, AWC, failed to investigate obvious signs of fraud engaged in by Kandi's management as described herein.

129. On May 18, 2016, the Public Company Accounting Oversight Board ("PCAOB") entered an Order censuring AWC, revoking its registration, and imposing other penalties due to AWC's "violations of PCAOB rules and standards in connection with the issuance of audit reports on the consolidated financial statements of [Kandi] for the years ended December 31, 2010, 2011, and 2012."[9]

130. The PCAOB found that AWC had "failed repeatedly to exercise due professional care and professional skepticism, to obtain sufficient appropriate audit evidence with respect to financial statement assertions, to include procedures designed to provide reasonable assurance of detecting fraud or illegal acts that would have a direct and material effect on the determination of financial statement amounts, and to prepare and maintain adequate audit documentation."

131. In particular, the PCAOB found that AWC failed to investigate obvious signs of fraud by Kandi's management, including, in one instance, where Defendant Hu and another Kandi financial controller had produced personal bank account statements as purported evidence of the Company's cash on hand.

---

[9] *Order Instituting Disciplinary Proceedings, Making Findings, And Imposing Sanctions, In the Matter of AWC (CPA) Limited, WONG Chi Wai, CPA, and WONG Fei Cheung, CPA*, PCAOB Release No. 105-2016-016 (May 18, 2016), available at https://pcaobus.org/Enforcement/Decisions/Documents/105-2016-016-AWC-CPA.pdf (last accessed on December 28, 2018).

132. The PCAOB also noted that Kandi had failed to properly report certain related party transactions in its financial statements and that AWC, while auditing those financial statements, "failed to address red flags regarding related party transactions and failed to place emphasis on testing material transactions with a related party" even though they knew that related-party transactions were a "key audit risk."[10]

133. Notably, on April 14, 2016, the Audit Committee (which included Defendants Yu, Lewin, and Chen) agreed to terminate AWC to serve as the Company's auditor *a month prior* to it being banned from the auditing industry, indicating that the Individual Defendants knew full well that that auditor was not reliable at best and fraudulent at worst. Nevertheless, as outlined further below, the Individual Defendants caused the Company to fail to disclose the true circumstances behind that termination, only hinting that AWC has been terminated for cause when admitting in the Restatement that AWC's past accounting reports for the Company (along with the Company's financial statements dating back to 2014) should no longer be relied upon.

**<u>The Individual Defendants Fail to Implement or Enforce Adequate Controls</u>**

134. From the start of the Relevant Period up through the Second Quarter of 2014, the Company admitted that it did not have effective internal controls in its financial reporting, as outlined in further detail below.

135. Then, in August 2014, the Company announced it had been undertaking significant reforms in the first half of 2014 to implement adequate controls, including (a) the head of the Company's audit department reporting directly to the head of the Audit Committee on "any reportable issues", (b) the approval of a new Audit Charter approved by the Audit Committee on May 30, 2014, (c) the approval by the Board of a new related-party transaction policy, and (d) a

[10] The undisclosed related-party transactions were with "Kandi USA," discussed above.

new "comprehensive remediation plan" spearheaded by the Chair of the Audit Committee (Defendant Yu), the Company's outside auditor (AWC), Company "management," and its internal auditing team, to remediate further deficiencies in the Company's internal controls.

136. By November 2014, the Individual Defendants then caused the Company to represent that its "disclosure controls and procedures were effective." As detailed further herein, however, nothing could have been further from the truth. To the contrary, the Company continued to misrepresent the most basic aspects of its finances ***for years*** – for example, by mischaracterizing hundreds of millions of dollars in purported cash flow, failing to report related-party transactions, and failing to adequately and fully disclose the status of its critical subsidy program.

137. Indeed, the Company did not admit it lacked effective controls ***until March 2017***, when it issued the Restatement – and many months ***after*** the SEC began to openly investigate the integrity of the Company's financial reporting, the Company's auditor was terminated, and the Company's CFO (Wang) suddenly resigned.

**False and Misleading Statements of Material Fact During the Relevant Period**

138. Further to the accounting misconduct described above, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact adverse to the investing public during the Relevant Period. Specifically, and as detailed in the section that follows, the Individual Defendants failed to and/or caused the Company to fail to: (a) correctly classify hundreds of millions of dollars of cash and noncash activities related to notes receivable, notes payable, accounts receivable and accounts payable in the Company's statements of cash flows; (b) identify certain related party accounts on the face of the Company's balance sheets and income statements; (c) transfer the $7.5 million of construction-in-progress recorded in 2014 back to the advances to suppliers or prepayments to

reflect the changed completion status of its Hainan facility; (d) properly report the income taxes for each reporting period during the Relevant Period; (e) include separate audited financial statements for its equity investment in the JV Company; (f) disclose the Fraudulent Subsidy Scheme; (g) disclose that the Company's financial statements for the first three quarters for the year ended December 31, 2016 and the years ended December 31, 2015 and 2014, contained numerous GAAP and SEC rule violations that the Company was required to adjust; (h) disclose and misrepresent the circumstances of the termination of its auditor AWC; (i) timely disclose critical changes in its credit terms with affiliated entities that were designed to further conceal the cessation of subsidies; (j) timely disclose Defendant Hu's interest in the Service Company; (k) timely disclose related-party transactions with a company called "Kandi USA," which was controlled by Defendant Hu's son and owed the Company significant debt; (l) disclose that the Company lacked effective disclosure controls and internal controls over financial reporting; and (m) disclose that the Company lacked sufficient expertise to ensure the accuracy and completeness of its accounting treatment and financial reporting. These misrepresentations and material omissions of fact rendered the statements that are set forth in paragraphs 139 to 226 herein materially false and misleading.

**<u>3Q 2013 10-Q</u>**

139. On November 14, 2013, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter ended September 30, 2013 ("3Q 2013 10-Q"), which was signed by Defendants Hu and X. Zhu.

140. The Company stated the following with regard to the effectiveness of its controls and procedures:

**Item 4. Controls and Procedures**

**Evaluation of Controls and Procedures**

The Company maintains a system of disclosure controls and procedures that is designed to ensure that information required to be disclosed by the Company in this Form 10-Q, and in other reports required to be filed under the Securities Exchange Act of 1934 (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the rules and forms for such filings. Management of the Company, under the direction of the Company's Chief Executive Officer and Chief Financial Officer, reviewed and performed an evaluation of the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15a(e) and 15d-15(e) under the Exchange Act) as of September 30, 2013. ***Based on that review and evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and is accumulated and communicated to management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.***

**Changes in Internal Control over Financial Reporting**

There were no changes to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Inherent Limitations on Effectiveness of Controls**

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls and procedures will prevent or detect all errors and all fraud. Disclosure controls and procedures, no matter how well designed, operated and managed, can provide only reasonable assurance that the objectives of the disclosure controls and procedures are met. Because of the inherent limitations of disclosure controls and procedures, no evaluation of such disclosure controls and procedures can provide absolute assurance that all control issues and instances of fraud, if any, have been detected.

(Emphasis added.)

141. Attached to the 3Q 2013 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) of the Exchange Act, Section 302 of the Sarbanes-Oxley Act of 2002

("SOX"), and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the SOX ("SOX Certifications"), signed by Defendants Hu and X. Zhu, attesting to the accuracy of the 3Q 2013 10-Q.

**The 2013 10-K**

142. On March 17, 2014, the Company filed an annual report on Form 10-K with the SEC for the year ended December 31, 2013 (the "2013 10-K"), which was signed by Defendants Hu, X. Zhu, Chen, Lewin, and Yu, and non-parties Ni Guangzheng ("Ni"), who has since passed away, and Qian Jingsong ("Qian").

143. The 2013 10-K disclosed that "the Company's internal controls over financial reporting were not effective as of December 31, 2013" and further stated:

> Management conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2013, the last day of our fiscal year. This assessment was based on criteria established in the framework Internal Control—Integrated Framework, issued by the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. Our management has excluded from its assessment for internal control over financial reporting at Zhejiang Kandi Electric Vehicles Co., Ltd., which is a 50% owned joint venture established in March 2013 and is accounted as an equity method investment. The main operations of Zhejiang Kandi Electric Vehicles Co.,Ltd started on December 2013, and therefore, management's assertion of the effectiveness of Kandi Technologies Group, Inc.'s internal control over financial reporting excluded internal control over financial reporting of Zhejiang Kandi Electric Vehicles Co. Ltd.
>
> Based on management's evaluation under the COSO framework, management concluded that ***the Company's internal controls over financial reporting were not effective as of December 31, 2013***. ***Management identified significant deficiencies in internal controls, which, in the aggregate, lead to a conclusion that a material weakness exists in the control environment***. The significant deficiencies noted in the control environment are summarized as follows:
>
> 1. ***Lack of adequate policies and procedures in internal audit function***, which may potentially result in: (1) lack of communication between internal audit department and the Audit Committee and the Board of Directors; (2) insufficient

internal audit work to ensure that the Company's policies and procedures have been carried out as planned.

2. There was ***no self-assessment performed by the Audit Committee*** to assess the effectiveness of the Audit Committee in oversight of management.

3. The ***internal control audit department reported to the CEO instead of the Audit Committee***. Such reporting structure impaired the independence and objectivity of the internal control audit department.

4. Inadequate ***design of internal controls over the approval procedures for related party transactions***

(Emphasis added)

144. Attached to the 2013 10-K were SOX Certifications signed by Defendants Hu and X. Zhu, attesting to the accuracy of the 2013 10-K.

**<u>1Q 2014 10-Q</u>**

145. On May 12, 2014, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter ended March 31, 2014 ("1Q 2014 10-Q"), which was signed by Defendants Hu and X. Zhu.

146. The Company stated the following with regard to the effectiveness of its controls and procedures:

**Item 4. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

The Company has evaluated, under the supervision of the Company's Chief Executive Officer and the Chief Financial Officer, the effectiveness of disclosure controls and procedures as of March 31, 2014. This is done in order to ensure that information the Company is required to disclose in reports that are filed or submitted under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is: (i) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and (ii) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were not

effective as of March 31, 2014, due to significant deficiencies in internal controls, which, in the aggregate, lead to a conclusion that a material weakness exists in the control environment as follows:

1. Lack of adequate policies and procedures in internal audit function, which may potentially result in: (1) lack of communication between internal audit department and the Audit Committee and the Board of Directors; (2) insufficient internal audit work to ensure that the Company's policies and procedures have been carried out as planned.

2. There was no self-assessment performed by the Audit Committee to assess the effectiveness of the Audit Committee in oversight of management.

3. Inadequate design of internal controls over the approval procedures for related party transactions.

147. The filing provided the following updates on the Company's purported remedial efforts to address these control deficiencies:

**Changes in Internal Control over Financial Reporting**

During the first quarter of 2014, we made arrangements to insure the efficient and timely communication between the internal control audit department and the Audit Committee. The internal audit department was restructured that its head has reported directly to Audit Committee on major accounting items to enhance the independence and objectivity of the department. Currently, the internal audit department has also revaluated the policies and procedures in internal audit function, and made necessary remediation. The new internal audit policies and procedures are in the process of approval and are expected to be approved by the end of May 2014.

During the first quarter of 2014, our Board of Directors also revaluated the approval procedures for related party transactions, and has prepared a new detail approval procedure for related party transactions. This is in the process of finalization, which is expected to be approved by our Board of Directors by the end of May 2014.

Other than with respect to the ongoing remediation of the material weakness pursuant to the plan described above, there were no changes to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

148. Attached to the 1Q 2014 10-Q were SOX Certifications signed by Defendants Hu and X. Zhu, attesting to the accuracy of the 1Q 2014 10-Q.

**2Q 2014 10-Q**

149. On August 11, 2014, the Company filed a quarterly report on Form 10-Q with the SEC for the second quarter ended June 30, 2014 ("2Q 2014 10-Q"), which was signed by Defendants Hu and X. Zhu.

150. That filing stated that it stated that Kandi's:

"disclosure controls and procedures were not effective as of June 30, 2014 due to significant deficiencies in internal controls, which, in the aggregate, lead to a conclusion that a material weakness exists in the control environment as follows:

1. We have a lack of adequate policies and procedures in internal audit function, which may potentially result in: (1) lack of communication between our internal audit department and the Audit Committee and our Board of Directors; (2) insufficient internal audit work to ensure that our policies and procedures have been carried out as planned.

2. There was no self-assessment performed by the Audit Committee to assess the effectiveness of its in oversight of management.

3. We have an inadequate design of internal controls over the approval procedures for related-party transactions.

151. The filing again provided the following updates on the Company's purported remedial efforts to address these control deficiencies:

**Changes in Internal Control over Financial Reporting**

During the first six months of 2014, we took the initiative to enhance the effective and timely communication between our internal audit department and our Audit Committee. We reorganized our internal audit department so that the head of such department reports directly to the Audit Committee on any reportable issue to enhance the independence and objectivity of the internal audit function. In addition, the internal audit department revisited the policies and procedures of internal audit and made modification to keep internal audit workflow in compliance with SEC requirements. On May 30, 2014, the Audit Committee of the Board of Directors held a special meeting and approved the new Internal Audit Activity Charter.

> During the first six months of 2014, the Board of Directors also evaluated the design of internal controls over the approval procedures for related party transactions, and developed a set of revised approval procedures for related-party transactions. ***On May 30, 2014, the Audit Committee of the Board of Directors held a special meeting and approved the new Management Policy on Related Party Transactions***.
>
> In July 2014, the Chairman of the Audit Committee of the Board of Directors met with our management, our internal audit team and our independent auditor to review the progress of implementation of the remediation measures and ***spearheaded a comprehensive remediation plan to fully address the deficiencies in our internal controls***. We intend to complete the project in a timely fashion and will conduct quarterly assessments of the state of our financial reporting measures and systems, as a whole.
>
> Aside from the remediation measures that we initiated during this reporting period described above, there was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d- 15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

152. Attached to the 2Q 2014 10-Q were SOX Certifications signed by Defendants Hu and X. Zhu, attesting to the accuracy of the 2Q 2014 10-Q.

**<u>3Q 2014 10-Q</u>**

153. On November 10, 2014, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter ended September 30, 2014 ("3Q 2014 10-Q"), which was signed by Defendants Hu and X. Zhu.

154. The Company stated the following with regard to the effectiveness of its controls and procedures:

> **Item 4. Controls and Procedures.**
>
> **Evaluation of Disclosure Controls and Procedures**
>
> We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the

> Securities Exchange Act of 1934 (the "Exchange Act")) as of September 30, 2014. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.*** Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act (a) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) is accumulated and communicated to management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives as described above.
>
> **Changes in Internal Control over Financial Reporting**
>
> During the quarter ended September 30, 2014, we continued to implement the remediation measures according to our new Internal Audit Activity Charter that were approved on May 30, 2014. In addition, the Audit Committee conducted a self-assessment to assess our effectiveness in oversight of management and updated the Audit Committee Charter.
>
> Other than those set forth above, there was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

155. Attached to the 3Q 2014 10-Q were SOX Certifications signed by Defendants Hu and X. Zhu, attesting to the accuracy of the 3Q 2014 10-Q.

156. In fact, the Company's disclosure controls and procedures were not effective, as would be admitted years later in the Restatement.

**The 2014 10-K**

157. On March 16, 2015, the Company filed an annual report on Form 10-K with the SEC for the year ended December 31, 2014 (the "2014 10-K"), which was signed by Defendants Hu, X. Zhu, Chen, Lewin, and Yu, and non-parties Ni and Qian.

158. The 2014 10-K contained a Consolidated Statements of Cash Flows table ("2014 Statements of Cash Flows") in which the Company reported incorrect cash flow figures for the year of 2014. First, for the year 2014, the Company incorrectly reported $15,254,847, which represented the settlement of the trade receivables with notes receivables, as an issuance of notes receivables in cash flow from investing activities in the 2014 Statements of Cash Flows. This classification was erroneous because the receipt of notes receivable for the settlement of trade receivables was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 2014 Statements of Cash Flows. In fact, the total amount of cash flow from the issuance of notes receivable for the year 2014 was not $24,705,489, but rather $9,450,642. Second, for the year 2014, the Company incorrectly reported $14,311,483 as repayments of notes receivable in the investing section of the 2014 Statements of Cash Flows, which, in fact, represented the assignment of the notes receivable to the Company's suppliers to settle the accounts payables. This classification was incorrect because the assignment of the notes receivable to the Company's suppliers to settle the accounts payables was supposed to be reported as a noncash activity in the non-cash disclosures section. In fact, the total amount of cash flow from the repayment of notes receivable for the year 2014 was $15,043,109, instead of $9,450,642. Third, for the year 2014, the Company incorrectly reported $5,707,027, which represented the settlement of accounts payable with notes payable, as the proceeds from notes payable in the financing section of the 2014 Statements of Cash Flows. This classification was incorrect because the settlement of accounts payable with notes payable was supposed to be reported as a noncash activity in the non-cash disclosures section. In fact, the total amount of cash flow from the proceeds from notes payable for the year 2014 was not $13,781,830, but rather $0.

159. In addition to the above disclosure failures, the Company also failed to disclose the dollar amount of related party transactions on the face of the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) ("2014 Consolidated Statements of Income") contained in the 2014 10-K. Rule 4-08(k) of Regulation S-X requires a reporting company to identify related party transactions and to state the amounts of such transactions "on the face of the balance sheet, income statement, or statement of cash flows." In order to comply with this rule, Kandi was expected to separately identify revenue from the JV Company and any other related parties and revenue from unrelated parties in the 2014 Consolidated Statements of Income. However, the Company reported the total revenue for 2014 as one line item without identifying which part of the revenue came from related parties.

160. Nevertheless, the Company asserted, in Item 9A of the 2014 10-K, that its internal controls were now effective following the purported remediation efforts earlier that year:

> **Item 9A. Controls and Procedures.**
>
> **(a) <u>Evaluation of Disclosure Controls and Procedures</u>**
>
> The Company has evaluated, under the supervision of the Company's Chief Executive Officer and the Chief Financial Officer, the effectiveness of disclosure controls and procedures as of December 31, 2014. This is done in order to ensure that information the Company is required to disclose in reports that are filed or submitted under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is: (i) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and (ii) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.
>
> ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2014.***
>
> **(b) <u>Management's Annual Report on Internal Control Over Financial Reporting</u>**
>
> Our management is responsible for establishing and maintaining adequate internal

control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under Exchange Act. ***The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.***

The Company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

…

Management conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2014, the last day of our fiscal year. This assessment was based on criteria established in the framework Internal Control—Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. ***Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were effective as of December 31, 2014.***

**Remediation of Previously Reported Material Weakness**

As of December 31, 2014, the management evaluated the material weakness in our internal control that was disclosed in Item 9A of our Annual Report on Form 10-K for the year ended December 31, 2013 (the "2013 Form 10-K") and related implementation of corrective measures in 2014. ***In May 2014, the Audit Committee reviewed and approved the Company's policies and procedures related to remediating inadequate internal control environment that was disclosed in Item 9A of the 2013 Form 10-K***, of which Audit Committee Charter and Amended Business Ethics and Codes of Conduct have been posted on our website. The internal auditor reports directly to the Company's audit committee. ***The Chairman of the Audit Committee and management representatives met with the internal auditor and the independent auditor who conducts the audit of internal control over financial reporting. The Audit Committee also reviewed and approved the amended approval procedures and guidelines for related-party transactions***

> ***(internal audit process). This new rule has been implemented by the management.*** In addition, ***the Audit Committee conducted a self-assessment to assess our effectiveness in oversight of management and updated the Audit Committee Charter. The management believes that the progresses made met the remediation requirements and were sufficient to remediate the material weakness in our internal control that was disclosed in Item 9A of our 2013 Form 10-K.***
>
> We reviewed the results of management's assessment with the Audit Committee of our Board of Directors.
>
> ***Our independent registered public accounting firm, AWC (CPA) Limited, has audited the effectiveness of our internal control over financial reporting as of December 31, 2014 as stated in their report which is attached to the auditors' report included under item 8 of this report.***
>
> **(c) <u>Changes in Internal Control Over Financial Reporting</u>**
>
> Except for the changes noted above, ***there had been no other changes in the Company's internal control over financial reporting identified in connection with the above evaluation that occurred during the last fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.***

(Emphasis added.)

161. The report of the Company's former auditor, AWC, was included under Item 8 of the 2014 10-K. The AWC report provided investors with the following assurances:

> We have audited the accompanying consolidated balance sheet of Kandi Technologies Group, Inc. and subsidiaries ("the Company") as of December 31, 2014 and 2013 and the related consolidated statements of income and comprehensive income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2014. We have also audited the internal control over financial reporting of the Company as of December 31, 2014, based on criteria established in the Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on these consolidated financial statements and an opinion on the Company's internal control over financial reporting based on our audit.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan

> and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects.
>
> …
>
> ***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Kandi Technologies Group, Inc. as of December 31, 2014 and 2013 and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2014, in conformity with US generally accepted accounting principles.***
>
> ***Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).***

(Emphasis added.)

162. Attached to the 2014 10-K were SOX Certifications signed by Defendants Hu and X. Zhu, attesting to the accuracy of the 2014 10-K.

**<u>The 2015 Proxy Statement</u>**

163. On April 10, 2015, the Directors at the time (Defendants Hu, Wang, Lewin, Yu, and Chen) caused the Company to file a Schedule 14A with the SEC (the "2015 Proxy Statement"), which claimed the following concerning the effectiveness of the Company's risk oversight:

> Our Board is responsible for oversight of the Company's risk management practices while management is responsible for the day-to-day risk management processes. ***In the Board's opinion, this division of responsibilities is the most effective approach for addressing the risks facing the Company.*** The Board receives periodic reports from management regarding the most significant risks facing the Company. ***In addition, the Audit Committee assists the Board in its oversight of our risk assessment and risk management policies. Our Audit Committee is empowered to appoint and oversee our independent registered public accounting firm, monitor the integrity of our financial reporting processes and systems of internal controls and provide an avenue of communication among our independent auditors, management, our internal auditing department and our Board.***

(Emphasis added.)

164. The Audit Committee Report included in the 2015 Proxy Statement, which was signed by Defendants Yu, Lewin, and Chen, stated in pertinent part:

> The Audit Committee has reviewed and discussed the audited financial statements with our management and representatives of AWC (CPA) Limited, our independent registered public accounting firm. ***The Audit Committee has discussed AWC (CPA) Limited's judgments as to the quality, not just the acceptability, of our accounting principles and such other matters as are required to be discussed with the Audit Committee*** by Statement on Auditing Standards No. 114 (which superseded Statement on Auditing Standards No. 61), other standards of the Public Company Accounting Oversight Board (United States), rules of the SEC, and other applicable regulations. The Audit Committee also received the written disclosures and the letter from AWC (CPA) Limited required by applicable requirements of the Public Company Accounting Oversight Board regarding the firm's independence from our management and has discussed with AWC (CPA) Limited its independence. The members of the Audit Committee considered whether the services provided by AWC (CPA) Limited, for the year ended December 31, 2014, are compatible with maintaining their independence. The Board has delegated to the Audit Committee the authority to approve the engagement of our independent registered public accounting firm.
>
> ***Based upon its reviews and discussions, the Audit Committee recommended to our Board that the audited financial statements be included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2014 for filing with the SEC and the Board approved that recommendation.***

(Emphasis added.)

165. The 2015 Proxy Statement also noted that Compensation for Kandi's named executive officers was based on "performance targets set up pursuant to the [2008 Omnibus Long-term Incentive] Plan . . . [and] the Compensation Committee and the Board approved the grant of common stock for 100,000 shares of common stock to [Defendant Hu] and 60,000 to [Defendant X. Zhu] in 2014." But the 2015 Proxy Statement failed to disclose that such compensation that was awarded was based on financial statements that were false and misleading and that, therefore, did not reflect the Company's true performance.

**<u>1Q 2015 10-Q</u>**

166. On May 11, 2015, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter ended March 31, 2015 ("1Q 2015 10-Q"), which was signed by Defendants Hu and Wang.

167. The 1Q 2015 10-Q contained a Consolidated Statements of Cash Flows table ("1Q 2015 Statements of Cash Flows") in which the Company reported incorrect cash flow figures. First, for the three months ended March 31, 2015, $2,762,925 was reported by the Company as an issuance of notes receivables in cash flows from investing activities in the 1Q 2015 Statements of Cash Flows, which, in fact, represented the settlement of money due from the JV Company and related parties with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of money due from the JV Company and related parties was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 1Q 2015 Statements of Cash Flows. Second, for the three months ended March 31, 2015, $2,572,850 was reported as repayments of notes receivable in cash flows from investing activities in the 1Q 2015 Statements of Cash Flows, which represented the assignment of the notes receivable to the Company's suppliers to settle the accounts payables. This classification was incorrect because the assignment of the notes receivable to the Company's suppliers to settle the accounts payables was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Third, for the three months ended March 31, 2015, $6,663,525 was reported as the proceeds from notes payables in cash flows from financing activities of the 1Q 2016 Statements of Cash Flows, which represented the settlement of accounts payable with notes payables. This classification was incorrect because the settlement of accounts payables with notes payable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section rather than proceeds from notes payable in the financing section. As a result of the above errors, the Company also misstated the notes receivable, accounts payable, and the amount due from the JV Company.

168. In the 1Q 2015 10-Q, the Company also reported the revenue for the three months ended March 31, 2015 as one line item in the Consolidated Statements of Income (Loss) and

Comprehensive Income (Loss) without identifying which part of the revenue came from related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the income statement as required by Rule 4-08(k) of Regulation S-X.

169. Additionally, the Company falsely reported the notes receivable as one line item on the Consolidated Balance Sheet contained in the 1Q 2015 10-Q without identifying separately notes receivable from the JV Company and related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the balance sheet as required by Rule 4-08(k) of Regulation S-X.

170. Moreover, the Company's Note 19–Taxes of the Notes to the Consolidated Financial Statements was not prepared and reported properly. First, the Company's reported taxes were not properly broken out between current and deferred taxes in the 1Q 2015 10-Q. Second, the Company's reconciliation schedule reported in Note 19 was prepared incorrectly. Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 740-10-50-12 requires a public business entity to disclose a reconciliation between the reported amount of income tax expense (or benefit) from continuing operations and the amount of income tax expense that would result from multiplying the pretax income (or loss) from continuing operations by the domestic statutory tax rate, showing the estimated dollar value of each of the underlying causes for the difference. Accordingly, the Company was supposed to use the PRC statutory rate of 25% to reconcile to the effective tax rate. However, in the 1Q 2015 10-Q, the expected tax expense reported by the Company was computed inappropriately through a combination of applying the U.S. Federal rate of 34%, the PRC rate of 25%, and the Hong Kong rate of 16.5%. Third, the Company failed to properly disclose the amount and nature of each item within "permanent differences" in the reconciliation between the expected and reported tax expense in the 2015 10-

K. Pursue to Rule 4-08(h)(2) of Regulation S-X, only reconciling items that are individually less than 5% of the computed amount may be combined in the reconciliation. The nature and amount of each individual reconciling items that is greater than five percent should be separately identified and disclosed. Fourth, the Company's reported loss carried forward and valuation allowance for the three months ended March 31, 2015 was not prepared correctly. Under FASB ASC 740-10-50-2 and 740-10-50-3, public entities are currently required to separately disclose the totals of deferred tax liabilities, deferred tax assets, the valuation allowance recognized for deferred tax assets, the net change in the total valuation allowance for the year, and the amount and expiration dates of operating losses and tax credit carryforwards. The Company failed to comply with the guidelines. For example, the Company failed to correctly disclose the amount and expiration dates of operating losses carryforwards existing as of the first quarter of 2015 and the associated total valuation allowance.

171. Despite all the disclosure and reporting failures, the Company claimed, in Item 4 of the 1Q 2015 10-Q, the following regarding the effectiveness of its controls and procedures:

> **Evaluation of Disclosure Controls and Procedures**
>
> We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of March 31, 2015. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.***
>
> Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act (a) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) is accumulated and communicated to management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their

objectives as described above.

**Changes in Internal Control over Financial Reporting**

***There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

172. Attached to the 1Q 2015 10-Q were SOX Certifications signed by Defendants Hu and Wang, attesting to the accuracy of the 1Q 2015 10-Q.

**2Q 2015 10-Q**

173. On August 10, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2015 ("2Q 2015 10-Q"), which was signed by Defendants Hu and Wang.

174. The 2Q 2015 10-Q contained a Consolidated Statements of Cash Flows table ("2Q 2015 Statements of Cash Flows") in which the Company reported incorrect cash flow figures. First, for the six months ended June 30, 2015, $4,121,797 was reported by the Company as an issuance of notes receivables in cash flows from investing activities in the 2Q 2015 Statements of Cash Flows, which, in fact, represented the settlement of money due from the JV Company and related parties with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of money due from the JV Company and related parties was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 2Q 2015 Statements of Cash Flows. Second, for the six months ended June 30, 2015, $4,944,527 was reported as repayments of notes receivable in cash flows from investing activities in the 2Q 2015 Statements of Cash Flows, which represented the assignment of the notes receivable to the Company's suppliers to settle the accounts payables. This classification was incorrect because the assignment of the notes receivable to the Company's suppliers to settle the accounts payables was

supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Third, for the six months ended June 30, 2015, $9,937,929 was reported as the proceeds from notes payables in cash flows from financing activities of the 2Q 2015 Statements of Cash Flows, which represented the settlement of accounts payable with notes payables. This classification was incorrect because the settlement of accounts payables with notes payable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. As a result of the above errors, the Company also misstated the accounts payable and the amount due from the JV Company.

175. In the 2Q 2015 10-Q, the Company also reported the total revenue for the second quarter of 2015 and the six months ended June 30, 2015 as one line item in the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) without identifying which part of the revenue came from related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the income statement as required by Rule 4-08(k) of Regulation S-X.

176. Additionally, the Company falsely reported the notes receivable as one line item in the Consolidated Balance Sheet contained in the 2Q 2015 10-Q without identifying separately notes receivable from the JV Company and related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the balance sheet as required by Rule 4-08(k) of Regulation S-X.

177. Furthermore, the Company's Note 19-Taxes of the Notes to the Consolidated Financial Statements contained in the 2Q 2015 10-Q was not prepared and reported properly. First, the Company's reported taxes were not properly broken out between current and deferred taxes. Second, the Company's reconciliation schedule reported in Note 19 was prepared incorrectly for

the same reason as stated above. Third, the Company failed to properly disclose the amount and nature of each item within "permanent differences" in the reconciliation between the expected and reported tax expense in the 2Q 2015 10-Q. Fourth, the Company failed to correctly disclose the amount and expiration dates of operating losses carryforwards existing as of the second quarter of 2015 and the associated valuation allowance.

178. Despite all the disclosure and reporting failures, the Company claimed, in Item 4 of the 2Q 2015 10-Q, the following regarding the effectiveness of its controls and procedures:

> **Evaluation of Disclosure Controls and Procedures**
>
> We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of June 30, 2015. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.***
>
> Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act (a) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) is accumulated and communicated to management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives as described above.
>
> **Changes in Internal Control over Financial Reporting**
>
> ***There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

179. Attached to the 2Q 2015 10-Q were SOX Certifications signed by Defendants Hu and Wang, attesting to the accuracy of the 2Q 2015 10-Q.

**3Q 2015 10-Q**

180. On November 9, 2015, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2015 ("3Q 2015 10-Q"), which was signed by Defendants Hu and Wang.

181. The 3Q 2015 10-Q contained a Consolidated Statements of Cash Flows table ("3Q 2015 Statements of Cash Flows") in which the Company reported incorrect cash flow figures. First, for the nine months ended September 30, 2015, $54,355,864 was reported by the Company as an issuance of notes receivables in cash flows from investing activities in the 3Q 2015 Statements of Cash Flows, which represented the settlement of money due from the JV Company and related parties with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of money due from the JV Company and related parties was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 3Q 2015 Statements of Cash Flows. Second, for the nine months ended September 30, 2015, $8,163,199 was reported as an issuance of notes receivables in cash flows from investing activities in the 3Q 2015 Statements of Cash Flows, which represented the settlement of accounts receivable with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of accounts receivable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Third, for the nine months ended September 30, 2015, $55,213,968 was reported as repayments of notes receivable in cash flows from investing activities in the 3Q 2015 Statements of Cash Flows, which represented the assignment of the notes receivable to the Company's suppliers to settle the accounts payables. This classification was incorrect because the assignment of the notes receivable to the Company's suppliers to settle the accounts payables was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Fourth, for the nine months ended September 30, 2015, $9,860,498 was

reported as the proceeds from notes payables in cash flows from financing activities of the 3Q 2015 Statements of Cash Flows, which represented the settlement of accounts payable with notes payables. This classification was incorrect because the settlement of accounts payables with notes payable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. As a result of the above errors, the Company also misstated the accounts receivable, notes receivable, accounts payable and the amount due from the JV Company.

182. In the 3Q 2015 10-Q, the Company also reported the total revenue for the third quarter of 2015 and the nine months ended September 30, 2015 as one line item in the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) without identifying which part of the revenue came from related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the income statement as required by Rule 4-08(k) of Regulation S-X.

183. Additionally, the Company falsely reported the notes receivable as one line item in the Consolidated Balance Sheet contained in the 3Q 2015 10-Q without identifying separately notes receivable from the JV Company and related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the balance sheet as required by Rule 4-08(k) of Regulation S-X.

184. Furthermore, the Company's Note 20-Taxes of the Notes to the Consolidated Financial Statements contained in the 3Q 2015 10-Q was not prepared and reported properly. First, the Company's reported taxes were not properly broken out between current and deferred taxes. Second, the Company's reconciliation schedule reported in Note 20 was prepared incorrectly. Third, the Company failed to properly disclose the amount and nature of each item within "permanent differences" in the reconciliation between the expected and reported tax expense in

the 3Q 2015 10-Q. Fourth, the Company failed to correctly disclose the amount and expiration dates of operating losses carryforwards existing as of the third quarter of 2015 and the associated valuation allowance.

185. Despite all the disclosure and reporting failures, the Company claimed, in Item 4 of the 3Q 2015 10-Q, the following regarding the effectiveness of its controls and procedures:

> **Evaluation of Disclosure Controls and Procedures**
>
> We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of September 30, 2015. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.***
>
> Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act (a) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) is accumulated and communicated to management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives as described above.
>
> **Changes in Internal Control over Financial Reporting**
>
> ***There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

186. Attached to the 3Q 2015 10-Q were SOX Certifications signed by Defendants Hu and Wang, attesting to the accuracy of the 3Q 2015 10-Q.

**The 2015 10-K**

187. On March 14, 2016, the Company filed an annual report on Form 10-K with the SEC for the year ended December 31, 2015 ("2015 10-K"), which was signed by Defendants Hu, Wang, Chen, Lewin, and Yu, and non-parties Ni and Qian.

188. The 2015 10-K contained a Consolidated Statements of Cash Flows table ("2015 Statements of Cash Flows") in which the Company reported cash flow figures for the year of 2013, 2014 and 2015.

189. As alleged above, certain cash flow figures the Company reported for the year of 2014 were incorrect as the Company failed to correctly classify certain cash and noncash activities related to notes receivable, notes payable, account receivable and accounts payable. Due to the same reasons, certain figures the Company reported for the year of 2015 were also incorrect.

190. First, for the year 2015, the Company overstated the amount of cash flows from issuance of notes receivables by $122,440,599 as the Company classified the settlement of the trade receivables with notes receivables as issuance of notes receivables in the investing section of the 2015 Statements of Cash Flows. This classification was erroneous because the receipt of notes receivable for the settlement of trade receivables was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 2015 Statements of Cash Flows. In fact, the total amount of cash flow from the issuance of notes receivable for year 2015 was not $131,852,319, but rather $9,411,720. Second, for year 2015, the Company overstated the amount of cash flows from repayments of notes receivable by $120,815,961 because the Company incorrectly classified the collections of the notes receivables or the assignment of the notes receivable to the Company's suppliers to settle the accounts payables as repayments of notes receivables in cash flow from investing activities. This classification was incorrect because the cash receipt from the collection of notes receivables or the assignment of the notes receivable to

the Company's suppliers to settle the accounts payables was supposed to be reported as a noncash activity in the non-cash disclosures section. In fact, the total amount of cash flow from the repayment of notes receivable for year 2015 was not $127,226,115, but rather $6,410,154. Third, for the year 2015, the Company incorrectly reported $13,781,830, which represented the settlement of accounts payable with notes payable, as the proceeds from notes payable in the financing section of the 2015 Statements of Cash Flows. This classification was incorrect because the settlement of accounts payable with notes payable was supposed to be reported as a noncash activity in the non-cash disclosures section. In fact, the total amount of cash flow from the proceeds from notes payable for the year 2014 was not $13,781,830, but rather $0. As a result of the above errors, the Company also misstated the accounts receivable, the notes receivable, the amount due from the JV Company, and the accounts payable for 2015.

191. Additionally, in connection with the relocation of the Company's Hainan facility in early 2016 and the Company's revised contract terms and technical requirements resulting therefrom, approximately $7.5 million of construction-in-progress recorded in 2014 was supposed to be transferred back to and recorded as the advances to suppliers or prepayments in the 2015 financial statements and balance sheets. However, the Company failed to make the adjustment in the 2015 Statements of Cash Flows to reflect the completion status change.

192. Similar to what the Company did in the 2014 10-K, the Company also reported the total revenue for 2015 as one line item in the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) contained in the 2015 10-K ("2015 Consolidated Statements of Income") without identifying which part of the revenue came from related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the income statement as required by Rule 4-08(k) of Regulation S-X. In order to comply with this rule,

Kandi was expected to separately identify revenue from the JV Company and any other related parties and revenue from unrelated parties in the 2015 Consolidated Statements of Income.

193. Moreover, the Company falsely reported the notes receivable as one line item on the Consolidated Balance Sheet contained in the 2015 10-K ("2015 Balance Sheet") without identifying separately notes receivable from the JV Company and related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the balance sheet as required by Rule 4-08(k) of Regulation S-X.

194. Furthermore, the Company's Note 20 – Taxes of the Notes to the Consolidated Financial Statements was not prepared and reported properly. First, the Company's reported taxes were not properly broken out between current and deferred taxes in the 2015 10-K. Second, the Company's reconciliation schedule reported in Note 20 was prepared incorrectly. The Company was supposed to use the PRC statutory rate of 25% to reconcile to the effective tax rate. Third, the Company failed to properly disclose the amount and nature of each item within "permanent differences" in the reconciliation between the expected and reported tax expense in the 2015 10-K. Fourth, the Company failed to correctly disclose the amount and expiration dates of operating losses carryforwards existing as of the year ended December 31, 2015 and the associated valuation allowance. Fifth, the Company included, by mistake, "unaudited" headings on the tables of the statutory to actual tax provision reconciliation, the 2015 presentation of net deferred tax liabilities, and the table presenting tax benefit (holiday) credit and net per share effect in Note 20 – Taxes in the 2015 10-K.

195. Despite all the disclosure and reporting failures, the Company nonetheless asserted, in Item 9A of the 2015 10-K, the following regarding the effectiveness of its controls and procedures:

**Item 9A. Controls and Procedures.**

**(a) Evaluation of Disclosure Controls and Procedures**

The Company has evaluated, under the supervision of the Company's Chief Executive Officer and the Chief Financial Officer, the effectiveness of disclosure controls and procedures as of December 31, 2015. This is done in order to ensure that information the Company is required to disclose in reports that are filed or submitted under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is: (i) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and (ii) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2015.***

**(b) Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under Exchange Act. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.

The Company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

…

Management conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2015, the last day of our fiscal year. This assessment was based on criteria established in the framework Internal Control—Integrated Framework (2013), issued by the Committee of Sponsoring

> Organizations of the Treadway Commission ("COSO") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. ***Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were effective as of December 31, 2015.***
>
> We reviewed the results of management's assessment with the Audit Committee of our Board of Directors.
>
> Our independent registered public accounting firm, AWC (CPA) Limited, has audited the effectiveness of our internal control over financial reporting as of December 31, 2015 as stated in their report which is attached to the auditors' report included under item 8 of this report.
>
> **(c) <u>Changes in Internal Control Over Financial Reporting</u>**
>
> ***There had been no changes in the Company's internal control over financial reporting identified in connection with the above evaluation that occurred during the last fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.***

(Emphasis added.)

196. The report of the Company's former auditor AWC provided the following assurances:

> We have audited the accompanying consolidated balance sheet of Kandi Technologies Group, Inc. and subsidiaries ("the Company") as of December 31, 2015 and 2014 and the related consolidated statements of income and comprehensive income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2015. We have also audited the internal control over financial reporting of the Company as of December 31, 2015, based on criteria established in the Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on these consolidated financial statements and an opinion on the Company's internal control over financial reporting based on our audit.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial

statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

…

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Kandi Technologies Group, Inc. as of December 31, 2015 and 2014 and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2015, in conformity with US generally accepted accounting principles.***

***Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2015, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).***

(Emphasis added.)

197. The Company also described its taxes in the section titled, "NOTE 20 – TAXES":

(a) Corporation Income Tax

In accordance with the relevant tax laws and regulations of the PRC, applicable corporate income tax ("CIT") rate is 25%. However, the Kandi Vehicle, qualified as a high technology company in China, was entitled to pay a reduced income tax rate of 15%. The applicable corporate income tax rate of each of the Company's three subsidiaries, Kandi New Energy, Yongkang Scrou and Kandi Hainan, the JV Company and its subsidiaries and the Service Company was 25%.

The Company, qualified as a high technology company in China, was entitled to pay a reduced CIT rate of 15%. After combining with the research and development tax credit of 25% on certain qualified research and development expenses, the final effective reduced income tax rate was 16.88%. The combined tax benefits were 51.26%. The actual effective income tax rate was reduced from 25% to 12.19% of the 2015 taxable corporate income.

According to the PRC CIT reporting system, the CIT sales cut-off base is concurrent with the value-added tax ("VAT"), which should reported to the State Administration of Taxation ("SAT") on a quarterly basis. Since the VAT and CIT are accounted for on a VAT tax basis that recorded all sales on a "State provided official invoices" reporting system, the Company is reporting the CIT according to the SAT prescribed tax reporting rules. Under the VAT tax reporting system, sales cut-off is not done on an accrual basis but rather on a VAT taxable reporting basis. Therefore, when the Company adopted U.S. GAAP using an accrual basis, the sales cut-off CIT timing (due to the VAT reporting system) creates a temporary sales cutoff timing difference. This difference is reflected in the deferred tax assets or liabilities calculations on the income tax estimate reported elsewhere on the report. Effective January 1, 2007, the Company adopted ASC 740, Income Taxes. The interpretation addresses the determination of whether tax benefits claimed or expected to be claimed on a tax return should be recorded in the financial statements.

Under ASC 740, the Company may recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position should be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. ASC 740 also provides guidance on de-recognition, classification, interest and penalties on income taxes, accounting in interim periods and requires increased disclosures. As of December 31, 2015, the Company did not have a liability for unrecognized tax benefits. The Company files income tax returns to the U.S. Internal Revenue Services ("IRS") and states where the Company has operations. The Company is subject to U.S. federal or state income tax examinations by the IRS and relevant state tax authorities for years after 2006. During the periods open to examination, the Company has net operating loss carry forwards ("NOLs") for U.S. federal and state tax purposes that have attributes from closed periods. Since these NOLs may be utilized in future periods, they remain subject to examination. The Company also files certain tax returns in China. As of December 31, 2015, the Company was not aware of any pending income tax examinations by U.S. and China tax authorities.

The Company's policy is to record interest and penalties on uncertain tax provisions as income tax expense. As of December 31, 2015, the Company has no accrued interest or penalties related to uncertain tax positions. The Company has not recorded a provision for U.S. federal income tax for the year ended December 31, 2015 due to the net operating loss in 2015 and an accumulated net operating loss carry forward from prior years in the United States.

Income tax expenses for the years ended December 31, 2015, 2014 and 2013 is summarized as follows:

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Current: | | | |
| Provision for CIT | $ 6,127,228 | $ 2,414,412 | $ 1,593,994 |
| Provision for Federal Income Tax | - | - | - |
| Deferred: | | | |
| Provision for CIT | - | - | - |
| Income tax expense (benefit) | $ 6,127,228 | $ 2,414,412 | $ 1,593,994 |

The Company's income tax expense differs from the "expected" tax expense for the years ended December 31, 2015, 2014 and 2013 (computed by applying the U.S. Federal Income Tax rate of 34% and PRC Corporation Income Tax rate of 25%, respectively to income before income taxes) as follows:

| | For the Years Ended December 31, (Unaudited) | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Computed "expected" expense | $ (4,013,791) | $ 929,405 | $ (1,381,713) |
| Favorable tax rate | (912,548) | (611,672) | (1,378,429) |
| Permanent differences | 3,408,181 | (929,318) | 361,230 |
| Valuation allowance | 7,645,386 | 3,025,997 | 3,992,906 |
| Income tax expense (benefit) | $ 6,127,228 | $ 2,414,412 | $ 1,593,994 |

The tax effects of temporary differences that give rise to the Company's net deferred tax assets and liabilities as of December 31, 2015, 2014 and 2013 are summarized as follows:

| | December 31, 2015 (Unaudited) | December 31, 2014 | December 31, 2013 |
|---|---|---|---|
| Current portion: | | | |
| Deferred tax assets (liabilities): | | | |
| Expense | $ (272,953) | $ (80,016) | $ 47,224 |
| Subtotal | (272,953) | (80,016) | 47,224 |
| | | | |
| Deferred tax assets (liabilities): | | | |
| Sales cut-off difference derived from Value Added Tax reporting system to calculate PRC Corporation Income Tax in accordance with the PRC State Administration of Taxation | 290,850 | (26,226) | (33,518) |

| | | | |
|---|---|---|---|
| Other | (2,392,821) | (124,622) | 0 |
| Subtotal | (2,101,971) | (150,848) | (33,518) |
| | | | |
| Total deferred tax assets (liabilities) – current portion | (2,374,924) | (230,864) | 13,706 |
| | | | |
| Non-current portion: | | | |
| Deferred tax assets (liabilities): | | | |
| Depreciation | (353,115) | (551,697) | 81,076 |
| Loss carried forward | 7,645,386 | 3,025,997 | 3,992,906 |
| Valuation allowance | (7,645,386) | (3,025,997) | (3,992,906) |
| Subtotal | (353,115) | (551,697) | 81,076 |
| | | | |
| Deferred tax liabilities: | | | |
| Accumulated other comprehensive gain | (1,240,467) | (1,715,028) | (1,009,477) |
| Subtotal | (1,240,467) | (1,715,028) | (1,009,477) |
| | | | |
| Total deferred tax assets – non-current portion | (1,593,582) | (2,266,725) | (928,401) |
| | | | |
| Net deferred tax assets (liabilities) | $ (3,968,506) | $ (2,497,589) | $ (914,695) |

(b) Tax Holiday Effect

For the years ended December 31, 2015, 2014 and 2013, the PRC corporate income tax rate was 25%. Certain subsidiaries of the Company are entitled to tax exemptions (tax holidays) for the years ended December 31, 2015, 2014 and 2013.

The combined effects of the income tax expense exemptions and reductions available to the Company for the years ended December 31, 2015, 2014 and 2013 are as follows:

| | **For the Years Ended December 31, (Unaudited)** | | |
|---|---|---|---|
| | **2015** | **2014** | **2013** |
| Tax benefit (holiday) credit | $ 912,548 | $ 611,672 | $ 1,378,429 |
| Basic net income per share effect | $ 0.020 | $ 0.010 | $ 0.040 |

198. The 2015 10-K also discussed the Company's construction-in-progress accounting in the section titled, "NOTE 16 – CONSTRUCTION-IN-PROGRESS":

> As of December 31, 2015, a total amount of advances to a supplier of RMB 353,000,000, or $54,368,753, made by Kandi Hainan to Nanjing Shangtong Auto Technologies Co., Ltd. ("Nanjing Shangtong") for equipment purchases was included in Construction in Process ("CIP"). None of the CIP was transferred to property, plant and equipment as of December 31, 2015.
>
> Because the government of Hainan Province is enforcing a new plan to centralize the manufacturing in designated industry park, the Wanning facility will be reallocated from Wanning City to Haikou City. In addition, all related expenses and assets disposal caused by the relocation were compensated by the local government.
>
> No depreciation is provided for CIP until such time as the facility is completed and placed into operation.
>
> The contractual obligation under CIP of the Company as of December 31,2015 is as follow:

| | Total CIP as of December 31, 2015 | Contracted but not provided for | Total contract amount |
|---|---|---|---|
| Kandi Hainan facility | $ 54,368,753 | $ 6,468,803 | $ 60,837,556 |
| Total | $ 54,368,753 | $ 6,468,803 | $ 60,837,556 |

> As of December 31, 2015 and 2014, the Company had CIP amounting to $54,368,753 and $58,510,051, respectively.
>
> No interest expense has been capitalized for CIP for the years ended December 31, 2015, 2014 and 2013, respectively.

199. In the 2015 10-K, the Company additionally provided information regarding its interest and investment in the JV Company, in "NOTE 24 – SUMMARIZED INFORMATION OF INVESTMENT IN THE JV COMPANY":

> In March 2013, pursuant to a joint venture agreement (the "JV Agreement") entered into between Kandi Vehicles and Shanghai Maple Guorun Automobile Co., Ltd. ("Shanghai Guorun"), a 99%-owned subsidiary of Geely Automobile Holdings Ltd. ("Geely"), the parties established Zhejiang Kandi Electric Vehicles Co., Ltd. (the "JV Company") to develop, manufacture and sell electric vehicles ("EVs") and related auto parts. Each of Kandi Vehicles and Shanghai Guorun has 50% ownership interest in the JV Company. In the fourth quarter of 2013, Kandi Vehicles entered into an ownership transfer agreement with the JV Company

pursuant to which Kandi Vehicles transferred 100% of its ownership in Kandi Changxing to the JV Company. As a result, the Company indirectly has 50% economic interest in Kandi Changxing through its 50% ownership interest in the JV Company after this transfer. In November 2013, Zhejiang Kandi Electric Vehicles Jinhua Co., Ltd. ("Kandi Jinhua") was formed by the JV Company. The JV Company has 100% ownership interest in Kandi Jinhua, and the Company, indirectly through its 50% ownership interest in the JV Company, has 50% economic interest in Kandi Jinhua. In November 2013, Zhejiang JiHeKang Electric Vehicle Sales Co., Ltd. ("JiHeKang") was formed by the JV Company. The JV Company has 100% ownership interest in JiHeKang, and the Company, indirectly through its 50% ownership interest in the JV Company, has 50% economic interest in JiHeKang. In December 2013, the JV Company entered into an ownership transfer agreement with Shanghai Guorun pursuant to which the JV Company acquired 100% ownership of Kandi Electric Vehicles (Shanghai) Co., Ltd. ("Kandi Shanghai"). As a result, Kandi Shanghai is a wholly-owned subsidiary of the JV Company, and the Company, indirectly through its 50% ownership interest in the JV Company, has 50% economic interest in Kandi Shanghai. In January 2014, Zhejiang Kandi Electric Vehicles Jiangsu Co., Ltd. ("Kandi Jiangsu") was formed by the JV Company. The JV Company has 100% ownership interest in Kandi Jiangsu, and the Company, indirectly through its 50% ownership interest in the JV Company, has 50% economic interest in Kandi Jiangsu. In addition, In July 2013, Zhejiang ZuoZhongYou Electric Vehicle Service Co., Ltd. (the "Service Company") was formed. The JV Company has a 19% ownership interest in the Service Company. In March 2014, the JV Company changed its name to Kandi Electric Vehicles Group Co., Ltd. In August 2015, the JV Company transferred its shares of the Service Company to Shanghai Guorun and Kandi Vehicles for 9.5% respectively. As the result, the JV Company no longer has any ownership of the Service Company since the transfer. In November 2015, Hangzhou Puma Investment Management Co,. Ltd. ("Puma Investment") was formed by the JV Company. The JV Company has 50% ownership interest in Puma Investment and the Company, indirectly through its 50% ownership interest in the JV Company, has 25% economic interest in Puma Investment. In November 2015, Hangzhou JiHeKang Electric Vehicle Service Co., Ltd. ("JiHeKang Service Company") was formed by the JV Company. The JV Company has 100% ownership interest in JiHeKang Service Company and the Company, indirectly through its 50% ownership interest in the JV Company, has 50% economic interest in JiHeKang Service Company.

As of the year ended December 31, 2015, the JV Company consolidated the following entities on its financial statements: (1) 100% interest in Kandi Changxing; (2) 100% interest in Kandi Jinhua; (3) 100% interest in JiHeKang; (4) 100% interest in Kandi Shanghai; and (5) 100% interest in Kandi Jiangsu;(6) 100% interest in JiHeKang Service; and (7) 50% interest in Puma Investment.

The Company accounted for its investments in the JV Company under the equity method of accounting as the Company has 50% ownership interest in the JV Company. Therefore, the Company's consolidated net income for the year Ended December 31, 2015 and 2014 included equity income from the JV Company during such periods.

The combined results of operations and financial position of the JV Company are summarized below:

| | Years ended December 31, | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Condensed income statement information: | | | |
| Net sales | $ 362,715,996 | $ 215,537,203 | $ 15,212,347 |
| Gross income | 59,635,845 | 41,889,144 | (1,279,914) |
| % of net sales | 16.4% | 19.4% | -8.4% |
| Net income | 23,323,128 | 7,526,164 | (3,020,756) |
| % of net sales | 6.4% | 3.5% | -19.9% |
| Company's equity in net income of JV | $ 11,661,564 | $ 3,763,082 | $ (1,510,378) |

| | Three months ended December 31, | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Condensed income statement information: | | | |
| Net sales | $ 164,750,714 | $ 88,773,410 | $ 15,212,347 |
| Gross income | 27,677,165 | 27,944,246 | (1,279,914) |
| % of net sales | 16.8% | 31.5% | -8.4% |
| Net income | 19,322,347 | 743,892 | (2,780,723) |
| % of net sales | 11.7% | 0.8% | -18.3% |
| Company's equity in net income of JV | $ 9,661,173 | $ 371,946 | $ (1,390,362) |

| | December 31, 2015 | December 31, 2014 |
|---|---|---|
| Condensed balance sheet information: | | |
| Current assets | $ 455,368,595 | $ 262,543,256 |
| Noncurrent assets | 191,145,583 | 194,229,114 |
| Total assets | $ 646,514,178 | $ 456,772,370 |
| Current liabilities | 429,487,683 | 280,779,432 |
| Noncurrent liabilities | 36,348,514 | 9,006,787 |
| Equity | 180,677,981 | 166,986,151 |
| Total liabilities and equity | $ 646,514,178 | $ 456,772,370 |

For the year ended December 31, 2015, the JV Company's revenues were $362,715,996, an increase of 68.28% from $215,537,203 for the year ended December 31, 2014. For the three months ended December 31, 2015, the JV Company's revenues were $164,750,714, an increase of 85.59% from $88,773,410 for the three months ended December 31, 2014. The revenue was primarily derived from the sales of EV products in the PRC with a total of 24,220 units sold during the year 2015, among which, a total of 12,100 units of EV products were sold during the three months ended December 31, 2015. The growth of sales of EV products was mainly driven by the demand from the MPT program. For the year ended December 31, 2015, the JV Company recorded a net profit of $23,323,128 as compared to $7,526,164 for the year ended December 31, 2014. For the three months ended December 31, 2015, the JV Company recorded a net profit of $19,322,347 as compared to $743,892 for the three months ended December 31, 2014. As the Company only has 50% ownership interest in the JV Company and accounted for its investments in the JV Company under the equity method of accounting, the Company didn't consolidate the JV Company's financial results but included equity income from the JV Company during such periods, which were a share of profit of $11,661,564 and $3,763,082 for the years ended December 31, 2015 and 2014, respectively.

Note: The following table illustrates the captions used in the Company's Income Statements for its equity basis investments in the JV Company.

Changes in the Company's equity method investment in JV Company for the year ended December 31, 2015 and 2014 are as follows:

| | **Years ended December 31,** | |
|---|---|---|
| | **2015** | **2014** |
| Investment in JV Company, beginning of the period, | $ 83,309,095 | $ 79,331,930 |
| Share of profit | 11,661,564 | 3,763,082 |
| Intercompany transaction elimination | (1,135) | (184,138) |
| Year 2014 unrealized profit realized | 181,426 | 911,322 |
| Exchange difference | (4,813,051) | (513,101) |
| Investment in JV Company, end of the period | $ 90,337,899 | $ 83,309,095 |

Sales to the Company's customers, the JV Company and its subsidiaries, for the year ended December 31, 2015 were $152,247,082 or 76% of the Company's total revenue for the year, an increase of 29.3% of the sales to the JV Company from the previous year. Sales to the JV Company and its subsidiaries for the three months ended December 31, 2015 were $45,787,956 or 78% of total revenue for that three months period. The sales to the JV Company and its subsidiaries were primarily the sales of battery packs, body parts, EV drive motors, EV controllers, air conditioning

units and other auto parts, the breakdown of the sales to the JV Company and its subsidaries [sic] as follows:

| | Years ended December 31, | |
|---|---|---|
| | 2015 | 2014 |
| JV Company | $ 67,729,570 | $ - |
| Kandi Changxing | 44,019,899 | 65,342,342 |
| Kandi Shanghai | 39,708,548 | 39,412,740 |
| Kandi Jinhua | 789,065 | 12,952,070 |
| Total sales to JV | $ 152,247,082 | $ 117,707,152 |

The following tables summarize the effects of transactions including sales and purchases with JV:

| | Years ended December 31, | |
|---|---|---|
| | 2015 | 2014 |
| Sales to JV | $ 152,247,082 | $ 117,707,152 |
| Purchase from JV | $ 55,179 | $ 356,609 |

As of the years ended 2015 and 2014, the amount due from the JV Company and its subsidieries [sic], net was $76,172,471 and $51,450,612, respectively, of which the majority was the balances with the JV Company, Kandi Jinhua, Kandi Changxing and Kandi Shanghai. The breakdown was as below:

| | December 31, 2015 | December 31, 2014 |
|---|---|---|
| Kandi Shanghai | $ (4,488,379) | $ 6,978,618 |
| Kandi Changxing | 3,249,445 | 7,359,202 |
| Kandi Jinhua | 6,218,177 | 12,736,420 |
| Kandi Jiangsu | 11,453 | - |
| JV Company | 71,181,775 | 24,376,372 |
| Consolidated JV | $ 76,172,471 | $ 51,450,612 |

Within the receivables from the JV Company, the $23,102,869 was a one-year entrusted loan that Kandi Vehicle lent to the JV Company from December 16, 2015 to June 15, 2016 carrying an annual interest rate determined by using the People's Bank of China floating benchmark lending rate on the date of withdraw plus 5% of that rate. The rate will not be adjusted after the withdraw during the lending period, which was 8.7%. The loan was organized by Bank of Communications Hangzhou Zhongan Branch as the agent bank between Kandi Vehicle and the JV Company. Entrusted loans are commonly found in China, where direct borrowing and lending between commercial enterprises are restricted.

200. Attached to the 2015 10-K were SOX Certifications signed by Defendants Hu and Wang, attesting to the accuracy of the 2015 10-K.

**April 13, 2016 8-K**

201. On April 13, 2016, Kandi announced in a Form 8-K (the "4/13/16 8-K") that, with the Audit Committee's approval, it had "dismissed AWC (CPA) Limited ('AWC') as the Company's independent registered public accounting firm" and had appointed "BDO China Shu Lun Pan Certified Public Accountants LLP ('BDO China') as the Company's new independent registered public accounting firm, effective April 12, 2016." The 4/13/16 8-K stated as follows:

> The principal accountant's reports of AWC on the financial statements of the Company as of and for the fiscal years ended December 31, 2015 and 2014 did not contain any adverse opinion or disclaimer of opinion and was not qualified or modified as to uncertainty, audit scope or accounting principles.
>
> During the Company's two most recent fiscal years and the subsequent interim period through April 12, 2016, there were no disagreements with AWC on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreement(s), if not resolved to the satisfaction of AWC, would have caused it to make reference to the subject matter of the disagreement(s) in connection with its report. During the Company's two most recent fiscal years and the subsequent interim period through April 12, 2016, there were no reportable events of the type described in Item 304(a)(1)(v) of Regulation S-K.
>
> The Company provided AWC with a copy of the foregoing disclosure and requested AWC to furnish the Company with a letter addressed to the Securities and Exchange Commission stating whether it agrees with the statements made therein. A copy of such letter, dated April 13, 2016, furnished by AWC is filed as Exhibit 16.1 to this Form 8-K.
>
> On April 12, 2016, the Company's audit committee approved the engagement of BDO China Shu Lun Pan Certified Public Accountants LLP ("BDO China") as the Company's new independent registered public accounting firm. During the Company's two most recent fiscal years and the subsequent interim period through April 12, 2016, neither the Company nor anyone on its behalf consulted with BDO China regarding (i) the application of accounting principles to a specified transaction, either completed or proposed; the type of audit opinion that might be rendered on the Company's financial statements, and neither a written report nor oral advice was provided that BDO China concluded was an important factor considered by the Company in reaching a decision as to the accounting, auditing or

> financial reporting issue; or (ii) any matter that was either the subject of a disagreement (as defined in Item 304(a)(1)(iv) of Regulation S-K and its related instructions) or a reportable event (as described in Item 304(a)(1)(v) of Regulation S-K).

202. Tellingly, the 4/13/16 8-K failed to disclose that, within a month, AWC's registration would be revoked by the PCAOB for misconduct arising from its dealings with the Company over many years.

**<u>1Q 2016 10-Q</u>**

203. On May 10, 2016, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter ended March 31, 2016 ("1Q 2016 10-Q"), which was signed by Defendants Hu and Wang.

204. The 1Q 2016 10-Q contained a Consolidated Statements of Cash Flows table ("1Q 2016 Statements of Cash Flows") in which the Company reported incorrect cash flow figures. First, for the three months ended March 31, 2016, $31,350,559 was reported by the Company as an issuance of notes receivables in cash flows from investing activities in the 1Q 2016 Statements of Cash Flows, which represented the settlement of money due from the JV Company and related parties with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of money due from the JV Company and related parties was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 1Q 2016 Statements of Cash Flows. Second, for the three months ended March 31, 2016, $10,413,273 was reported as an issuance of notes receivables in cash flows from investing activities in the 1Q 2016 Statements of Cash Flows, which represented the settlement of accounts receivable with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of accounts receivable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Third, for the three months ended March 31, 2016,

$40,855,454 was reported as repayments of notes receivable in cash flows from investing activities in the 1Q 2016 Statements of Cash Flows, which represented the assignment of the notes receivable to the Company's suppliers to settle the accounts payables. This classification was incorrect because the assignment of the notes receivable to the Company's suppliers to settle the accounts payables was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Fourth, for the three months ended March 31, 2016, $2,063,766 was reported as the proceeds from notes payables in cash flows from financing activities of the 1Q 2016 Statements of Cash Flows, which represented the settlement of accounts payable with notes payables. This classification was incorrect because the settlement of accounts payables with notes payable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section rather than proceeds from notes payable in the financing section. As a result of the above errors, the Company also misstated the accounts receivable and the amount due from the JV Company for the three months ended March 31, 2016.

205. In the 1Q 2016 10-Q, the Company also reported the total revenue for the three months ended March 31, 2016 as one line item in the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) without identifying which part of the revenue came from related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the income statement as required by Rule 4-08(k) of Regulation S-X.

206. Moreover, the Company falsely reported the notes receivable as one line item in the Consolidated Balance Sheet contained in the 1Q 2016 10-Q without identifying separately notes receivable from the JV Company and related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the balance sheet as required by Rule 4-08(k) of Regulation S-X. In addition, in the 1Q 2016 10-Q, the Company also failed to

transfer the $7.5 million of construction-in-progress recorded in 2014 back to the advances to suppliers or prepayments to reflect the changed completion status of its Hainan facility.

207. Furthermore, the Company's Note 19-Taxes of the Notes to the Consolidated Financial Statements contained in the 1Q 2016 10-Q was not prepared and reported properly. First, the Company's reported taxes were not properly broken out between current and deferred taxes. Second, the Company's reconciliation schedule reported in Note 19 was prepared incorrectly. The Company was supposed to use the PRC statutory rate of 25% to reconcile to the effective tax rate pursuant to FASB ASC 740-10-50-12. However, in the 1Q 2016 10-Q, the expected tax expense reported by the Company was computed inappropriately through a combination of applying the U.S. Federal rate of 34%, the PRC rate of 25%, and the Hong Kong rate of 16.5%. Third, the Company failed to properly disclose the amount and nature of each item within "permanent differences" in the reconciliation between the expected and reported tax expense in the 1Q 2016 10-Q. Fourth, the Company failed to correctly disclose the amount and expiration dates of operating losses carryforwards existing as of the first quarter of 2016 and the associated valuation allowance.

208. Despite all the disclosure and reporting failures, the Company claimed, in Item 4 of the 1Q 2016 10-Q, the following regarding the effectiveness of its controls and procedures:

> **Evaluation of Disclosure Controls and Procedures**
>
> We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of March 31, 2015. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.***
>
> Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act (a) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) is

> accumulated and communicated to management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives as described above.
>
> **Changes in Internal Control over Financial Reporting**
>
> ***There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

209. Attached to the 1Q 2016 10-Q were SOX Certifications signed by Defendants Hu and Wang, attesting to the accuracy of the 1Q 2016 10-Q.

**2Q 2016 10-Q**

210. On August 9, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2016 ("2Q 2016 10-Q"), which was signed by Defendants Hu and Wang.

211. The 2Q 2016 10-Q contained a Consolidated Statements of Cash Flows table ("2Q 2016 Statements of Cash Flows") in which the Company reported incorrect cash flow figures. First, for the six months ended June 30, 2016, $34,866,384 was reported by the Company as an issuance of notes receivables in cash flows from investing activities in the 2Q 2016 Statements of Cash Flows, which represented the settlement of money due from the JV Company and related parties with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of money due from the JV Company and related parties was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 2Q 2016 Statements of Cash Flows. Second, for the six months ended June 30, 2016, $12,714,237

was reported as an issuance of notes receivables in cash flows from investing activities in the 2Q 2016 Statements of Cash Flows, which represented the settlement of accounts receivable with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of accounts receivable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Third, for the six months ended June 30, 2016, $49,046,178 was reported as repayments of notes receivable in cash flows from investing activities in the 2Q 2016 Statements of Cash Flows, which represented the assignment of the notes receivable to the Company's suppliers to settle the accounts payables. This classification was incorrect because the assignment of the notes receivable to the Company's suppliers to settle the accounts payables was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Fourth, for the six months ended June 30, 2016, $229,450 was reported as repayments of notes receivable in cash flows from investing activities of the 2Q 2016 Statements of Cash Flows, which represented the cash receipts from the collection of notes receivables. This classification was incorrect because the cash receipt from the collection of notes receivables was supposed to be reported as an activity in the cash flow from operation activities section of the 2Q 2016 Statements of Cash Flows. Fifth, for the six months ended June 30, 2016, $4,796,570 was reported as the proceeds from notes payables in cash flows from financing activities of the 2Q 2016 Statements of Cash Flows, which represented the settlement of accounts payable with notes payables. This classification was incorrect because the settlement of accounts payables with notes payable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section rather than proceeds from notes payable in the financing section. As a result of the above errors, the Company also misstated the accounts receivable, notes receivable, accounts payable and the amount due from the JV Company.

212. In the 2Q 2016 10-Q, the Company also reported the total revenue for the second quarter of 2016 and the six months ended June 30, 2016 as one line item in the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) without identifying which part of the revenue came from related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the income statement as required by Rule 4-08(k) of Regulation S-X.

213. Moreover, the Company falsely reported the notes receivable as one line item in the Consolidated Balance Sheet contained in the 2Q 2016 10-Q without identifying separately notes receivable from the JV Company and related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the balance sheet as required by Rule 4-08(k) of Regulation S-X. In addition, in the 2Q 2016 10-Q, the Company also failed to transfer the $7.5 million of construction-in-progress recorded in 2014 back to the advances to suppliers or prepayments to reflect the changed completion status of its Hainan facility.

214. Furthermore, the Company's Note 18-Taxes of the Notes to the Consolidated Financial Statements contained in the 2Q 2016 10-Q was not prepared and reported properly. First, the Company's reported taxes were not properly broken out between current and deferred taxes. Second, the Company's reconciliation schedule reported in Note 18 was prepared incorrectly. Third, the Company failed to properly disclose the amount and nature of each item within "permanent differences" in the reconciliation between the expected and reported tax expense in the 2Q 2016 10-Q. Fourth, the Company failed to correctly disclose the amount and expiration dates of operating losses carryforwards existing as of the second quarter of 2016 and the associated valuation allowance.

215. Despite all the disclosure and reporting failures, the Company claimed, in Item 4 of the 2Q 2016 10-Q, the following regarding the effectiveness of its controls and procedures:

> **Evaluation of Disclosure Controls and Procedures**
>
> We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of June 30, 2016. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.***
>
> Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act (a) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) is accumulated and communicated to management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives as described above.
>
> **Changes in Internal Control over Financial Reporting**
>
> ***There was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

216. Attached to the 2Q 2016 10-Q were SOX Certifications signed by Defendants Hu and Wang, attesting to the accuracy of the 2Q 2016 10-Q.

**<u>2016 Proxy Statement</u>**

217. On November 2, 2016, the Directors at the time (including Defendants Hu, Wang, Lewin, Yu, and Chen) caused the Company to file the 2016 Proxy Statement. Concerning the

effectiveness of the Company's risk oversight, the Company claimed in the 2016 Proxy Statement, in pertinent part:

> Our Board is responsible for oversight of the Company's risk management practices while management is responsible for the day-to-day risk management processes. ***In the Board's opinion, this division of responsibilities is the most effective approach for addressing the risks facing the Company.*** The Board receives periodic reports from management regarding the most significant risks facing the Company. ***In addition, the Audit Committee assists the Board in its oversight of our risk assessment and risk management policies. Our Audit Committee is empowered to appoint and oversee our independent registered public accounting firm, monitor the integrity of our financial reporting processes and systems of internal controls and provide an avenue of communication among our independent auditors, management, our internal auditing department and our Board.***

(Emphasis added.)

218. Notably, the 2016 Proxy Statement contained an Audit Committee Report signed by Defendants Yu, Lewin and Chen, which stated, in pertinent part:

> The Audit Committee has reviewed and discussed the audited financial statements with our management and representatives of AWC (CPA) Limited, our former independent registered public accounting firm. ***The Audit Committee has discussed AWC (CPA) Limited judgments as to the quality, not just the acceptability, of our accounting principles and such other matters as are required to be discussed with the Audit Committee*** by Statement on Auditing Standards No. 114 (which superseded Statement on Auditing Standards No. 61), other standards of the Public Company Accounting Oversight Board (United States), rules of the SEC, and other applicable regulations. The Audit Committee also received the written disclosures and the letter from AWC (CPA) Limited required by applicable requirements of the Public Company Accounting Oversight Board regarding the firm's independence from our management and has discussed with AWC (CPA) Limited its independence. The members of the Audit Committee considered whether the services provided by AWC (CPA) Limited, for the year ended December 31, 2015, are compatible with maintaining its independence. The Board has delegated to the Audit Committee the authority to approve the engagement of our independent registered public accounting firm.
>
> ***Based upon its reviews and discussions, the Audit Committee recommended to our Board that the audited financial statements be included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2015 for filing with the SEC and the Board approved that recommendation.***

(Emphasis added.)

219. The 2016 Proxy Statement also noted in connection to performance awards provided to Kandi's executive officers and/or directors, that "[o]n April 23, 2015 and June 7, 2015, the Company granted 550,000 shares and 120,000 shares, respectively, to the senior management and key employees as year 2014 performance awards." The 2016 Proxy Statement failed to disclose that such compensation that was awarded was based on financial statements that were false and misleading and that, therefore, did not reflect the Company's true performance.

**3Q 2016 10-Q**

220. On November 9, 2016, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2016 ("3Q 2016 10-Q"), which was signed by Defendants Hu and Wang.

221. The 3Q 2016 10-Q contained a Consolidated Statements of Cash Flows table ("3Q 2016 Statements of Cash Flows") in which the Company reported incorrect cash flow figures. First, for the nine months ended September 30, 2016, $46,791,213 was reported by the Company as an issuance of notes receivables in cash flows from investing activities in the 3Q 2016 Statements of Cash Flows, which represented the settlement of money due from the JV Company and related parties with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of money due from the JV Company and related parties was supposed to be separately reported as a noncash activity in the supplemental non-cash disclosures of the 3Q 2016 Statements of Cash Flows. Second, for the nine months ended September 30, 2016, $15,198,694 was reported as an issuance of notes receivables in cash flows from investing activities in the 3Q 2016 Statements of Cash Flows, which represented the settlement of accounts receivable with notes receivables. This classification was incorrect because the receipt of notes receivable for the settlement of accounts receivable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Third, for the nine months ended

September 30, 2016, $61,497,480 was reported as repayments of notes receivable in cash flows from investing activities in the 3Q 2016 Statements of Cash Flows, which represented the assignment of the notes receivable to the Company's suppliers to settle the accounts payables. This classification was incorrect because the assignment of the notes receivable to the Company's suppliers to settle the accounts payables was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section. Fourth, for the nine months ended September 30, 2016, $918,018 was reported as repayments of notes receivable in cash flows from investing activities of the 3Q 2016 Statements of Cash Flows, which represented the cash receipts from the collection of notes receivables. This classification was incorrect because the cash receipt from the collection of notes receivables was supposed to be reported as an activity in the cash flow from operation activities section of the 3Q 2016 Statements of Cash Flows. Fifth, for the nine months ended September 30, 2016, $5,187,040 was reported as the proceeds from notes payables in cash flows from financing activities of the 3Q 2016 Statements of Cash Flows, which represented the settlement of accounts payable with notes payables. This classification was incorrect because the settlement of accounts payables with notes payable was supposed to be reported as a noncash activity in the supplemental non-cash disclosures section rather than proceeds from notes payable in the financing section. As a result of the above errors, the Company also misstated the accounts receivable, notes receivable, accounts payable and the amount due from the JV Company.

222. In the 3Q 2016 10-Q, the Company also reported the total revenue for the third quarter of 2016 and the nine months ended September 30, 2016 as one line item in the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss) without identifying which part of the revenue came from related parties. By doing so, the Company failed to disclose the dollar

amount of related party transactions on the face of the income statement as required by Rule 4-08(k) of Regulation S-X.

223. Additionally, the Company falsely reported the notes receivable as one line item in the Consolidated Balance Sheet contained in the 3Q 2016 10-Q without identifying separately notes receivable from the JV Company and related parties. By doing so, the Company failed to disclose the dollar amount of related party transactions on the face of the balance sheet as required by Rule 4-08(k) of Regulation S-X. Moreover, in the 3Q 2016 10-Q, the Company also failed to transfer the $7.5 million of construction-in-progress recorded in 2014 back to the advances to suppliers or prepayments to reflect the changed completion status of its Hainan facility.

224. Furthermore, the Company's Note 18-Taxes of the Notes to the Consolidated Financial Statements contained in the 3Q 2016 10-Q was not prepared and reported properly. First, the Company's reported taxes were not properly broken out between current and deferred taxes. Second, the Company's reconciliation schedule reported in Note 18 was prepared incorrectly. Third, the Company failed to properly disclose the amount and nature of each item within "permanent differences" in the reconciliation between the expected and reported tax expense in the 3Q 2016 10-Q. Fourth, the Company failed to correctly disclose the amount and expiration dates of operating losses carryforwards existing as of the third quarter of 2016 and the associated valuation allowance.

225. Despite all the disclosure and reporting failures, the Company claimed, in Item 4 of the 3Q 2016 10-Q, the following regarding the effectiveness of its controls and procedures:

> **Evaluation of Disclosure Controls and Procedures**
>
> We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of September 30, 2016.

> ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective.***
>
> Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act (a) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (b) is accumulated and communicated to management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives as described above.
>
> **Changes in Internal Control over Financial Reporting**
>
> ***There was no change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

226. Attached to the 3Q 2016 10-Q were SOX Certifications signed by Defendants Hu and Wang, attesting to the accuracy of the 3Q 2016 10-Q.

## **The Truth Emerges**

227. On November 14, 2016, the Company announced the abrupt resignation of Defendant Wang as the CFO.

228. On this news, shares of Kandi fell $0.40 per share or over 10% from its previous closing price to close at $3.50 per share on November 14, 2016.

229. On December 20, 2016, pre-market, Kandi announced "the final results of the review of subsidy payments for [EVs] manufactured by [the JV Company] from 2013 to 2014." Based on those results, the "JV Company estimates it will need to write off approximately USD 6.6 million of previously recorded account receivables."

230. On March 13, 2017, the Company filed a Form 8-K with the SEC ("3/13/17 8-K") revealing that the Company's previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 could not be relied upon and would need to be restated. Specifically, the 3/13/17 8-K stated, in pertinent part:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> (a) During the course of Kandi Technologies Group, Inc.'s (the "Company") preparation of its Annual Report on Form 10-K for the year ended December 31, 2016, and during preparation of responses to comments from the staff of the Securities and Exchange Commission ("SEC"), Division of Corporate Finance, ***the Company's management identified certain areas in the Company's previously issued financial statements for the years ended December 31, 2015 and 2014, and the first three quarters for the year ended December 31, 2016 (the "Previously Issued Financial Statements"), that require adjustment as described below and in more detail in the Company's annual report on Form 10-K/A for the fiscal year ended December 31, 2015 ("Form 10-K/A"), to be filed with the SEC. As a result, on March 7, 2017, the board of directors (the "Board") of the Company, based on the recommendation of the Company's audit committee, and in consultation with management, concluded that the Company's Previously Issued Financial Statements should no longer be relied upon.*** The Company will, in the Form 10-K/A, restate the Previously Issued Financial Statements, ***which restatement will include separate audited financial statements for the JV Company (the "Restatements")***. The Restatements will have no effect on the net income of the Company as reported in the Previously Issued Financial Statements. The Company will endeavor to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016, pursuant to SEC's rules (including timing guidelines), and will file the Form 10-K/A as soon as practicably possible.
>
> The Restatements will include separate audited financial statements for the Company's equity investment in the JV Company, corrections to the classification of notes receivable and notes payable in the Company's statements of cash flow, revisions in the Company's financial statement presentation to separately identify certain related party accounts on the face of the Balance Sheets and the Consolidated Statements of Income (Loss) and Comprehensive Income (Loss), certain amendments to Note 20 – Taxes of the Notes to the Company's Consolidated Financial Statements, the adjustment of previously recorded construction-in-progress back to prepayment in Note 16 - Construction-in-Progress of the Notes to the Company's Consolidated Financial Statements, expansions of two tables of sales to and purchases from the JV Company in Note 24 - Summarized Information of Investment in the JV Company of the Notes to the Company's

Consolidated Financial Statements from two years to three years, and the removal of "unaudited" labels from certain tables in Note 20 - Taxes of the Notes to the Company's Consolidated Financial Statements.

The Company will also amend its unaudited quarterly data for the first three quarters ended December 31, 2016, as set forth in its upcoming Annual Report on Form 10-K for the year ended December 31, 2016. The Company has not filed and does not intend to file amendments to its Quarterly Reports on Form 10-Q for the quarterly periods affected. Accordingly, investors should no longer rely upon the Company's previously released financial statements for those periods or any earnings releases or other communications relating to those periods. The Company's Quarterly Reports on Form 10-Q for fiscal year 2017 will include restated results for the corresponding interim periods of fiscal year 2016.

***In addition, in conjunction with the Restatements, the Company is reassessing its internal controls over its financial reporting and compliance programs. The result of this reassessment could lead the Company to conclude that there were deficiencies in its internal controls over financial reporting that constitute material weaknesses and could therefore affect its conclusions regarding effectiveness as previously expressed in Item 9A, Controls and Procedures, of the Company's Annual Report on Form 10-K for the year ended December 31, 2015. Accordingly, management's report on internal controls over financial reporting as of December 31, 2015, and the associated report of AWC (CPA) Limited, the Company's former principal accountant ("AWC"), should no longer be relied upon.*** The Public Company Accounting Oversight Board revoked the registration of AWC on May 18, 2016. The Company dismissed AWC and engaged BDO China Shu Lun Pan Certified Public Accountants LLP ("BDO China") as its new independent registered public accounting firm on April 12, 2016, as previously reported. The Company is committed to maintaining an effective control environment and making all necessary changes to enhance control effectiveness.

The chair of the Company's audit committee, on behalf of the audit committee, and the management have discussed the matters disclosed in this Item 4.02(a) of this Current Report on Form 8-K with BDO China.

(Emphasis added.)

231. On this news, shares of Kandi fell $0.30 per share, or approximately 6%, from its previous closing price to close at $4.05 per share on March 14, 2017.

232. On March 16, 2017, the Company filed the 2016 10-K with the SEC, in which the Company restated its consolidated financial statements as of and for the years ended December 31, 2015 and 2014 and its unaudited quarterly financial data for the first three quarters for the year

ended December 31, 2016 and 2015 (*i.e.*, the Restatement). The adjustments made as a result of the Restatement were discussed in Note 26 - Restatements of Certain Accounts in Previously Issued Financial Statements and Note 27 - Unaudited Quarterly Financial Data, of the Notes to Consolidated Financial Statements included in the 2016 10-K.

233. In the 2016 10-K, the Company again warned investors that they should not rely upon the Company's previously released financial statements for those periods affected by the Restatement and any earning releases or other communications relating to those periods. The Company stated that it would not file an amendment to the annual report for the fiscal year ended December 31, 2015 on Form 10-K/A to duplicate the content of the Restatement contained in the 2016 10-K.

234. In addition, the Company acknowledged the following regarding its controls and procedures under Item 9A of the 2016 10-K:

> **(a) Evaluation of Disclosure Controls and Procedures**
>
> The Company has evaluated, under the supervision of the Company's Chief Executive Officer and the Chief Financial Officer, the effectiveness of disclosure controls and procedures as of December 31, 2016. This is done in order to ensure that information the Company is required to disclose in reports that are filed or submitted under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is: (i) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and (ii) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.
>
> ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2016.***
>
> **(b) Management's Annual Report on Internal Control Over Financial Reporting**
>
> Our management is responsible for establishing and maintaining adequate internal control over financial reporting ("ICFR") as defined in Rules 13a-15(f) and 15d-15(f) under Exchange Act. The Company's ICFR is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP.
>
> …

Management conducted an assessment of the effectiveness of our system of ICFR as of December 31, 2016, the last day of our fiscal year of 2016. This assessment was based on criteria established in Internal Control—Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in 2013 (the "2013 COSO Framework") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment.

***According to the SEC rules and guidance on internal control over financial reporting, a material weakness is a deficiency, or a combination of deficiencies, in ICFR such that there is a reasonable possibility that a material misstatement to the annual or interim financial statements will not be prevented or detected on a timely basis.***

Based on management's evaluation under the 2013 COSO Framework, management identified the following material weaknesses as of December 31, 2016 in the Company's ICFR, principally related to the Company's period-end financial reporting.

i. ***Accounting and finance personnel. The company lacks sufficient expertise relating to technical knowledge of certain US GAAP accounting and SEC disclosures to ensure accuracy and completeness of accounting treatment and financial reporting. The weakness was largely due to the lack of requisite U.S. GAAP and SEC compliance experience with our finance personnel responsible for the preparation of U.S. GAAP based financial statements and disclosures pursuant to the SEC rules and regulations.***

ii. ***Disclosure requirements for equity investments. The Company did not have sufficient expertise to ensure the completeness of the disclosure of financial statements for equity investments. The procedures in the control framework designed by the Company's internal department in its accounting manual (the "Accounting Manual") used to identify the requirements to file separate audited financial statements for equity investments was not adequately performed during each reporting period. The weakness resulted in the addition of separate audited financial statements of the JV Company to this Form 10-K.***

iii. ***Disclosure of related party transactions. The Company did not have sufficient expertise to ensure that proper disclosure of related party transactions. The procedures in the Accounting Manual for the preparation of the financial statements were not adequately performed during each reporting period. The weakness resulted in the restatement of consolidated balance sheet and consolidated income statement to separately identify certain accounts with the JV Company and related parties on the face of consolidated balance sheet and consolidated income statement in this Form 10-K.***

iv. ***Presentation of the statement of cash flows. The Company did not have effective controls to ensure the proper classification and reporting of certain cash and non-cash activities related to accounts receivable, accounts payable,***

> ***notes receivable and notes payable on the statement of cash flows. The procedures in the Accounting Manual for the preparation of the statement of cash flows were not adequately performed during each reporting period. The weakness resulted in the reclassification of the statement of cash flows line items and related financial disclosures in this Form 10-K.***
>
> v. ***Accounting for income taxes. The Company did not have sufficient expertise to ensure the accuracy of the accounting and reporting of income taxes and related disclosures. The procedures in the Accounting Manual for the identification of the tax rates and calculation of the income taxes were not adequately performed during each reporting period. The weakness resulted in the correction in accounting for income taxes in this Form 10-K.***

> ***Based on the material weaknesses as laid out above, management concluded that the Company's internal control over financial reporting was not effective as of December 31, 2016 based on the 2013 COSO Framework.***

(Emphasis added.)

235. On this news, Kandi's share price fell $0.35, or 8.6%, to close at $3.70 per share on March 16, 2017.

**<u>The Individual Defendants Are Unjustly Enriched at the Company's Expense</u>**

236. Throughout the Relevant Period, the Individual Defendants awarded themselves excessive compensation while the wrongdoing described herein was occurring.

237. For the fiscal year ended December 31, 2015, corporate management, including Defendants Hu, X. Zhu, and Wang, were awarded stock-based compensation in the total of $22,306,987. According to the 2015 10-K, that amount accounted for ***68%*** of Kandi's reported operating expenses and ***78%*** of its reported gross profits.

238. Then, in just the first six months of the fiscal year 2016, according to the Company's 2Q 2016 10-Q, management's stock-based compensation ***rose 200%*** (to $15,134,658) from the same period in the prior year.

239. This patently unjustified compensation – in the context of an enterprise that was collapsing in the wake of the subsidy scandal due to the Individual Defendants' misconduct – was detailed further in an August 18, 2016 *Seeking Alpha* Article[11], which noted:

> [D]espite showing positive GAAP earnings of $14.6 million, Kandi did not generate positive operating earnings or positive cash flow for all of 2015. And while it did show positive net income from its JV stake, the huge increase in money owed to Kandi by the JV indicates that the JV is not generating cash to back up its net income (just like parent Kandi) and is experiencing a significant cash crunch.
>
> And all of that was before the EV subsidy scandal even broke! In the first half of 2016, Kandi again failed to generate any operating profits, showing a negative $3.9 million operating loss, equal to its operating loss for all of 2015. All other income, including income from the JV but excluding any change in the value of warrants, was $2.8 million. Thus, when excluding the change in value of warrants, Kandi failed to earn a pretax income in the first six months of 2016.
>
> These might not sound like ideal conditions under which to escalate a stock compensation plan, but Kandi is living in the moment. ***Stock compensation has risen to $15 million for the first half of 2016, an indefensible 200% increase from the same period last year. At the current rate, Kandi is on track to increase full-year stock-based compensation over last year despite not generating operating profits or operating cash flow for six quarters.***

(Emphasis added)

**<u>Red Flags That Put the Individual Defendants On Notice of Misconduct</u>**

240. To the extent that the Individual Defendants did not participate in the misconduct alleged herein directly, it would have been impossible for them to have not been aware of such misconduct prior to the Restatement given the following red flags and other facts that compel that conclusion:

241. *First*, the Fraudulent Subsidy Scheme *was* Kandi's business throughout the Relevant Period. Put another way, Kandi's very business model was dependent on the related-

---

[11] Seeking Alpha, *Kandi Technologies: Chinese EV Clunker Begins To Break Down Amid Subsidy Scandal, 70% Downside*, Aug. 18, 2016, https://seekingalpha.com/article/4000616-kandi-technologies-chinese-ev-clunker-begins-break-amid-subsidy-scandal-70-percent-downside (lass accessed December 28, 2018).

party corporate structure and illegal duplicative subsidies it obtained. As underscored by the Company's financial collapse when those subsidies ceased, the business was only viable if the subsidies that it depended on continued. The fact that this fraud constituted the core operation of the Company compels the conclusion that the Individual Defendants, charged with managing the Company, were aware of it.

242. *Second*, and similarly, the sheer magnitude of the underlying problems concealed by accounting fraud would have been unmistakable to the Individual Defendants, who were ultimately responsible for overseeing the Company's accounting as its CEO, its CFOs, and as members of the Audit Committee. Once the Chinese government suspended the subsidies, the Company's almost-exclusive client – the JV Company – had no means to pay Kandi for its goods, meaning that Kandi had no way to pay its suppliers. This fundamental collapse of Kandi's business structure, and the associated white-washing of that collapse through misclassifying hundreds of millions of dollars of "IOUs" as cash inflows and cash outflows, would have been impossible to miss.

243. *Third*, even before the Relevant Period, Kandi and Defendant Hu had a history of false statements and stock manipulation, as discussed above. As the managers of the Company and/or members of the Audit Committee during the Relevant Period, the Individual Defendants must have been aware of the Defendant Hu's dubious history, and the likelihood similar misconduct would recur (which it in fact did).

244. *Fourth*, from the start of the Relevant Period, the SEC had been investigating Kandi's financial statements concerning its cash and related-party transactions. As early as 2013, it openly questioned how it could sustain an $80 million investment in the JV Company given the state of its finances in 2013, how it could depend on a "single customer" to sustain its business

model, and how it could explain the "extremely large balance of outstanding gross receivables" – the precise item the Individual Defendants manipulated to conceal the Company's lack of cash. Moreover, the SEC ultimately demanded that Kandi disclose that its business dealings with Kandi USA were related-party transactions, which it belatedly did in 2014. These red flags on financial reporting – Kandi's mysterious and growing outstanding receivables to its near-exclusive customer, and its failure to clearly disclose related party transactions – were literally flashed in front of the Individual Defendants (including the Audit Committee members), and put them on notice of the core issues surrounding the accounting misconduct leading to the Restatement, at the very beginning of the Relevant Period.

245. *Fifth*, the Company *admitted* in its 2013 10-K, apparently in response to these ongoing SEC inquiries, that it lacked adequate controls over financial reporting, including a lack of "policies and procedures in its internal audit function", a lack of "self-assessment performed by the Audit Committee" to ensure effective oversight, and a "lack of internal controls over the approval procedures for related party transactions." In 2014, the Company claimed that management and the Audit Committee (*i.e.*, the Individual Defendants) had remediated these deficiencies through the approval of a new Audit Charter approved by the Audit Committee, the approval by the Board of a new related-party transaction policy, and a new "comprehensive remediation plan" spearheaded by the Chair of the Audit Committee (Defendant Yu). Of course, nearly *three years later*, the Restatement proved that no meaningful remediation on financial controls had actually occurred, or if they did the Individual Defendants knowingly failed to enforce them, because the accounting problems supposedly addressed by the remediation – failure of the internal audit function through misclassification of cash-flow and other core GAAP violations, and failure to disclose (let alone vet) related-party transactions, and beyond – had continued to flourish.

246. *Sixth*, throughout the Relevant Period, the Company reported that its account receivable balance from the JV Company has been steadily increasing, from $51.4 million at December 31, 2014, to $76.1 million at December 31, 2015, and further to $114.8 million at September 30, 2016. Simultaneously, the credit terms offered by the Company to the JV Company had also spiked. For example, by 2016, the Company allowed payments by the JV Company for Company parts to be made as late as 720 days after delivery. Combined with the cessation of subsidies and the fact the JV Company was the Company's near-exclusive customer, these red flags had to put the Individual Defendants on notice that the Company was cash-starved, and thus the purported hundreds of millions of dollars of cash-flow between the Company, the JV Company, and its suppliers, as reported on the Company's financial statements, lacked a valid basis in fact.

247. *Seventh*, in April 2016, the members of the Audit Committee approved the termination of the Company's auditor AWC, *the month before* AWC's registration was publicly revoked due to its auditing failures at the Company, and then caused and/or permitted the Company to file the 4/13/16 8-K stating that there had been "no disagreements" with AWC concerning its past financial reporting dating back to 2014, strongly suggesting that the Individual Defendants (and in particular members of the Audit Committee) were already well aware but wanted to conceal that the Company's external auditor was deficient and that, as a result, the Company's audited financial reporting dating years back had been compromised. Indeed, after AWC was censured by regulators, the Individual Defendants (including, again, the members of the Audit Committee) appeared to take no further action to remediate or address financial control deficiencies, at least up until the time of the 2017 Restatement, after the SEC had forced the Company's hand.

248. *Eighth*, after Defendant Wang suddenly and mysteriously stepped down as the Company's CFO in November 2016 – four months *prior* to the Restatement – the Individual Defendants (including the Audit Committee members) appeared to take no further action to remediate or address accounting deficiencies that likely triggered that resignation. In fact and instead, they allowed Wang to be appointed in a newly made-up position at the Company, CSO. This also strongly suggests the Individual Defendants were already well aware of the accounting misconduct, but quietly attempted to conceal it through internal shuffling in lieu of addressing the core problems.

249. *Ninth*, months before the March 16, 2017 Restatement, the SEC again raised red flags on the Company's financial reporting through extensive correspondence. Among other things, the SEC again inquired and sought clarification regarding the sharp increases over the Relevant Period on the "amount due from the JV Company, net." Yet in response, the Individual Defendants appeared to take no internal action, instead reflexively responding to these inquiries by defending the treatment of its financial reporting in letters back to the SEC. The Company ultimately was compelled to restate its financial statements by the SEC *only after the SEC caught on* through this correspondence – by February 2017 – that the Company had been mischaracterizing its cash-flow activities for years, had committed other core GAAP violations, and had continued to fail to disclose its related-party transactions. In other words, even after minimal diligence through correspondence, the SEC learned of the core issues surrounding accounting misconduct. It strains credulity to believe that the Individual Defendants, charged with overseeing accurate financial reporting *inside* the Company for years, had not long been aware of these core problems.

**Summary of the Individual Defendants' Misconduct**

250. In breach of their fiduciary duties, the Individual Defendants caused the Company to enter and participate in the Fraudulent Subsidy Scheme, which operated to make the Company appear more profitable than it was, enrich the Individual Defendants through excessive compensation, allow Defendant Hu to personally recoup a portion of illegal duplicative subsidies through his related-party interests, and ultimately led the Company to lose its critical cash-flow after the scam was uncovered and the subsidies ceased.

251. In further breach of their fiduciary duties, the Individual Defendants caused the Company to engage in a massive accounting fraud designed to conceal the cessation of governmental subsidies (on information and belief starting in 2015) to keep the stock price afloat. Among other things, the Individual Defendants caused the Company to falsely report that it was in receipt of hundreds of millions of dollars of cash up until the Restatement in 2017. The Individual Defendants also caused the Company to commit numerous other and blatant GAAP and SEC reporting violations in its financial statements, including failure to identify certain related party accounts on the face of the Company's balance sheets and income statements, and misrepresentations concerning the adequacy and remediation of the Company's internal controls.

252. In further breach of their fiduciary duties, the Individual Defendants knowingly or recklessly failed to maintain and enforce an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting, and in spite of assurances that such internal controls had been established and maintained years earlier.

253. In further breach of their fiduciary duties, the Individual Defendants – particularly the members of the Company's Compensation Committee (Defendants Chen and Yu) – failed to claw-back the Individual Defendants' unjustified compensation in light of the fraudulent conduct after the Restatement.

## DAMAGES TO KANDI

254. As a direct and proximate result of the Individual Defendants' conduct, Kandi will lose and expend many millions of dollars.

255. Such losses, costs, and expenditures include: (a) the collapse of the Company's financial health in the wake of the Fraudulent Subsidy Scheme and associated accounting misconduct; (b) costs and payments associated with defending the Securities Class Action filed against the Company, its CEO-Chairman, CFO, and former CFO; (c) costs and payments associated with defending SEC and Chinese governmental investigations and inquiries; (d) costs connected with issuing the Restatement; (e) costs connected with internal investigations and necessary enhancement of the internal controls and corporate governance of the Company; (f) lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company; and (g) a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

256. Plaintiff brings this action derivatively and for the benefit of Kandi to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Kandi, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violation of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

257. Kandi is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

258. Plaintiff is, and continuously has been, a shareholder of Kandi common stock since 2012 before the beginning of the Relevant Period. Plaintiff will adequately and fairly represent the interests of Kandi in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

259. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

260. A pre-suit demand on the Board of Kandi is futile and, therefore, excused. At the time of filing of this amended complaint, the Board consists of the following six individuals: Individual Defendants Hu, Lewin, Yu, and Chen (collectively, the "Defendant-Directors") and non-parties Feng Zhu ("F. Zhu") and Lin Yi (together with F. Zhu and the Defendant-Directors, the "Directors"). Plaintiff needs only to allege demand futility as to three of the six directors who were on the Board at the time this was amended complaint is filed.

261. Demand is excused as to all of the Defendant-Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of (a) their participation in and causing the Company to engage in the Fraudulent Subsidy Scheme, (b) their participation in and causing the Company to engage in the multi-year accounting fraud to conceal the fall-out from the Fraudulent Subsidy Scheme, and thereby causing the Company to make false and misleading statements and omissions of material fact, (c) their failure to maintain effective disclosure controls and internal controls over financial reporting, particularly where years earlier they caused the Company to falsely represent it had remediated and obtained effective controls, and (d) their causing the Company to grant excessive executive compensation, in spite of its

faltering performance, and in spite of the fact the Individual Defendants were breaching their fiduciary duties.

262. In addition, each of the Directors lacks the requisite independence to impartially consider a demand to commence and aggressively prosecute this action because, among other things, they are dependent on Defendant Hu, a major stockholder who has effective control over the Company's operations, transactions, and finances, and who lies at the center of the misconduct alleged herein and personally profited thereby.

263. As a result of the foregoing, each of the Director-Defendants faces a substantial likelihood of liability and is not disinterested or independent, and each of the remaining Directors is also not disinterested or independent. Thus, all of the Directors are unable to impartially investigate the charges and decide whether to pursue action against Defendant Hu or the other Director-Defendants. Accordingly, demand upon each of them is futile, and thus excused.

264. Additional reasons why demand is futile as to individual Directors follow:

**Defendant Hu**

265. Defendant Hu was the driver of the Fraudulent Subsidy Scheme. As controller of the Company's operations, transactions, and finances, he intentionally designed a corporate structure that would fraudulently capture duplicative subsidies to enrich himself (through his interest in both the JV Company and the Service Company), and then orchestrated an accounting scheme to conceal the complete financial collapse of the Company once the subsidies ceased. He was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings, all of which he signed. Moreover, and consequently, Defendant Hu is a defendant in the Securities Class Action. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the

Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Hu faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

266. Defendant Hu was also the Company's Chairman and CEO at all relevant times, and is thus, as the Company admits, a non-independent director. Indeed, Defendant Hu receives millions of dollars in compensation from the Company annually, despite the fact that it has been failing financially. For example, Defendant Hu received total compensation of $3,842,504 for 2015, $3,087,831 for 2016, and $1,778,200 in 2017. Defendant Hu is also involved in certain related-party transactions that go to the heart of these allegations. He and the Company both have ownership interests in the JV Company and in the Service Company, the principal entities that assisted in effectuating and profiting from the Fraudulent Subsidy Scheme and the key subjects of the accounting misconduct. Additionally, his son engages in business with the Company through Kandi USA/Eliteway Motorsports, which has owed Kandi as much as $620,410. Thus, for these reasons, too, Defendant Hu is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Lewin**

267. Defendant Lewin has served as a director of Kandi since 2010 and is a member of the Company's Audit Committee. Defendant Lewin was responsible for many of the false and misleading statements and omissions that are detailed herein, including the 2013 10-K, 2014 10-K, 2015 Proxy Statement (and the Audit Committee Report therein), the 2015 10-K, and the 2016 Proxy Statement (and the Audit Committee Report therein), which he signed. Thus, Defendant

Lewin is especially culpable for the false and misleading statements and omissions of material fact that were made in the Company's SEC filings and for the failure to maintain effective disclosure controls and internal control over financial reporting. As a trusted director and a member of the Audit Committee, Defendant Lewin conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Lewin faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

268. Further, Defendant Lewin is beholden to Defendant Hu. By virtue of Defendant Lewin's participation and assistance in these schemes, and continued concealment of the same up into the time of the Restatement, Defendant Lewin has *for years* demonstrated his subservience to Defendant Hu and his schemes at the expense of the best interest of the Company. Thus, for these reasons, too, Defendant Lewin is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Yu**

269. Defendant Yu has served as a director of Kandi since 2011 and is the Chair of the Company's Audit Committee. Defendant Yu was responsible for many of the false and misleading statements and omissions that are detailed herein, including the 2013 10-K, 2014 10-K, 2015 Proxy Statement (and the Audit Committee Report therein), the 2015 10-K, and the 2016 Proxy Statement (and the Audit Committee Report therein), which he signed. By virtue of his role as Chair of the Audit Committee, Defendant Yu is especially culpable for the false and misleading statements and omissions of material fact that were made in the Company's SEC filings and for

the failure to maintain effective disclosure controls and internal control over financial reporting. As a trusted director, the Chair of the Audit Committee and a member of the Compensation Committee and the Nominating and Corporate Governance Committee, Defendant Yu conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Yu faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

270. Further, Defendant Yu is beholden to Defendant Hu. By virtue of Defendant Yu's participation and assistance in these schemes, and continued concealment of the same up into the time of the Restatement, Defendant Yu has *for years* demonstrated his subservience to Defendant Hu and his schemes at the expense of the best interest of the Company. Thus, for these reasons, too, Defendant Yu is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Chen**

271. Defendant Chen has served as a director of Kandi since 2012. Defendant Chen was responsible for many of the false and misleading statements and omissions that are detailed herein, including the 2013 10-K, 2014 10-K, 2015 Proxy Statement (and the Audit Committee Report therein), the 2015 10-K, and the 2016 Proxy Statement (and the Audit Committee Report therein), which he signed. He is a member of the Audit Committee and the Nominating and Corporate Governance Committee. Thus, Defendant Chen is especially culpable for the false and misleading statements and omissions of material fact that were made in the Company's SEC filings, for the

failure to maintain effective disclosure controls and internal control over financial reporting, and for the Board's failure to properly exercise corporate governance oversight. As a trusted director, the Chair of the Compensation Committee and a member of the Audit Committee and the Nominating and Corporate Governance Committee, Defendant Chen conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Chen faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

272. Moreover, Defendant Chen is beholden to Defendant Hu. By virtue of Defendant Chen's participation and assistance in these schemes, and continued concealment of the same up into the time of the Restatement, Defendant Chen has *for years* demonstrated his subservience to Defendant Hu and his schemes at the expense of the best interest of the Company. Thus, for these reasons, too, Defendant Chen is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Non-Party F. Zhu**

273. Non-party F. Zhu has served as a director of Kandi since December 2017. He was appointed as President of Kandi Electric Vehicles Group (*i.e.*, the JV Company) in January 2017. Prior to that, he was Executive Vice President of Kandi Electric Vehicles Group since 2015. From 2014 to 2015, he also served as Executive Vice General Manager of Kandi Electric Vehicles (Shanghai). By virtue of his longstanding position as an officer of at least two Kandi entities, including the JV Company – in which Kandi (and by extension Defendant Hu) has a substantial interest – F. Zhu is dependent on the Company, and therefore Defendant Hu, for his livelihood.

Because Defendant Hu lies at the center of these allegations, F. Zhu thus lacks the requisite independence to consider a pre-suit demand.

274. Additional reasons why demand is futile on certain of the Directors follow.

275. The members of the Company's Audit Committee, Director-Defendants Yu, Lewin, and Chen, failed to uphold the Audit Committee Charter, which states that:

> the primary function of the Audit Committee . . . is to assist the Board . . . in fulfilling its oversight responsibilities by: (1) reviewing the financial reports and other financial related information released by the Company to the public . . . .; (2) reviewing the Company's system of disclosure controls and procedures, internal controls over financial reporting, and compliance with ethical standards adopted by the Company; (3) reviewing the Company's accounting and financial reporting processes and the audits of the financial statements of the Company . . . .

Pursuant to their duties, and given the fact the Fraudulent Subsidy Scheme and associated accounting misconduct went to the very core of the Company's operations and viability, it strains credulity to believe that members of the Audit Committee members (Director-Defendants Yu, Lewin, and Chen) were not aware in real time of the misconduct and associated false and misleading statements and omissions as described herein. In fact, given the numerous red flags and sequence of events as alleged herein, it would have been impossible for Director-Defendants Yu, Lewin, and Chen to have *not* been aware of the misconduct that they failed to control, instead causing and/or allowing the Company to represent that its internal controls were effective. These red flags include:

- Defendant Hu's history of false statements and stock manipulation at Kandi prior to the Relevant Period.

- The sheer magnitude of the breakdown of the Company's finances when the subsidies ceased in 2015, which could only be whitewashed through accounting misconduct: once the Chinese government suspended the subsidies, the Company's almost-exclusive client – the JV Company – had no means to pay Kandi, and yet Kandi continued to report hundreds of millions of dollars of cash-flow.

- The fact that the SEC had been investigating Kandi's financial statements concerning its cash and related-party transactions as early as 2013, including Kandi's mysterious and growing outstanding receivables to its near-exclusive customer, and its failure to clearly disclose related party transactions.

- The fact that the Company admitted in 2014 that it lacked effective controls over financial reporting, that in response Defendants Yu, Lewin, and Chen as members of the Audit Committee allegedly helped undertake remediation efforts to improve audit controls and related-party disclosures in 2014, but that the Company admitted nearly three years later (in the Restatement) that those same problems had *not* been corrected, and had continued to flourish.

- The fact that the Company's account receivable balance from the JV Company has been steadily increasing throughout the Relevant Period, from $51.4 million at December 31, 2014, to $76.1 million at December 31, 2015, and further to $114.8 million at September 30, 2016, that the associated credit terms offered by the Company to the JV Company had also spiked, and that the subsidy payments had ceased – and yet the Company was still reporting hundreds of millions of dollars of cash-flow.

- The fact that AWC was censured by regulators nearly *a year prior* to the Restatement for misconduct concerning the Company's financial reporting dating back years.

- The fact that months *before* the Restatement, the SEC again raised red flags on the Company's financial reporting, seeking clarification regarding the sharp increases over the Relevant Period on the "amount due from the JV Company, net." In other words, even after minimal *outside* correspondence, the SEC learned of the accounting misconduct, in contrast to the members of the Audit Committee who had purportedly been scrutinizing the Company's financial reporting *from the inside* for years.

276. Compounding the conclusion that Director-Defendants Yu, Lewin, and Chen were long aware of the misconduct during the Relevant Period, and yet at minimum did nothing to stop it, is the fact that in April 2016, the members of the Audit Committee approved the termination of the Company's auditor AWC, *well before* AWC's registration was publicly revoked due to its auditing failures concerning the Company's financial reporting dating back years. They then caused and/or permitted the Company to report on the 4/13/16 8-K that the Company had "no disagreements" with AWC on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, for financial statements dating back to 2014. Then,

even after the May 2016 public censuring of AWC, the Audit Committee continued to do nothing to address financial reporting at the Company.

277. Moreover, after Defendant Wang suddenly and mysteriously stepped down as the Company's CFO in November 2016 – four months *prior* to the Restatement –Audit Committee members appeared to take no action to remediate or address accounting deficiencies that likely triggered that resignation. In fact and instead, they allowed Defendant Wang to be appointed in a newly made-up position at the Company, "CSO". This also strongly suggests that Director-Defendants Yu, Lewin, and Chen were already well aware of the accounting misconduct, but quietly attempted to conceal it, in coordination with Defendant Hu, through internal re-shuffling.

278. In late 2016, in response to fresh SEC inquiries on the Company's financial reporting – which ultimately compelled the Restatement many months later – the members of the Audit Committee again appeared to take no internal action, instead causing and/or allowing the Company to reflexively defend the treatment of its financial reporting in letters back to the SEC. The SEC ultimately compelled the Company to restate its financial reporting only after the SEC caught on through this very correspondence – by February 2017 – that the Company had been fundamentally mischaracterizing its cash-flow activities for years, had committed other core GAAP violations, and had continued to fail to disclose its related-party transactions.

279. For all these additional reasons, Director-Defendants Yu, Lewin, and Chen face a substantial likelihood of liability for this misconduct, and any demand as to them is futile, and thus excused.

280. Separately, as the members of the Company's Compensation Committee, Director-Defendants Chen and Yu, failed to uphold the Compensation Committee Charter, which states that they had the responsibility to "review and make recommendations to the Board . . . regarding all

forms of compensation to be provide to the executive officers and directors of Kandi . . . including stock compensation and loans, and all bonus and stock compensation to all employees." Their responsibilities also included:

> 3.1 Reviewing and making recommendations to the Board regarding the compensation policy for executive officers of and directors of the Company, and such other officers of the Company as directed by the Board;
>
> 3.2 Reviewing and making recommendations to the Board regarding all forms of compensation (including all "plan" compensation, as such term is defined in Item 402(a)(7) of Regulation S-K promulgated by the Securities and Exchange Commission, and all non-plan compensation) to be provided to the executive officers of the Company;
>
> 3.3 Reviewing and making recommendations to the Board regarding general compensation goals and guidelines for the Company's employees and the criteria by which bonuses to the Company's employees are determined . . . .

During the Relevant Period, the Compensation Committee members awarded excessive amounts of Company shares to Kandi's executive officers and/or Board members, including Defendants Hu, X. Zhu, and Wang, based on the purported performance of the Company – when in fact the Company was in a tailspin due to the collapse of its critical subsidies. As such, the Compensation Committee members approved excessive compensation to be awarded to certain of the Company's officers and directors based on a false and misleading portrayal of the Company's performance. Even worse, once it came to light that the financial information relied upon to award that compensation was improper, the Compensation Committee members failed to claw back the compensation wrongly awarded.

281. Thus, for these additional reasons, Director-Defendants Chen and Yu face a substantial likelihood of liability for this misconduct, and any demand as to Director-Defendants Chen and Yu is futile, and thus excused.

282. Additionally, the Directors, as members of the Board, were and are subject to the Code of Ethics. The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict with the Company's interests or adversely affect the Company's reputation. The Director-Defendants did not comply with the requirements of the Code of Ethics. The Director-Defendants violated the Code of Ethics because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director-Defendants violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

283. Kandi has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Kandi any part of the damages Kandi suffered and will continue to suffer thereby. Thus, any demand on the Directors would be futile.

284. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

285. The acts complained of herein constitute violations of fiduciary duties owed by Kandi's officers and directors, and these acts are incapable of ratification.

286. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Kandi. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Kandi, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

287. If there is no directors' and officers' liability insurance, then the Directors will not cause Kandi to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

288. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934

289. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.[12]

290. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

291. Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

292. Under the direction and watch of the Directors, the 2015 and 2016 Proxy Statements failed to disclose: (a) the Fraudulent Subsidy Scheme; (b) that the Company was misclassifying hundreds of millions of dollars of cash and noncash activities related to notes receivable, notes payable, accounts receivable and accounts payable in the Company's statements

[12] This Section 14(a) Exchange Act claim is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this nonfraud claim.

of cash flows to conceal the Company's collapse in the wake of the Fraudulent Subsidy Scheme; (c) that the Company had failed to identify certain related party accounts on the Company's balance sheets and income statements, and was committing numerous other GAAP and SEC rule violations as alleged herein; and (d) that the Company lacked effective controls over financial reporting.

293. The Individual Defendants also caused the 2015 and 2016 Proxy Statements to be affirmatively false and misleading because they stated that the Company's then-current division of responsibilities to address Company risk, between Company management, the Board of Directors, and the Company's outside auditor AWC, "is the most effective approach for addressing the risks facing the Company." To the contrary, the Individual Defendants' failure to maintain effective oversight, disclosure controls and internal controls over financial reporting, and the Company's dissemination of the materially false and misleading statements, evidenced that the Individual Defendants failed to practice and/or uphold even the most minimal corporate governance practices to address risk.

294. The Individual Defendants also caused the 2015 and 2016 Proxy Statements to be affirmatively false and misleading because they represented that generous compensation in the form of Company stock awarded to Individual Defendants who served as officers (including Defendants Hu, Wang, and X. Zhu) was based on purported Company performance targets that were, in reality, materially false and misleading due to the accounting misconduct and lack of controls as detailed herein.

295. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2015 and 2016 Proxy Statements were materially false and misleading.

296. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2015 and 2016 Proxy Statements, including but not limited to, (a) election of the Director Defendants who then continued to breach their fiduciary duties to the Company through the Fraudulent Subsidy Scheme and accounting misconduct described herein, (b) approval of officer compensation, which resulted in the further unjust enrichment as the Individual Defendants were breaching their fiduciary duties, and (c) the appointment of an independent auditor AWC that was (at best) failing its duty of oversight and (at worst) assisting the Individual Defendants in the accounting misconduct described herein.

297. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2015 and 2016 Proxy Statements.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

298. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

299. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, loyalty, reasonable inquiry, oversight, and supervision in the management and administration of Kandi's business and affairs.

300. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

301. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Kandi.

302. In breach of their fiduciary duties, the Individual Defendants caused and/or permitted the Company to engage in the Fraudulent Subsidy Scheme, which ultimately led to the Chinese government cutting off Kandi's critical subsidies and causing its financial collapse.

303. In further breach of their fiduciary duties owed to Kandi, the Individual Defendants willfully or recklessly caused and/or permitted the Company to make false and misleading statements and omissions of material fact as described herein, including the failure to disclose the Fraudulent Subsidy Scheme and the Company's true standing in the Chinese government subsidy program, fundamental and sustained misrepresentations on hundreds of millions of dollars of purported Company cash-flow, critical details concerning related party transactions, and the Company's complete lack of effective controls.

304. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

305. In further breach of their fiduciary duties, the Individual Defendants knowingly or recklessly failed to maintain and enforce an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting, and in spite of assurances that such controls had been established for years.

306. In further breach of their fiduciary duties, the Individual Defendants approved the issuance of grossly excessive compensation to Company officers who were breaching their fiduciary duties to the Company (including to Defendants Hu, X. Zhu, and Wang), and then failed to claw-back the Individual Defendants' patently unjustified compensation that was based on Kandi's financial performance in light of the fraudulent conduct and/or after the Restatement.

307. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

308. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Kandi has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

309. Plaintiff on behalf of Kandi has no adequate remedy at law.

**<u>THIRD CLAIM</u>**

**Against Individual Defendants for Unjust Enrichment**

310. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

311. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Kandi.

312. The Individual Defendants were unjustly enriched because they received lavish compensation in the form of cash, stock grants, and options based on false and misleading financial performance at the Company and while also breaching their fiduciary duties to the Company.

313. In addition, Defendant Hu was unjustly enriched in the Fraudulent Subsidy Scheme by receiving interests in improperly duplicative subsidies received by the JV Company and the Servicing Company, which abuse led to the cessation of those subsidies by the Chinese Government and the collapse of the Company itself.

314. Plaintiff, as a shareholder and a representative of Kandi, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by

the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

315. Plaintiff on behalf of Kandi has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

316. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

317. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Kandi, for which they are legally responsible.

318. As a direct and proximate result of the Individual Defendants' abuse of control, Kandi has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Kandi has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

319. Plaintiff on behalf of Kandi has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

320. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

321. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Kandi in a manner consistent with the operations of a publicly-held corporation.

322. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Kandi has sustained and will continue to sustain significant damages.

323. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

324. Plaintiff, on behalf of Kandi, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

325. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

326. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Kandi to waste valuable corporate assets by causing the Company to (a) engage in the Fraudulent Subsidy Scheme and accounting misconduct that has led to the collapse of its business, (b) incur many millions of dollars of legal liability and/or costs to defend and remedy unlawful actions (including in the Securities Class Action), (c) engage in internal investigations, (d) incur costs in defending SEC inquiries and by having to restate its financial reporting, and (e) lose financing from investors and business from future customers who no longer trust the Company and its products.

327. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

328. Plaintiff on behalf of Kandi has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Kandi, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Kandi;

(c) Determining and awarding to Kandi the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Kandi and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Kandi and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Kandi to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Kandi restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: December 28, 2018

Respectfully submitted,

/s/Phillip Kim
Phillip Kim
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, New York 10016
Tel: 212.686.1060
Fax: 212.202.3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*

VERIFICATION

I, Richard Baker am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _th day of December 2018.
12/27/2018

DocuSigned by:
Richard Baker
957A3E014E5A460...
Richard Baker